LAW OFFICES OF

## PAVONE & FONNER

BENJAMIN PAVONE, ESQ.
STATE BAR NUMBER 181826
7676 HAZARD CENTER DRIVE, 5TH FLOOR
SAN DIEGO, CALIFORNIA  92108
TELEPHONE: 619 224 8885
FACSIMILE:  619 224 8886
EMAIL: bpavone@cox.net

THE LAW OFFICES OF

## BURNS & SCHALDENBRAND

EDWARD BURNS, ESQ., STATE BAR NO. 201913
FREDERIK SPIESS, ESQ., STATE BAR NO. 221421
509 NORTH COAST HIGHWAY
OCEANSIDE, CALIFORNIA 92054
TELEPHONE: 760 453 2189
FACSIMILE:  760 453 2194
BURNS EMAIL: ewburns@bsrlawyers.com
SPIESS EMAIL: frederik.spiess@bsrlawyers.com

THE LAW OFFICES OF

## AFFELD GRIVAKES ZUCKER LLP

GREGG ZUCKER, ESQ., STATE BAR NO. 166692
VICTORIA NIEWRZOL, STATE BAR NO. 282889
2049 CENTURY PARK EAST, SUITE 2460
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310 979 8700
FACSIMILE:  310 979 8701
ZUCKER EMAIL: gz@agzlaw.com
NIEWRZOL EMAIL: vn@agzlaw.com

THE LAW OFFICES OF

## DAVID ELLIOT, ESQ.

STATE BAR NUMBER 270381
110 WEST A STREET, SUITE 750
SAN DIEGO, CALIFORNIA  92101
TELEPHONE: 858 228 7997
FACSIMILE: 619 255 1856
EMAIL: elliot.david@hotmail.com

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

BATES, ERIC;
BLEVINS, PAUL;
BLUE, MICHAEL;
BRADFORD, DARRELL;
BRIONES, JOHNNY;
CARR, JAMES;
CARTER, RICKY;
DEAN, KEITH;
DEL AGUILA, MARCO;
ESTRADA, VICKTER;
EVERHART, JOHN;
FRANCO, ANTONIO;
FRANCO, EMMANUEL;
FREDERICKSON, MICHAEL;
GARRETT, JAMES;

CASE NO: _____

**COMPLAINT**

**I.    VIOLATION OF 42 U.S.C. § 1983**

**(CRUEL AND UNUSUAL PUNISHMENT PROHIBITED BY THE 8TH AMENDMENT)**

**II.    NEGLIGENCE**

**DEMAND FOR JURY TRIAL**

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HARDIN, KEVIN;
HAYTER, CLIFFORD;
HINN, SOKHA;
HOCKLEY, JASON;
HUGHES, DARNELL;
ISLAS, JOSE;
JOHNSON, JESSE;
MANDAZ, JOHNSON;
JONES, DANIEL;
LIENWEBER, MIKHIEL;
LEWELLING, JESSE;
LEWIS, CLEOFAS;
LEWIS, KEVIN;
MANNING, MICHAEL;
MCGINLEY, JAMES;
MILTON, WILLIAM;
PAGE, MACK;
PARKER, CEDRIC;
PARKER, THEODORE;
QUIROGA, MANUEL;
ROBERTSON, CHARLES;
ROBERTSON, RICHARD;
SANCHEZ, JOHNNY;
SANDERS, TYRONE;
TARAMONA, JULIO
TERRY, DANNY;
WALLACE, PATRICK;
WILLIAMS, ALONZO;
WIMBERLEY, FINLEY; and
YOUNG, GERALD,

                    PLAINTIFFS,
v.

ARNOLD SCHWARZENEGGER,
FORMER GOVERNER OF THE
STATE OF CALIFORNIA;

JEFFREY BEARD, SECRETARY
CALIFORNIA DEPT. OF
CORRECTIONS AND
REHABILITATION;

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BURNS | ELLIOT | B. PAVONE| M. PAVONE | SPIESS | ZUCKER

PAUL BRAZELTON,
FORMER WARDEN,
PLEASANT VALLEY
STATE PRISON;

MATTHEW CATE,
FORMER SECRETARY
OF THE CALIFORNIA
DEPARTMENT
OF CORRECTIONS AND
REHABILITATION;

FRAUENHEIM, SCOTT,
WARDEN, PLEASANT
VALLEY STATE PRISON;

JAMES HARTLEY,
FORMER WARDEN
AVENAL STATE PRISON;

SUSAN L. HUBBARD,
FORMER DIRECTOR,
DIVISION OF ADULT
OPERATIONS;

DEBORAH HYSEN,
CHIEF DEPUTY SECRETARY,
FACILITIES PLANNING,
CONSTRUCTION &
MANAGEMENT;

DR. FELIX IGBINOSA,
MEDICAL DIRECTOR,
PLEASANT VALLEY
STATE PRISON;

SCOTT KERNAN,
FORMER CHIEF DEPUTY
SECRETARY OF ADULT
INSTITUTIONS;

1   CHRIS MEYER,
2   SENIOR CHIEF,
    FACILITIES PLANNING,
3   CONSTRUCTION
4   & MANAGEMENT;

5   TANYA ROTHCHILD,
    FORMER CHIEF OF
6   THE CLASSIFICATION
7   SERVICES UNIT;

8   TERESA SCHWARTZ,
9   FORMER DIRECTOR,
    DIVISION OF ADULT
10  INSTITUTIONS;

11  DWIGHT WINSLOW,
12  FORMER MEDICAL
    DIRECTOR, CDCR;
13
14  CARL WOFFORD,
    WARDEN, AVENAL
15  STATE PRISON;

16  JAMES A. YATES,
17  FORMER WARDEN,
    PLEASANT VALLEY
18  STATE PRISON; and
19
20  UNKNOWN
    DEFENDANTS 1-50,
21  ─────────────────

22  J. CLARK KELSO,
23  RECEIVER, CALIFORNIA
    CORRECTIONAL
24  HEALTH CARE SERVICES,

25      IN HIS OFFICIAL CAPACITY,

26              DEFENDANTS.
27
28

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1

2

# **TABLE OF CONTENTS**

3
**PAGE**

4

5
I.  JURISDICTION AND VENUE.............................................................  1

6
II.  SUMMARY OF THIS CASE................................................................  1

7
III.  THE DEFENDANT PARTIES..............................................................  4

8

9
IV.  FACTUAL ALLEGATIONS................................................................  7

10
    A.  The Effect of Coccidioidomycosis Infection..............................  7

11

12
    B.  Defendants, as Prison Officials and Medical Experts,
        Were Aware of the Increased Risk of Valley Fever

13
        at These Prisons...........................................................................  10

14

15
    C.  Defendants Knew Certain Groups Were
        Particularly Susceptible.............................................................  17

16

17
    D.  Each Defendant Knew the Risks to Inmates But
        Chose to Disregard Those Risks.................................................  19

18

19
    E.  Defendants Had the Power to Assign or Transfer
        Every Susceptible Inmate Away from the Danger....................  26

20

21
    F.  Defendants Had the Power to Prevent Plaintiffs from
        Being Assigned to Hyper-Endemic Prisons...............................  28

22

23
    G.  Defendants Could Have Used the Routine Periodic
        Review Process to Transfer Plaintiffs to Safer Facilities..........  29

24

25
    H.  Defendants Could Have Transferred
        At-Risk Inmates to Safer Prisons.............................................  30

26

27
    I.  At-Risk Inmates Could Have Been Transferred
        to Out-of-State Facilities...........................................................  31

28

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

J.    Defendants Also Failed to Implement Remedial Measures Recommended by Their Own Experts to Reduce the Risk of Infection at the Prisons............................................................ 33

V.    PLAINTIFFS.............................................................. 35

VI.   DEFENDANTS' LIABILITY........................................... 67

      A.    Allegations Against Each Individual Defendant ................... 67

      B.    Defendants Failed to Dislose Known Risks............................. 116

VII.  EACH PLAINTIFF SEEKS RELIEF ONLY AGAINST CERTAIN DEFENDANTS IDENTIFIED BELOW AND ONLY AS TO CERTAIN CLAIMS.................................................................... 118

IX.   FIRST CLAIM FOR RELIEF – VIOLATION OF THE EIGHTH AMENDMENT (42 U.S.C. § 1983) ................................................ 126

      A.    Defendants Knew of Serious Health Risks to Plaintiffs and Decided Not to Act and Protect Plaintiffs............................. 126

      B.    Defendants' Conduct Justifies an Award of Punitive Damages... 131

      C.    Defendants Do Not Have Qualified Immunity............................ 138

IX.   SECOND CLAIM FOR RELIEF – STATE LAW NEGLIGENCE CLAIM........................................................ 139

X.    PRAYER FOR RELIEF............................................................ 141

XI.   DEMAND FOR TRIAL BY JURY............................................. 144

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

# I.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction pursuant to Title 28 U.S.C. §§ 1331 and 1343.  The individual defendants are persons who caused the Plaintiffs to contract Valley Fever, a lifelong crippling disease.  Infliction of that disease constitutes Cruel and Unusual Punishment in violation of the Eighth Amendment to the United States Constitution, by depriving plaintiffs of a federally-guaranteed right under color of state law in contravention of Title 42 U.S.C § 1983.

2.     Venue is properly in this Court, pursuant to Title 28 U.S.C § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, including Plaintiffs' exposure to spores that cause Valley Fever, and the Court has ruled that Plaintiffs should proceed in this judicial district.

3.     Plaintiffs make the following allegations upon personal knowledge as to those assertions concerning themselves and, as to all other matters, upon the investigation of counsel, which includes, without limitation:  a) review and analysis of public documents published by the State of California, Department of Corrections and Rehabilitation (CDCR) and other public agencies; b) review and analysis of public filings, press releases and other publications by certain of the defendants and other non-parties; c) review of news articles, medical and other reference sources, as well as postings on the State of California CDCR and correctional facility websites concerning the issues described herein; and, d) review of other available information concerning CDCR's operations, the medical conditions and treatment described herein, and the individual defendants.

# II.

## SUMMARY OF THIS CASE

4.     The American system of justice requires that state correctional authorities carry out the exact sentence determined by the judicial process – no more

and no less.  Instead, Defendants imposed on Plaintiffs a lifelong, crippling, and sometimes fatal disease in addition to their judicial sentences.

5.     The disease, called Coccidioidomycosis, "Valley Fever," or "VF," is carried by a fungus-like organism that lives and reproduces in the soils in certain limited geographic areas.  It produces spores that can infect humans.  To those infected, it can be debilitating, disfiguring, intensely painful, and if it is not treated quickly, accurately and indefinitely, may be fatal.  Over 30 prisoners have already died from the disease and many more live with serious medical complications from it.

6.     For some who come in contact with the spores, the disease spreads throughout the lungs or to other parts of the body; this is referred to as the "disseminated" form of the disease.

7.     Disseminated coccidioidomycosis attacks multiple organ systems including the skin, lungs, eyes, bones, joints, nervous system and brain. Victims of the disseminated form require lifelong treatment and may lose limbs to amputation, require sections of bone or whole organs to be removed, may suffer disfiguring skin lesions, and if the disease attacks the brain, may suffer permanent brain damage or die from coccidioidal meningitis.

8.     Those in certain ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as persons who are immune-compromised, or immune-suppressed from taking medication for chronic arthritis and other diseases, are more susceptible to developing the aggressive, disseminated form of Valley Fever.

9.     Plaintiffs in this action are inmates and former inmates of the state correctional system who contracted Valley Fever as a result of excess exposure to the disease-causing spores.  Plaintiffs were required to serve their lawful sentences. They did not deserve a life-long debilitating illness as a result of Defendants' deliberate indifference.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

10.     Defendants knew that placing inmates in prisons where the prevalence of spore-laden soils was a known hazard – where Valley Fever was already occurring at epidemic rates – posed an unacceptable risk of irreparable harm.  Yet they not only placed Plaintiffs in harm's way, they also failed to implement even the few simple measures recommended by the correctional authority's own experts to protect Plaintiffs from the risk of contracting the disease.

11.     Defendants could have diverted or transferred Plaintiffs away from hyper-endemic prisons, either by formal policy or on a case-by-case basis at the facility level, in order to reduce the rate at which inmates were infected with the virus.

12.     Defendants could also have implemented environmental measures at the prisons that CDCR's own staff experts recommended to reduce inmate exposure: basic precautions such as paving, landscaping, and soil stabilization.

13.     California state authorities repeatedly recommended that the prison ventilation systems be improved, that the existing ventilation systems be properly maintained to protect inmates against indoor exposure to the spores, and that inmates be offered respiratory protection and cautioned to stay indoors during high wind conditions to avoid outdoor exposure.

14.     Defendants did none of these things.

15.     Defendants continued to transfer high-risk and other inmates into these hyper-endemic prisons, failed to take even the simplest protective measures, and allowed major construction, which churned the soil and threw the spores into the air, to take place on site and immediately adjacent to one of the most dangerously infectious prisons, Pleasant Valley.

16.     Defendants knowingly exposed each Plaintiff to serious disease risks and demonstrated a reckless indifference to Plaintiffs' safety, health, and constitutional right to be free of excessive punishment.

17.     Plaintiffs have sought to resolve this matter through administrative remedies, to no avail.

18.    Plaintiffs seek adequate medical care and other damages as appropriate to their injuries.

### III.

### THE DEFENDANT PARTIES

19.    Defendant Paul D. Brazelton acted as warden of Pleasant Valley State Prison (PVSP) from early 2012 through the Fall of 2013.  He presided over PVSP, the most adversely affected prison, during this period.  Mr. Brazelton is believed to reside in Coalinga, California, County of Fresno.

20.    Defendant Jeffrey Beard is the current Secretary of the CDCR.  He was appointed as Secretary by Governor Edmond G. Brown, Jr., on December 27, 2012. Beard has overseen prison policy since his appointment.

21.    Defendant Matthew Cate was the Secretary of the CDCR from 2008-2012.   Secretary Cate supervised and was responsible for the housing of inmates at prisons where they contracted Valley Fever.  Cate resides in Sacramento County, California.

22.    Defendant Scott Frauenheim is the current warden of Pleasant Valley State Prison.  He was appointed acting warden during 2013 and became warden in 2014.  He resides in Kings County, California.

23.    Defendant James D. Hartley is the former warden of Avenal State Prison.  He acted in that position from 2007-2014.  He is believed to reside in Fresno County.

24.    Defendant Dr. Susan L. Hubbard is the former director of the Division of Adult Operations.   She is an author of the 2007 CDCR "exclusion" policy that resulted in highly-susceptible inmates continuing to be housed at hyper-endemic prisons.  Hubbard resides in Carmichael, Sacramento County, California.

25.    Defendant Deborah Hysen is the current Director of CDCR's Office of Facility Planning, Construction and Management (FPCM).   Hysen was the Chief Deputy Secretary of FPCM from at least 2006 until 2014, during which time CDCR

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

failed to implement any of the recommended remedial measures to reduce inmate infection rates. Hysen resides in Sacramento, California.

26.    Defendant Dr. Felix Igbinosa was the medical director of Pleasant Valley State Prison, having served in that capacity from approximately 2005-2014. Dr. Igbinosa resides in Clovis, California.

27.    Defendant J. Clark Kelso is currently serving as the Receiver of the California Correctional Health Care Services agency (CCHCS).[1]  Mr. Kelso is believed to reside in Elk Grove, California, Sacramento County.

28.    Defendant Scott Kernan is the former head of the Department of Adult Institutions (DAI), titled Chief Deputy Secretary at that time, and served in that position until 2014.  He was head of DAI at the time the 2007 exclusion policy was devised and implemented.  On information and belief, he resides within or is otherwise subject to the jurisdiction of this federal court.

29.    Defendant Chris Meyer was the Senior Chief of Facility Planning, Construction and Management from 2009 to 2014, succeeded by Defendant Hysen as head of that office.  It was Meyer's responsibility to employ best practices at the prisons to ensure their safety.  Plaintiffs are informed and believe that Meyer resides in Sacramento, California, and are seeking to verify that address through his counsel.

30.    Defendant Tanya Rothchild is the former Chief of CDCR's Classification Services Unit (CSU), the agency department in charge of endorsing and transferring inmates to specific prisons.  Rothchild resides within or is otherwise subject to the jurisdiction of this federal court.

---

[1] CCHCS is the California state agency that has been responsible for health care in the state prison system since October 3, 2005, after the *Plata* court determined that the then-existing prison health care system violated the Eighth Amendment.  *Plata v. Brown*, Case No. 01-1351 [Northern District of California].  The *Plata* court ordered CCHCS to take over prison healthcare; it has since been legally responsible for overseeing 7,000 staff addressing health care in California state prisons.

1    31.    Defendant Teresa Schwartz is a former deputy director of Adult

2  Institutions at CDCR.  She was deputy director of DAI at the time the 2007 exclusion

3  policy was initiated.  Schwartz resides within or is otherwise subject to the jurisdiction

4  of this federal court.

5    32.    Defendant Arnold Schwarzenegger is the former Governor of California,

6  having acted in that position from 2003 through 2011.  Schwarzenegger resides in Los

7  Angeles County, California.

8    33.    Defendant Dwight Winslow, M.D. is the former Statewide Medical

9  Director for CDCR.  He co-authored the 2007 exclusion policy.  Winslow resides in

10 Sacramento, California.

11   34.    Defendant Carl Wofford is the current warden of Avenal State Prison.

12 He was appointed acting warden during 2013 and became warden on or about

13 December 20, 2013.  He resides in Los Angeles County, California.

14   35.    Defendant James A. Yates is the former warden of Pleasant Valley State

15 Prison and is believed to have occupied that position from at least 2005 until 2011.

16 During this time a large number of inmates contracted Valley Fever at PVSP.  Mr.

17 Yates is believed to reside in Corcoran, Kings County, California.

18   36.    The true names and capacities, whether individual, corporate, associate,

19 governmental or otherwise of some of the Defendants herein are presently unknown to

20 Plaintiffs.

21   37.    Plaintiffs will seek leave of the Court to amend this Complaint to show

22 the true names and capacities of such Defendants if and when these are ascertained by

23 Plaintiffs.

24   38.    Unknown Defendants 1-50 are one or more state officials of the

25 California Department of Corrections and Rehabilitations, each of whom were aware

26 of the increased risk faced by Plaintiffs and had the authority, ability and means to

27 reduce those risks but failed to act to do so.

28

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

## IV.

## FACTUAL ALLEGATIONS

### A.   The Effect of Coccidioidomycosis Infection

39.     Coccidioidomycosis is a parasitic disease caused by exposure to airborne fungal spores of Coccidioides organisms found in the soil in certain locations in the southwestern United States including California.

40.     When a human inhales the Coccidioides fungal spores, those spores may lodge in various locations in the respiratory system. The spores then grow and transform into large tissue-invasive parasitic spherules.  The spherules divide, enlarge, and rupture, each releasing as many as thousands of new "endospores" that can invade surrounding tissue or can migrate through the blood to other tissues and organs, where they repeat the process and continue to multiply in the body.

41.     The developing endospores grow on host body tissue, dissolving some of that tissue in the process.  Depending on the site of the disseminated infection, this may lead to disfiguring skin lesions, destruction of soft tissue, erosion of bones, joints, and eyes, ulcers penetrating into the pleura in the lungs, and the colonization of other organs including the brain.  Lesions may occur in every organ in the body.[2]

42.     Coccidioides replicates so quickly that it is considered the most virulent fungal parasite known to man.[3]  The Coccidioides fungus was at one time listed as a "Select Agent" – a potential weapon of biological warfare or bioterrorism – in the Antiterrorism and Effective Death Penalty Act of 1996 and the Public Health and Security and Bioterrorism Preparedness and Response Act of 2002.[4]   The Centers for

---

[2] Smith, Pappagianis, et al, _Human Coccidioidomycosis_, Bacteriology Reviews (September, 1961), 25(3), pp. 310-320, at p. 311.

[3] Dixon, _Coccidioides Immitis as a Select Agent of Bioterrorism_, Journal of Applied Microbiology (October 2001), 91(4):602-5.

[4] Filip & Filip, Valley Fever Epidemic, Golden Phoenix Books (2008), p. 2 (hereinafter "Filip"). Published in 2008, this reference summarized 268 published

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

Disease Control (CDC) requires scientists handling Coccidioides spores to use protective protocols just one level below that required for handling the hemorrhagic fever Ebola virus.[5]

43.    In the general population, 40% of those exposed will show symptoms of a respiratory illness resembling the flu that may last weeks or months.[6]

44.    In a segment of that 40%, however, which varies depending on the ethnicity and medical status of the individual, the infections will cause severe, life-threatening pneumonia or blood-borne spread of the fungus from the lungs to other parts of the body, which is referred to as a disseminated infection.[7]

45.    Disseminated infection commonly involves skin and soft tissues, bones, and the central nervous system.  Both the spore-provoked pneumonia and the disseminated infection, especially if it reaches the brain and causes meningitis, can be fatal.[8]

46.    Per Filip, who authored a leading book on Valley Fever: "Valley Fever can kill, but it can also affect its survivors for a lifetime.  It can disseminate to the eyes where it can cause blindness and possibly require the removal of an infected eye. Valley Fever can attack any organ or limb in the body to cause lesions, chronic pain, and to require amputations.  Some cases can necessitate surgical removal of an

---

medical studies, professional journal articles, and other authoritative material concerning Coccidioidomycosis.

[5] "*Biosafety in Microbiological and Biomedical Laboratories*," U.S. Department of Health and Human Services Public Health Service Centers for Disease Control and Prevention National Institutes of Health, (2009, 5th Edition).

[6] Dec. John Galgiani, ¶ 7 (April 25, 2013, Docket 2598 in *Plata* Eastern District case), Valley Fever expert.

[7] Galgiani, ¶ 7.

[8] *Id.*

infected lung…."  Valley Fever can cause facial lesions that leave permanent scarring and disfigurement.  In the most lethal varieties of the disease it can attack the lining of the brain (meninges), [leading to] permanent brain damage.  Valley Fever can infect the bones and joints, causing chronic debilitation, pain, and resulting in the need for joint fusions or amputations ... people with Valley Fever have become wheelchair bound as a result of disseminated spinal lesions . . . ."[9]

47.    Once the disease is established in the disseminated form, there is no cure.  The disease is treated with antifungal drugs which can have severe side effects and must be taken for a lifetime.  These drugs do not cure the disease, however, since they only reduce but do not eliminate the population of infectious spores.  Continuous treatment with oral anti-fungal medication may keep the disease partially and temporarily at bay, but the disease remains within an infected person for his or her lifetime, and repeated debilitating relapses may be expected.  As many as 75% of patients who stop taking the drugs will relapse into the life-threatening disease within a year.[10]

48.    Treatment of Valley Fever is expensive, for the patients and for the public health system.  As of 2006, "The cost of antifungal medication is high, in the range of $5,000 to $20,000 per year of treatment.  For managing critically ill patients with coccidioidomycosis, there are considerable additional costs including intensive care support for many days or weeks."[11]  Some patients require repeated hospitalization for the disseminated disease.  As of 2011, the cost for such treatment was in the range of $55,000 per hospitalization on average.

---

[9] Filip, at pp. 63-65.

[10] *See, e.g.,* Filip, p. 40; Kanan, Renee, M.D., "*Valley Fever,*" Dept of Corrections Memo to Health Care Managers November 5, 2004 [hereinafter "Kanan" or "Kanan Memo"], p. 4; Galgiani, John, et al., *Practice Guidelines for the Treatment of Coccidioidomycosis*, Oxford Journals (2000).

[11] Galgiani, *Practice Guidelines*, at p. 659.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

49.     Plaintiffs in this case, who have had Valley Fever for relatively short amounts of time, have already reported one or more of the following symptoms: skin lesions; fever; shortness of breath and wheezing; chronic and severe coughing including coughing up blood; chest pain; uncontrollable chills and night sweats; nausea; rapid weight loss; rashes; burning sensations in various body parts (feet, joints, etc.); chronic exhaustion; joint and bone pain, stiffness and swelling; swelling of the legs, ankles, and feet; sensitivity to light; vision problems; neurologic symptoms including inability to concentrate; foot drop and partial paralysis; and excruciating head and neck pain.

50.     Over thirty inmates have already died from exposure to the disease within the prison system from 2005 to the present, and more are expected to die prematurely, while hundreds or perhaps thousands will live with grave consequences of the disease.

**B.    Defendants, as Prison Officials and Medical Experts, Were Aware of the Increased Risk of Valley Fever at These Prisons**

51.     California health officials have known about the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the disease's acute risks to inmate health for over (50) years.[12]

52.     By the late 1960's, employers were being warned that "the importation of any susceptible labor force into the endemic areas carries with it the responsibility for reducing the rate and severity of infection through whatever dust control measures are possible and for providing a vigorous program of medical surveillance."[13]

---

[12] *See*, *e.g.*, Smith, C. E.: *The Epidemiology of Acute Coccidioidomycosis With Erythema Nodosum ("San Joaquin" or "Valley Fever")*, American Journal of Public Health 30, at p. 600 (June 1940).

[13] Schmelzer and Tabershaw, *Exposure Factors In Occupational Coccidioidomycosis,* American Journal of Public Health and the Nations Health, January 1968: Vol. 58, No. 1, p. 111.

53.    Despite this, between 1987 and 1997, the CDCR built eight prisons within the hyper-endemic regions of San Joaquin Valley: Avenal State Prison; California Correctional Institution; California State Prison-Corcoran; Wasco State Prison; North Kern State Prison; Pleasant Valley State Prison; California Substance Abuse Treatment Facility and State Prison, both at Corcoran; and Kern Valley State Prison.

54.    Locating these prisons in these hyper-endemic region of the Central Valley, significantly overcrowding them, housing inmates at risk or at increased risk from Valley Fever there, and failing to implement any of the remedial measures recommended to reduce inmate exposure to cocci has had drastic repercussions on the health and welfare of California's inmate population.[14]

55.    Though all of these prisons presented a potentially elevated risk of exposing inmates to Valley Fever, there are two – ASP and PVSP – at which these risks are acutely amplified, and one in particular, PVSP, which by 2006 was known to be extraordinarily dangerous.

56.    Pleasant Valley State Prison (PVSP) is located in Coalinga, California. The prison provides long-term housing and services for minimum, medium and maximum custody inmates.  It was opened in November 1994, covers 640 acres and was designed to house 3,000 inmates.  Today, there are approximately 730 staff and 5,188 prisoner beds.

57.    The soil surrounding and at PVSP and other hyperendemic prisons is known to be contaminated with the Coccidioides fungus.

58.    In November 2004, before the drastic rise in incidence rates at PVSP, Defendant Renee Kanan, M.D., Deputy Director of Health Care Services at CDCR, wrote a memorandum to all health care managers, staff members, and other officials within CDCR regarding Valley Fever and its origin in soil fungus.

---

[14] *Coccidioidomycosis in California's Adult Prisons 2006-2010*, California Correctional Health Care Services; April 16, 2012.

59.     Known as the Kanan Memo, it included a three-page overview of Valley Fever, its cause, diagnosis, symptoms and treatment.  The memorandum admitted that: (a) the Central Valley prisons are located within areas which host the dangerous cocci fungus in the soil (b) Valley Fever has "potential lethality" for people exposed to the fungus; (i) "winds and construction activity may cause the organism to be blown into the air where it can be inhaled and pneumonia can occur"; (ii) "[a] percentage of individuals exposed to coccidioides immitis … will progress to frank, generally patchy pneumonia (the incubation period is up to four (4) weeks), or to disseminated disease"; (iii) "[t]he risk and incidence of disseminated disease are highest in American Indians, Asians, Blacks and immuno-compromised individuals"; (iv) "[d]issemination usually occurs to the skin, bones and meninges, although any part of the body can be involved"; (v) bone lesions, back pain and paraplegia may result from Valley Fever; (vi) skin lesions "imply a poor prognosis and often herald widespread dissemination"; (vii) "[m]eningeal involvement eventually leads to a severe, unremitting headache" and (vii) "[t]reatment must be continued for life to maintain control of symptoms; there is no cure for coccidiodal meningitis at this time."

60.     Dr. Kanan's memo was and continues to be widely available to state officials, including the Defendants, after it was initially distributed to CDCR officials.[15]

---

[15] The Kanan Memo was addressed to Nadim Khoury, M.D. (Assistant Deputy Director (A), Clinical Policy and Programs Branch, Health Care Services Division of Department of Corrections); Donald Smilovitz, M.D. (Physician and Surgeon, Infection Control Department, CMC); Anita Mitchell, M.D. (Chief Medical Officer, Clinical Standards & Services (CSS), HCSD); and Tim Rougeux (Project Director, Medical Programs Implementation) and then available, and on information and belief, read widely throughout CDCR.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

61.    Beginning in 2005, after the Kanan memo was distributed, Pleasant Valley State Prison (PVSP) began to experience an epidemic of Valley Fever, including multiple deaths from the disease.

62.    Infection rates at PVSP during this time were as much as 1,000 times the rate seen in the general population, yet state officials continued to transfer susceptible and high-risk inmates to this prison.

63.    An internal CDCR memorandum dated October 27, 2006 to all administrative personnel, apparently generated at the request of Sacramento government officials, described the epidemic infection rates:

"The Cocci information requested by [California government officials in] Sacramento is as follows:

2001 – 42 inmates
2002 – 38 inmates
2003 – 80 inmates
2004 – 66 inmates          1 death
2005 – 187 inmates        5 deaths
2006 – 1145 inmates      8 deaths

The above information is an approximation of the number of inmates with positive Cocci lab results."[16]

64.    This memo showed that Valley Fever incidence rates increased at PVSP by more than 445% between 2001 and 2005, and by over 2,500% by 2006.  In 2006 (through mid-August), the California prison system accounted for 30% of all Valley Fever cases reported to the State Department of Health Services.

65.    An August 3, 2006 internal memorandum confirmed that CDCR officials knew that they were exposing inmates to elevated risk of Valley Fever.[17]

_____

[16] Durst, Karen, "Coccidioidomycosis (Cocci) Report," [CRCR memorandum dated October 27, 2006 to Administrative Personnel].

[17] *See* Dovey & Farber-Szekrenyi, "*Inmate Patients at High Risk of Valley Fever Excluded from Specific Central Valley Institutions,*" p. 1 [CDCR Memo August 3,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

66.     During 2006-2010, rates of Valley Fever in the hyper-endemic area prisons worsened.  The rates at Pleasant Valley State Prison, Avenal State Prison, Wasco State Prison, and North Kern State Prison, were each significantly higher than rates in the counties in which they are located.  In comparison with the rate in California (7/100,000), the rate at PVSP was 1,001 times higher (7011/100,000), the rate at ASP was 189 times higher (1326/100,000) and the rate at WSP was 114 times higher (800/100,000).

67.     Between 2006 and 2012, approximately 1,800 inmates became infected with Valley Fever at PVSP.[18]

68.     The rates at PVSP, ASP, and WSP were also much higher than the rate in Kern County, the county with the highest rate of cocci in California (135/100,000).  An April, 2012 retrospective study found that the infection rate at PVSP was approximately 7,011 cases for every 100,000 people, or 7 out of every 100.

69.     Of the 27 CDCR inmates who died of Valley Fever between 2006 and 2010, eighteen (or 68 percent) were African-Americans, according to the report.  The rate of death due to Valley Fever among African-Americans was twice that among non-black inmates.

70.     Following the Kanan Memo, which warned that construction activity was associated with the increased exposure to the spores that cause Valley Fever, some experts observed that the probable cause of the rapid and continuing increase in Valley Fever cases at PVSP that began in 2005/2006 was the construction of a new state facility immediately adjacent to the prison.  The excavation and construction churned up and broadcast Coccidioides spores through the air and on to bare soil and surfaces throughout the prison, where they took root to become an ongoing source of

2006, hereinafter "Dovey"].

infection.[19]  Those spores spawned cocci colonies that pose an ongoing threat of Valley Fever infection at the prison currently and into the future.

71.    Dr. Pappagianis' report confirms "the influence of 'new construction' (including excavation)" on PVSP's Valley Fever rates as follows: "Construction began in late Summer to early Fall [2005] and soon the number of cases increased.  …  It was evident that PVSP had a higher rate of infections than other institutions some of which had comparable numbers of inmates.  By mid-August 2006, PVSP had 300 new cases recognized, far exceeding those recognized at (51) [at] Avenal, the next highest represented.  We calculated incidence of 3,000/100,000 for PVSP in 2005; and in 2006 up to mid-August the rate was 6,000/100,000.  For comparison, the highest incidence rate of [Valley Fever] was 572/100,000 for Kern County during the epidemic year 1993."[20]

72.    After evidence of the epidemic became unmistakable, California Corrections Health Care Services (CCHCS) requested assistance from the California Department of Public Health (CDPH) in assessing the magnitude of the problem.

73.    CDPH reported that the rate of cases at PVSP was 38 times the rate in residents of Coalinga, and 600 times the rate in Fresno County and confirmed that at least 29 persons had had to be hospitalized and 4 deaths had resulted.  CDPH reported that risk of disease was associated with increased outdoor time, pre-existing health conditions, and African-American race.

74.    CDPH's report included specific recommendations for reducing Valley Fever at the hyper-endemic prisons.

---

[19] *See* Winslow D, Khoury N, Snyder N, Bick J, Hawthorne K, Chapnick R, et al., 2007; "*Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California,*" p. 4, June, 2007 [hereinafter "Winslow Recommendations"].

[20] Kanan Memo [Attachment 3, p. 4].

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

75.    Based on the CDPH report, CCHCS issued recommendations in June, 2007, which included: (i) proceeding with environmental mitigation in the prisons through landscaping with ground cover, and placing concrete and other dust reducing materials on the grounds; (ii) continue the diversion and relocation of inmates at high risk for coccidioidomycosis (which in reality was everyone); (iii) reinstate the public health system in prisons; (iv) notify the local health departments of new cases identified by prison providers; (v) expand epidemiologic research around cocci; (vi) support vaccine research; (vii) do not expand prison beds in the hyper-endemic area, especially at Pleasant Valley State Prison.

76.    In November, 2007, Defendants Hubbard and Winslow amended the 2006 exclusion policy, which on information and belief was ratified by Defendants Schwartz, Kernan, Cate and Schwarzenegger.  That policy protected only persons with certain identified medical conditions.  It failed to protect any other inmates including those in the identified high-risk racial and ethnic groups, although risks to persons in those groups were already well-known to Defendants.

77.    Predictably, the wholly inadequate 2007 policy failed to stem the epidemic of Valley Fever.

78.    From 2007 through 2010, the rate in PVSP was 6 times higher than the rate among residents of the adjacent state mental health facility built in 2005.[21]

79.    During 2009, CDCR first requested, and then without explanation, terminated a project by the leading federal health agencies to assist the California prison system with the Valley Fever epidemic.

80.    In December 2009, after California officials had canceled the project, two officials at the Centers for Disease Control (CDC) and its National Institute for Occupational Safety and Health (NIOSH), wrote to Nikki Baumrind, Ph.D, M.P.H.,

---

[21] "*Coccidioidomycosis in California Department of Corrections and Rehabilitation Institutions,*" p. 2 [CDCR Report, October 10, 2012].

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

Chief of the Occupational and Public Health Section of the California Department of Corrections and Rehabilitation.  This letter made it clear that the CDC and NIOSH had ceased their work on the project due to the CDCR's "lack of support" in assisting with the federal agencies' investigation.

81.    The NIOSH officials reminded CDCR that "[p]eople at greater risk for developing disseminated infection include people of African American; Asian or Filipino descent; … and immunocompromised persons".[22]

**C.    Defendants Knew Certain Groups Were Particularly Susceptible.**

82.    It is commonly and widely-known among prison officials and medical personnel that certain groups are much more susceptible than others to the aggressive and disseminated form of Valley Fever.

83.    The scientific literature acknowledged the exceptional susceptibility of African-Americans and Filipinos over 80 years ago.[23]

84.    An article in the journal *Military Medicine* in June 2003 observed that "Filipinos and African-Americans have been shown to have up to a 200-fold increased risk of disseminated disease and an increased mortality rate."[24]

85.    California's Department of Health Services referenced the exceptionally high-risk groups in a letter dated March 16, 2006 from Duc Vugia, M.D., M.P.H. of the California Department of Health Services to Bernard Henderson, an inmate at PVSP, citing an article in a contemporaneous medical journal.[25]

---

[22] Letter from NIOSH to CDCR, December 4, 2009, p. 2.

[23] *See* Smith, Pappagianis, et al, <u>Human Coccidioidomycosis</u>, Bacteriology Reviews (September, 1961), 25(3), pp. 314, 318, fns. 5, 27.

[24] David Filip, <u>Valley Fever Epidemic</u>, (2008) p. 29, citing Crum NF, Lederman ER, Hale BR, Lim ML, Wallace MR. "*A Cluster of Disseminated Coccidioidomycosis Cases at a US Military Hospital*,  Mil Med. (June 2003), 168(6), pp. 460-464.

[25] *See* Letter from Duc Vugia, M.D., citing Galgiani article (March 16, 2006)]; Galgiani, John et al., *Coccidioidomycosis*, 41 Clinical Infectious Diseases Journal

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

86.    In addition to the higher-risk racial and ethnic groups, anyone with a compromised or suppressed immune system also has an increased risk of developing disseminated Valley Fever.[26]

87.    A compromised immune system may be caused by any of several chronic diseases including diabetes, HIV, lung disease, organ transplant, or taking TNF inhibitors as medication for arthritis.

88.    Individuals over the age of 55 have also been found to be at increased risk, if exposed, of developing the severe disseminated disease.[27]

89.    California's Department of Public Health informed the CDCR in its January 11, 2007, "Recommendations for Coccidioidomycosis Mitigation in Prisons in Hyperendemic Areas of California" that "[p]revious studies have suggested that the risk for extrapulmonary complications is increased for persons of African or Filipino descent, [and] the risk is even higher for heavily immunosuppressed patients." The DPH in 2007 therefore concluded that exclusion of all of these high-risk inmates was "the most effective method to decrease risk [of Valley Fever infections]."[28]

90.    CDCR's inmate mortality figures bear this out. In analyzing reports from the Receiver's medical staff, Dr. Galgiani noted that "African-American prisoners [in the Central Valley state prisons] died with Valley Fever at a higher rate than the general inmate population, and at much higher rates than African-American

1217-1218 ["several-fold higher for persons of African or Filipino ancestry (possibly also for persons of Asian, Hispanic, or Native American ancestry), and as high as 30%-50% of infections for heavily immunosuppressed patients"].

[26] *See, e.g.,* American Thoracic Society, "*Patient Information Series,*" American Journal of Respiratory Care Medicine, Vol. 184, p. 6.

[27] Clinical Infectious Diseases Journal (March 2001) 1:32(5), 708-15. The 2011 Thoracic Society also supports this conclusion, p. 5.

[28] CCHCS Report dated April 16, 2012 relating recommendations in Jan, 2007, p. 8, Box 2.

men in California."[29]  In fact, African-American prisoners comprised 71% of the 34 Valley Fever deaths in CDCR prisons between 2006 and 2011.[30]

91.    A 2012 study in the journal Emerging Infectious Diseases found the rate of hospitalization from disseminated cocci among blacks in California was 8.8 times higher than for whites.

92.    After CDCR failed to act to address the risks to the susceptible racial and ethnic groups, the Receiver finally took steps to force CDCR to relocate the omitted higher-risk inmates. Joyce Hayhoe, a spokeswoman for the Receiver's office, disclosed  that, "The State of California has known since 2006 that segments of the inmate population were at a greater risk for contracting Valley Fever, and mitigation efforts undertaken by CDCR to date have proven ineffective."  She stated that, "as a result, the Receiver has decided that immediate steps are necessary to prevent further loss of life."

**D.    Each Defendant Knew the Risks to Inmates But Chose to Disregard Those Risks.**

93.    Each of the named Defendants was aware that housing inmates at the hyper-endemic prisons posed a greatly elevated risk to those inmates of contracting Valley Fever and that failure to control exposure to the cocci-containing soil at those locations increased that risk significantly. Each Defendant received this information through multiple sources, of general circulation and addressed specifically to that Defendant.

94.    The 2004 Kanan Memo was circulated to a number of specific health care professionals inside the prison system and was intended to be circulated to all health care managers within the Department of Corrections, for general circulation to

[29] Galgiani Declaration, April 25, 2013 [Docket 2598], ¶ 10.

[30] *Id.*

all health care professionals in the system.  On information and belief, at a minimum Defendants Schwarzenegger, Cate, Kelso, Winslow, Hubbard, and Igbinosa knew of and were familiar with the substantive contents of that memo and its ramifications while they held positions, since 2004, in the state government and state prison system.

95.    In 2005, the prisoners' rights group Prison Movement sent an informational briefing packet directly to then-Governor Schwarzenegger describing the threat posed by Valley Fever, and especially its threat to susceptible groups including African-Americans, Filipinos, elderly inmates and the immune-compromised.

96.    Beginning in 2006-2007, and continuing yearly thereafter, a Fresno County Grand Jury undertook the task of evaluating inmate health at PVSP and made a series of recommendations.  Beginning in 2007, the Grand Jury issued periodic public reports concerning Valley Fever incidence at PVSP.   It observed that "[l]ocal prison officials are well aware of this health crisis. . ." and stated that inmates and staff continue to be at risk from Valley Fever.

97.    The Grand Jury issued these reports, starting in 2007 and continuing each year thereafter, directly to Defendants Brazelton, Yates, and Cate, and to Mr. Kelso of the California Correctional Health Service, as well as to other CDCR officials, while they held office within, and oversaw, the state prison system.

98.    The Grand Jury required Defendants Yates, Cate, and Brazelton at a minimum to respond directly to the Grand Jury regarding these findings, under the authority of California Penal Code Section 919(b).  Defendant Yates also sent copies of his response at a minimum to Defendant Cate, to Kelso, and other CDCR officials.

99.    The Grand Jury found, consistent with common medical knowledge regarding the disease, that disease rates for all groups at the prison had increased dramatically since 2004 and that African Americans, Hispanics, Filipinos, and other Asians were at far greater risk from the disease than other ethnicities.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

100.    In addition to the other sources of information available to them, some of which are discussed further below, the Fresno Grand Jury findings informed Defendants Yates, Cate, Brazelton, each year from 2007 on, during the period each Defendant was employed in the state prison system, that inmates including those who contracted the disease at PVSP were at increased risk from Valley Fever and susceptible to potentially fatal health consequences as a result, if they were housed at or remained at PVSP.

101.    Despite his personal knowledge of the threat of Valley Fever, including on information and belief, the information provided to him about the risks of increased exposure to the spores that cause Valley Fever by construction activity, in September 2007 then-Governor Schwarzenegger proposed that the state construct new dormitories at PVSP to expand by 600 the number of beds located and prisoners housed there.

102.    At a press conference called to announce the expansion plans, Governor Schwarzenegger responded to questions about the fact that the proposed expansion would inevitably expose more prisoners to the disease.  Defendant Schwarzenegger indicated he would deliberately disregard the risk of exposing large numbers of additional prisoners to Valley Fever, stating: "We will go ahead and build."

103.    On information and belief, as described herein, by the time of the press conference Defendant Schwarzenegger was fully informed that inmates housed at PVSP, and at the hyper-endemic prisons in general, were at a greatly increased risk of contracting Valley Fever, that racial and ethnic minorities were particularly susceptible to these risks, and that preventative measures such as ground cover to control spores were recommended but not implemented, and that the risks would be increased by the construction.  Governor Schwarzenegger's comments at the press conference evidenced his deliberate indifference to those risks.

104.    Further, CDCR publishes and distributes an Orientation Manual for all medical personnel.  The Manual discusses the coccidioides epidemic in detail and

specifically notes that African Americans, Filipinos, and those with compromised immune systems or chronic diseases are at greatly increased risk for contracting Valley Fever in its most deadly form.[31]

105.   The orientation manual is authorized and promulgated by Defendant Winslow, the Chief Physician Executive at CDCR, who clearly knew of the increased risks but took no effective steps to prevent Plaintiffs' infection.

106.   All medical personnel and facility management at CDCR were aware of the information in the Orientation Manual and its implications for inmates housed at hyper-endemic prisons.

107.   Defendants were provided with numerous others sources of information that further confirmed and reinforced the risk to inmates including Plaintiffs.

108.   In 2006 the California Department of Public Health, Center for Infectious Disease conducted an epidemiological study of Valley Fever in California prisons (the "Study").  The Study was published in January 2007.

109.   The Study found that the number of cases of Valley Fever reported at PVSP in 2005 was at least 3 times that of the entire rest of Fresno County combined. The Study reported that any persons with suppressed immune systems as a result of disease or medications which are immune-suppressive, such as those for chronic arthritis, are at risk of the deadliest form of Valley Fever, as are African-Americans, Hispanics, Filipinos and other Asians.

110.   The Study recommended that CDCR evaluate relocating the highest risk groups to areas that are not hyper-endemic for Coccidioides, and at a minimum to take steps at the prisons to minimize exposure, including ventilation, respiratory protection, and dust suppression and soil control.

---

[31] Imai & Winslow, M.D.'s, Department of Correctional Healthcare Services, "*Letter from the Chief Physician Executive*, January 23, 2008.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

111.   On information and belief, each of the Defendants was at all relevant times aware of the CDPH Study and familiar with its conclusions regarding inmates, Valley Fever, and suggested mitigation measures.

112.   Further, CDCR published general-circulation policy memos in both 2006 and 2007 regarding Valley Fever at PVSP and other hyper-endemic prisons.

113.   On information and belief, each of the Defendants other than Defendant Schwarzenegger received copies of or had access to these particular memos, and in the normal course of their duties was expected to read and understand both the memos and the underlying information available to CDCR staff regarding Valley Fever at PVSP and the other hyper-endemic prisons.

114.   In 2007, CDCR Facilities Department Senior Management officials including Defendant Hysen stated that they were preparing to implement measures to reduce the risk to inmates of contracting Valley Fever at PVSP.

115.   The planned remedial actions included extensive measures to control inmates' exposure to contaminated soils outside buildings and greatly improved ventilation systems to prevent exposure inside buildings.

116.   Not a single element of this remedial plan was implemented until six *years* later, and only after two contested court orders forced the agency to act.  CDCR management asserted that they supposedly considered the remedial plan "too expensive."  The comprehensive planned remedial program was estimated to cost $750,000; one of the options, which was considered capable of reducing inmates' risk of infection significantly, cost only $110,000.[32]  Defendants failed to implement even that limited-cost option.

117.   CDCR now spends approximately $23 million each year treating inmates infected with Valley Fever.

_____

[32]  January 2007 Memorandum from Yates to Schwartz, re:  remedial measures at PVSP.

118.   The New York Times quoted Defendant Yates in 2007 regarding the Valley Fever epidemic at his prison, PVSP, in a story on Valley Fever at California prisons.  Yates surmised to the Times that inmates and staff at PVSP contracted the disease by breathing in spores from the air as they "walk around out there."[33]

119.   Defendant Yates was clearly aware of the risks and the exposure pathways subjecting inmates at PVSP to Valley Fever certainly no later than 2007, and almost positively in the years before.

120.   In June 2007, the California Department of Health Services (CDHS) offered specific recommendations for reducing Valley Fever incidence among CDCR inmates. CDHS recommended that CDCR consider relocating all inmates "from this institution [PVSP] to institutions with rates of cocci equal to or better than their local community rates."[34]

121.   Further, in August 2007, the Prison Legal News (PLN), a specialty periodical of extensive circulation in the prison community, ran as its cover story an investigation of Valley Fever at California prisons.[35]  The PLN cover story described in detail the source, exposure pathways, prognosis, and risk factors for the disease and its endemic presence in the subject California prisons.

122.   Despite their actual knowledge of the risk and the appropriate remedial actions, Defendants took little to no action to address the greatly increased risks to inmates at these prisons or to keep inmates away from the risk.

123.   In April, 2012, the California Correctional Health Care Services (CCHCS) released a report titled, "*Coccidioidomycosis in California Adult Prisons,*

---

[33] "*Infection Hits a California Prison Hard,*" New York Times, December 30, 2007. Yates reported that 26 PVSP staff members had filed workers compensation cases based on Valley Fever.

[34] *Winslow Recommendations*, June, 2007.

[35] "*California Prison Beset by Deadly Valley Fever Epidemic,*" Prison Legal News (June, 2008), Vol. 19, p. 22.

*2006-2010*." The Report received general circulation among CDCR staff including specifically Wardens and Unit Managers and executives.

124.    The CCHCS Report found that CDCR had done nothing between 2006 and 2010 that had any effect on cocci incidence rates at PVSP and ASP. This failure to act continued for years and confirms Defendants' deliberate indifference.

125.    The Report reiterated that Valley Fever incidence rates at the hyper-endemic prisons were drastically elevated, and that African-Americans in particular were at increased risk from Valley Fever and of suffering its lethal form. The Report found that African-American inmate men died from cocci at far higher rates than unincarcerated African-Americans in California and much higher rates than the general inmate population.

126.    The 2012 CCHCS Report found that PVSP in particular had extensive areas of unstabilized soil on its grounds, posing an extreme risk of spore release, transport, and infection and noted that simply "…planting lawns and paving roads reduced the rate of coccidiodal infection by one-half to two-thirds," based on results at a military installation that had been studied.

127.    The Report concluded that "the incarceration of individuals . . . in prisons within the endemic areas will continue to provide a stream of challenging and costly cases of coccidioidomycosis."

128.    In addition to the massive numbers of inmates infected with Valley Fever, over 80 CDCR facility staff members have contracted Valley Fever to date, and at least one CDCR corrections officer has died from the disease.

129.    Each Defendant at all relevant times possessed sufficient information, common throughout the organization, that exposure to spore-infested soils at the eight California hyper-endemic prisons posed an unacceptably high risk of life-long Valley Fever infection, illness, and death, to inmates located at the hyper-endemic prisons.

130.    At all times, all Defendants have had ready access to information concerning an inmate's racial and ethnic composition as part of his central file;

classification and facility management are required to consider each inmate's racial make-up for purposes of appropriate housing determinations. Defendants nevertheless took no action, either to exclude at-risk inmates from the hyper-endemic prisons or to make those prisons safer.

> **E.    Defendants Had the Power to Assign or Transfer Every Susceptible Inmate Away from the Danger.**

131.   Defendants had the ability to divert all at-risk inmates away from the high-risk prisons in the initial facility assignment process.

132.   At all relevant times, CDCR had robust, systematic procedures to match inmates to facilities but Defendants failed to use or to adapt those procedures to identify at-risk inmates or prevent their assignment to the hyper-endemic prisons.

133.   The classification scoring system that drives CDCR's housing placement decisions under Title 15, § 3375(b), allowed Defendants to consider environmental risk to an inmate's health, allowing consideration of an inmate's "needs, interests and desires, his/her behavior and placement score in keeping with the Department and institution's/ facility's program and security missions and public safety."

134.   When new inmates first enter the custody of CDCR, they undergo an initial review process designed to assign the inmate to an appropriate long-term custodial facility.

135.   CDCR refers to the initial review as the "Reception and Classification Process" (RCP). Inmates are housed at a temporary custody facility during the RCP, which may take as much as four months.

136.   The RCP includes direct observation of the inmate and a review of an inmate's relevant personal history and personal factors, including the age of the inmate, the nature of the offense, prior incarceration history if any, and other relevant personal factors

137.   At the end of the RCP, an inmate is given a classification score. The inmate then participates in a classification committee review, after which the inmate is

recommended for placement at a specific institution based on their score and the committee findings. An inmate's geographical preference may but is not required to be taken into account in the assignment, for example for family proximity.

138.   The inmate's classification security score generally dictates the security level of the institution the inmate is assigned to.  Facilities are designated as Level I (lowest security) through Level IV (highest security.)

139.   Level I Facilities generally are open dormitories with a low-security perimeter.  Level II Facilities are open dormitories with a secure perimeter which may include armed guarding.  Level III Facilities have a secure perimeter with armed coverage; housing units or cells may be adjacent to exterior walls.  Level IV Facilities have a secure perimeter with internal and external armed guarding and cell block housing separated from exterior walls.

140.   After an inmate receives the classification committee's initial assignment to an institution, an official in a separate office within CDCR must approve the assignment.  This official is referred to as the Classification Staff Representative (CSR).

141.   After a final review of the inmate's case factors, the CSR reviews and approves the inmate's assignment to a specific institution. This process is called "endorsement."

142.   Endorsement to an institution may take an additional 45-60 days.  The inmate may also have to wait for a bed to be available at the endorsed institution, which may take additional time.

143.   Finally, a separate committee at the destination facility called the Unit Classification Committee (UCC) reviews initial program assignments, as well as all transfers at the facility. The UCC is composed of three staff members and is chaired by an official at the level of Facility Captain or Correctional Captain.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

**F.      Defendants Had the Power to Prevent Plaintiffs
         from Being Assigned to Hyper-Endemic Prisons.**

144.    At any point during CDCR's redundant, protracted, multi-level and multi-factor inmate classification, assignment and review process, Defendants had the ability to screen out inmates at risk for Valley Fever and to divert those individuals from hyper-endemic prisons.

145.    CDCR's inmate classification and assignment process uses standardized forms and procedures to review numerous personal factors regarding each inmate, ostensibly in order to assign inmates only to suitable facilities.

146.    At any of numerous points in this process, Defendants could have implemented simple procedures to identify African-American, Asian, Hispanic, and older inmates who were particularly susceptible to Valley Fever and divert these from hyper-endemic prisons.

147.    Between September 2010 and December 2011, Defendants Cate and Rothchild supervised a "comprehensive" evaluation of the inmate classification system (ICS).[36]

148.    Although an Expert Panel conducted the review, Defendants Cate and Rothchild determined the scope of that review and excluded from that scope any consideration of the risk to inmates of contracting Valley Fever.  Both Cate and Rothchild knew of those risks but deliberately chose to ignore them in revising the process of inmate classification. Cate and Rothchild reviewed draft and final copies of the Expert Panel's study report and were fully aware that Valley Fever was entirely absent from that review. Neither took any action to include in the CDCR's Classification System or in the review of that classification system the known risk to

---

[36] Expert Panel Study Of The Inmate Classification Score System, State of California Department of Corrections and Rehabilitation, Office of Research, Research and Evaluation Branch, December 2011; and see Decl. of Tanya Rothchild in Supp. Defs.' Resp. to Apr. 11, 2013 Order, Case No. 2:90-cv-00520.

inmates of contracting Valley Fever should they be classified and endorsed to PVSP, ASP, or any of the other hyper-endemic prisons.

149.  Cate was clearly aware of the risks of Valley Fever to inmates endorsed to hyper-endemic prisons – he was receiving and responding to Fresno County Grand Jury reports on those risks before and during this time. Yet Cate did not implement risk-based screening of inmates or an exclusion policy that would have prevented all of the Plaintiffs from being housed at hyper-endemic prisons.

150.  Although Cate and Rothchild knew by 2006 at the latest that these individuals were in substantial danger, they failed to incorporate a screen for the known higher-risk groups for Valley Fever into the RCP or assignment processes to divert susceptible inmates to locations where they would not be exposed to increased risk of the disease.

**G.  Defendants Could Have Used the Routine Periodic Review Process to Transfer Plaintiffs to Safer Facilities.**

151.  Under CDCR policy, each inmate also has a periodic review, typically on an annual basis, to assess the continued suitability of the current custodial facility for that inmate.

152.  An annual review is performed for each inmate by a facility staff member, typically a counselor, to determine if an inmate meets standard criteria to have his or her placement score changed.

153.  In addition, a staff committee called the Unit Classification Committee (UCC) periodically reviews the status of every inmate at every institution. Inmates appear personally before the UCC, typically on an annual basis, to adjust their classification score and re-evaluate their housing status.

154.  During the periodic review, aspects of an inmate's status at a facility, including program participation, work groups, custody designation, and the advisability of transfer out of the facility, are reviewed by the Counselor and the UCC.

155.   Defendants had the ability to incorporate procedures into the periodic facility-level Counselor's or UCC review to identify African-American, Asian, Hispanic or older inmates susceptible to Valley Fever and to designate these individuals for urgent transfer.

156.   Defendants declined to take even these simple steps to protect these individuals from the known elevated risks they faced.

**H.  Defendants Could Have Transferred At-Risk Inmates to Safer Prisons.**

157.   Once identified, susceptible individuals already resident at hyper-endemic prisons could have been transferred out of danger using CDCR's existing transfer processes.

158.   Defendants could have arranged for Plaintiffs to be transferred from hyper-endemic prisons facilities to other California facilities, either state or federal, or to out-of-state facilities.

159.   CDCR has established formal regulations and procedures for the transfer of inmates between correctional facilities, pursuant to Title 15, § 3379 of the California Code of Regulations.

160.   CDCR "routinely transfers hundreds or thousands of inmates on a weekly basis" using these regulations and established procedures.[37]

161.   Defendants' procedures include provisions for voluntary and involuntary transfers and for transfers both within and outside CCDR.  Inmates can be transferred not only to other CDCR correctional facilities, but can also be transferred to out-of-state correctional facilities, or to federal facilities in California, under established CDCR transfer procedures set forth in Title 15, §§ 3379(a)(6), (a)(7)

162.   Every male inmate is potentially eligible for transfer to an out-of-state facility, either voluntarily or involuntarily.  The transfer procedure even allows for temporary placement of inmates in facilities or levels for which they are not endorsed,

---

[37] *Plata* Order at p. 5, fn. 3 [Docket 2661].

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

due to medical conditions, and includes provisions for resolving any pending disciplinary issues prior to transfer.[38]

163.   Inmate transfers may be ordered by CDCR executive or administrative staff or can be initiated at the facility level. At the facility level, either a Warden or the UCC committee at a facility may on their own initiative arrange for inmate transfers.

164.   Further, any warden or supervisor can temporarily suspend a pending inbound transfer.[39]

165.   Defendants, including any warden or supervisor at the hyper-endemic prisons, could therefore at any time have initiated procedures to transfer at-risk inmates away from the high-risk facilities, and also could have suspended the in-bound transfer of any more at-risk inmates into the hyper-endemic prisons.

166.   The transfer procedure uses standardized forms and checklists for determining the eligibility and suitability for transfer of any inmate to any particular facility.[40]  These forms allow for easy analysis of an inmate's suitability for transfer to any given CCDR facility.

167.   Defendants, having the ability to transfer Plaintiffs away from the danger of the hyper-endemic prisons, failed to take this step to prevent Plaintiffs' exposure or to remove Plaintiffs from the danger.

### I.    At-Risk Inmates Could Have Been Transferred To Out-of-State Facilities.

168.   Former Governor Schwarzenegger's 2006 Proclamation, and subsequent passage of Assembly Bill (AB) 900, the Public Safety and Offender Rehabilitation Services Act of 2007, provided the authority for CDCR to transfer inmates to private

---

[38] *See* §§ 3379(b), 3379(c).

[39] Title 15, § 3379(a)(4).

[40] See, e.g., CCDR Forms 839, 840, 841.

prison facilities in other states. CDCR began to transfer inmates to out-of-state facilities under this authority in October 2006.

169.   CDCR maintains a separate office called the Contract Beds Unit (CBU) to administer the already-substantial volume of inmates CDCR transfers to out-of-state facilities. Between 2006 and 2009, CDCR announced the transfer of thousands of inmates to out-of-state correctional facilities to relieve prison over-crowding.

170.   CDCR put out numerous press releases celebrating its successes with out-of-state transfers during this time, including:

- *"Governor Uses Executive Authority to Relieve Prison Overcrowding, Proclaims Emergency to Allow Inmate Transfer"* (10/04/06)
- *"CDCR Resumes Temporary Out of State Inmate Transfers"* (6/4/07)
- *"CDCR Continues Temporary Out of State Inmate Transfers"* (7/20/07)
- *"CDCR Contracts for Additional Out of State Beds to Reduce Overcrowding"* (10/05/07)
- *"Moving Inmates Out-Of-State Reduces Prison Overcrowding"* (4/21/08); and
- *"CDCR Amends Contract to House More Inmates Outside of California"* (11/2/09).

171.   Under existing regulatory procedures and contractual arrangements, the CDCR can place California inmates in one of four different out-of-state correctional facilities: two in Arizona, one in Oklahoma, and one in Mississippi.

172.   These out-of-state facilities are capable of housing inmates with any security classification level, including higher-custody levels that are not eligible for low-security facilities.

173.   CDCR has already arranged to house at these four out-of-state facilities over 10,000 inmates transferred out of California prisons.

174.   In 2009, as part of the ongoing plan to reduce prison overcrowding, CDCR amended its existing agreement with the Corrections Corporation of America (CCA) to expand the capacity for transfers of inmates out of state. The 2009

addendum allowed CDCR to add an additional 2,336 out-of-state beds for California inmates, for a total of 10,468 beds.

175.   Scott Kernan, CDCR Undersecretary for Operations, stated that, "[o]ur ability to place offenders out-of-state offers us much needed flexibility in placement of offenders that ultimately creates a safer environment for inmates, our staff and for the public."

176.   CDCR's "ability to place offenders out-of-state" could just as easily have been utilized to transfer at-risk inmates away from the known dangers of Valley Fever at hyper-endemic prisons.

177.   CDCR had existing mechanisms, procedures, and capacity to remove every at-risk inmate away from the known danger of contracting Valley Fever.

178.   Although Defendants knew by no later than 2006 that inmates including African–Americans, Filipinos, and older inmates were at extreme risk of contracting Valley Fever at hyper-endemic prisons, Defendants did not attempt to transfer these at-risk inmates away from this known danger, and did not modify CDCR's procedures to prevent additional inmates, high-risk or otherwise, from being transferred in to and housed at these facilities, until forced by court order in 2013 as to some.

179.   Knowing of this acute danger, and knowing that inmates at hyper-endemic prisons were powerless to protect themselves from exposure to Valley Fever, Defendants chose instead to "post laminated signs" about the "signs and symptoms" of the disease in facility medical clinics and inmate housing units. *Plata*, *supra*. Defendants did nothing to divert or to remove at-risk inmates from the facilities where they were in mortal danger.

## J.    Defendants Also Failed to Implement Remedial Measures Recommended by Their Own Experts to Reduce the Risk of Infection at the Prisons

180.   Beginning in 2006, numerous experts from various organizations including the CDCR itself recommended, in addition to screening out at-risk inmates

and transferring them away, designing and implementing simple, specific remedial measures at the hyper-endemic prisons in order to reduce inmates' exposure to the cocci-containing soil there. Besides the CDCR experts, the CCHCS, the CDP, the Fresno Grand Jury, and independent public health experts all recommended simple, specific remedial measures. These included landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions.

181.    On information and belief, Defendants Brazelton, Cate, Hysen, Hubbard, Kernan, Meyer, Hartley, Kelso, Igbinosa, Schwartz, Schwarzenegger, Winslow and Yates, each knew of the increased risk, knew the recommended measures could reduce that risk, and had the ability, the means and the authority to implement these measures throughout their respective tenures, as specified in the section entitled "The Defendant Parties" below. None did so.

182.    All Defendants acquiesced to one or more customs, policies or practices to not intervene in the State's continuing transfer of inmates to hyperendemic prisons without meaningful regard of the Valley Fever problem, and not take remedial steps to reduce the risk on the grounds of the applicable prisons.

183.    Defendants Hysen, Meyer, Yates, and Schwartz announced in 2006 that a program of such remedial measures would be implemented and calculated the costs for the recommended remedial measures at the prisons. The full program as designed would have cost an estimated $750,000. A lesser option, of soil stabilization only, would have cost just $110,000 and was considered capable of significantly reducing the risk to inmates.[41] But Defendants did not implement any of these measures until

---

[41] Treatment of inmates afflicted with Valley Fever is estimated to cost the State of California $23 million each year.

five years later, in 2011 and 2013, after multiple lawsuits had been filed and federal court orders issued.

184.   During this time and throughout their tenure, Defendants including Brazelton, Schwarzenegger, Hysen, Kernan, Meyer, Yates, and Cate all had access to funds sufficient to have implemented the full suite of recommended remedial measures at the prison or prisons for which they were responsible, which could have reduced Plaintiffs' exposure to and risk of Valley Fever.

185.   During this same time period, Defendants budgeted, requested, allocated and spent millions of dollars on discretionary construction projects at these same prisons.  For example, in 2009-2010, these Defendants allocated and caused to be spent over $1 million on remodeling group therapy rooms at PVSP. They caused nearly $1.5 million to be spent on upgrades to wastewater treatment plant equipment to "reduce normal wear and tear," and they budgeted $565,000 to expand and remodel staff offices at PVSP's wastewater treatment plant.[42]  These Defendants requested $565,000 for nicer offices but would not spend $110,000 to reduce the known risk that inmates including Plaintiffs would contract Valley Fever and suffer devastating consequences.

## V.

## PLAINTIFFS

### ERIC BATES

186.   Eric Bates is a 47-year-old African American from Bakersfield, California.

187.   Other than knee problems, Mr. Bates did not have any physical health problems before he was transferred to Avenal State Prison.

---

[42] CDCR Institution Project Status Report, Pleasant Valley State Prison, 2009-2010.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

188.   Bates was diagnosed with Valley Fever in 2011.  He suffered from dizzy spells, pain in his side, and severe sweating.

189.   After he was diagnosed, Bates was nursed back to health by other inmates as he was too weak to use the bathroom on his own or attend meals.

190.   Bates continues to experience difficulty sleeping due to joint aches and breathing problems.

191.   At the time of his diagnosis, Mr. Bates was prescribed an antifungal for 4 to 6 months.

192.   Bates brings a federal claim.

193.   Infected at ASP in 2011, Bates brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, and Winslow.

194.   These Defendants knew that inmates like Bates were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

195.   His CDCR number is AN5473.

## PAUL BLEVINS

196.   Paul Blevins is a 35-year-old Caucasian.

197.   Mr. Blevins was transferred to ASP in February, 2013.

198.   While incarcerated, Mr. Blevins continued his education and received numerous Certificates of Academic Achievement.  He is enrolled at Coastline Community College.

199.   At the time he contracted Valley Fever, Mr. Blevins was incarcerated for a parole violation.  He is expected to be released in early 2015.

200.   Blevins suffers from asthma and Hepatitis C.

201.   He has experienced body aches, headaches, congestion, a dry cough, and a rash that would not heal.

202.   Mr. Blevins was diagnosed with Valley Fever in August 2014.

203.   He was treated with 200mg doses of Fluconazole.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

204.   Blevins continues to experience headaches and difficulty concentrating.

205.   He filed a claim with the California Victim Compensation and Government Claims Board on October 15, 2014.

206.   Mr. Blevins brings a state claim.

207.   Infected at ASP in 2014, Blevins brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Beard and Wofford.

208.   These Defendants knew that inmates like Blevins were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

209.   Mr. Blevins' CDCR number is AI1851.

### MICHAEL BLUE

210.   Michael Sherman Blue is a 50-year-old African American from New York.

211.   He has worked in a number of occupations.  His skills include machine operator, fork lift operator, skill saws, table saws and welding.  He has his GED.

212.   Mr. Blue contracted Valley Fever after his transfer to PVSP.  He was diagnosed in 2012 at Natividad Medical Center.

213.   Blue suffers chills, joint pain, severe headaches, difficulty with his eyesight, uncontrollable sweating, and a loss of appetite.  At times he feels dizzy and disoriented, and he gets short of breath if he tries to exercise.  His joint pain prevents him from walking easily.

214.   Mr. Blue was prescribed Fluconazole for Valley Fever and Naproxen for pain.

215.   Blue brings a federal claim.  He previously filed a state and federal claim on November 10, 2014.

216.   Infected at PVSP in 2012, Blue brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

217.   These Defendants knew that inmates like Blue were at increased risk of contracting Valley Fever but failed to take action to protect him from this disease.

218.   Mr. Blue's CDCR number is G31172.

## DARRELL BRADFORD

219.   Darrell Bradford is a 53-year-old male of a mixed racial background, from Southern California.

220.   Mr. Bradford is currently enrolled in Palo Verde College pursuing an Associate of Arts degree with an emphasis on counseling.  He has two children who each earned college degrees.

221.   Bradford was transferred to Pleasant Valley State Prison on December 23, 2009.

222.   He was in good health prior to his transfer.

223.   He was diagnosed with Valley Fever in April 2011.

224.   His condition is considered disseminated.

225.   Bradford was initially treated with Fluconazole but suffered severe side effects.  He is currently being treated with Posaconazole and has lab work performed every 90 days to monitor his condition.

226.   Bradford's symptoms are worsening. He continues to experience severe joint aches, headaches, dizziness, and was recently diagnosed with arthritis in his upper neck. Some days he cannot get out of bed due to the discomfort.

227.   Bradford brings a federal claim.

228.   Infected at PVSP in 2011, Bradford brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

229.   These Defendants knew that inmates like Bradford were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

230.   Mr. Bradford's CDCR number is T49982.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1

## JOHNNY BRIONES

2    231.    Johnny Briones is a 44-year-old Hispanic from Fresno, California.

3    232.    Mr. Briones suffers from asthma, seizures, and Hepatitis C.

4    233.    Briones was transferred to PVSP in March 2013 from California State

5    Prison in Lancaster.

6    234.    Mr. Briones was diagnosed with Valley Fever in February 2014 after he

7    was hospitalized due to shortness of breath and a high fever.

8    235.    Briones is treated intravenously with Abelcet.

9    236.    Mr. Briones filed a claim with the California Victim Compensation and

10   Government Claims Board on July 29, 2014.

11   237.    He brings a state and federal claim.

12   238.    Because he was infected at PVSP in 2014, Mr. Briones bring claims

13   against Defendants Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kernan,

14   Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Yates and Beard.

15   239.    These Defendants knew that inmates like Briones were at increased risk

16   of contracting Valley Fever but failed to take action to protect him from the disease.

17   240.    Mr. Briones' CDCR number is F15570.

18   ## JAMES CARR

19   241.    Mr. James Carr is a 47-year-old African American from Chicago,

20   Illinois.  He has been married for over 20 years.

21   242.    Prior to incarceration, he was employed in construction and in shipping

22   and receiving.

23   243.    Mr. Carr continued his education while incarcerated, earning his GED

24   and numerous certificates.

25   244.    He was transferred to PVSP in 2006 when the sensitive needs yard at

26   Donovan State Prison was closed.

27   245.    While at PVSP, Mr. Carr was assigned to work on the yard crew. Part of

28   his assignment included digging in the soil to repair sprinklers.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1

246.   Carr suffers from Hepatitis C.

2

247.   In February 2012, he began experiencing night sweats, headaches, a sore

3

throat and chest pains.

4

248.   He later experienced constant body aches, low energy, and sores on his

5

head and body.

6

249.   Mr. Carr was diagnosed with Valley Fever in March 2012.

7

250.   He was prescribed 200mg of Fluconazole, twice a day, for one year.

8

251.   Carr continues to be fearful of triggering infection relapse or worsening

9

of his symptoms.  He tires easily and experiences constant body aches.

10

252.   Mr. Carr brings a federal claim.

11

253.   Infected at PVSP in 2012, Plaintiff Carr brings claims against

12

Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz,

13

Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

14

254.   These Defendants knew that inmates like Carr were at increased risk of

15

contracting Valley Fever but they failed to take action to protect him from this disease.

16

255.   Mr. Carr's CDCR number is V48223.

17

**RICKY CARTER**

18

256.   Ricky Carter is a 40-year-old African American.

19

257.   Prior to his assignment to PVSP in 2008, Mr. Carter was in good health.

20

258.   He was diagnosed with Valley Fever in September 2013.

21

259.   His symptoms include breathing difficulty, chronic fatigue, loss of

22

appetite and difficulty sleeping.

23

260.   Mr. Carter brings a state and federal claim.

24

261.   Infected at PVSP in 2013, Plaintiff Carter brings claims against

25

Defendants Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kernan, Meyer,

26

Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Yates and Beard.

27

262.   These Defendants knew that inmates like Carter were at increased risk of

28

contracting Valley Fever but failed to take action to protect him from the disease.

263.    Mr. Carter's CDCR number is J59549.

**KEITH DEAN**

264.    Keith Dean is a 42-year-old African American.  Prior to his incarceration, he was an entrepreneur.  Dean ran his own retail business selling clothes and music.

265.    Mr. Dean was transferred to Avenal State Prison in 2011.

266.    Prior to his incarceration, Dean was an active young man.  He received a pacemaker in September 2011 due to symptomatic bradycardia, which was the first time he was made aware of this condition.

267.    Dean was diagnosed with Valley Fever in October 2011.

268.    Dean suffers constant head and body aches, night sweats, coughing fits, and overall weakness.

269.    Dean brings a federal claim.

270.    Infected at ASP in 2011, Dean brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, and Winslow.

271.    These Defendants knew that inmates like Dean were at increased risk of contracting Valley Fever but failed to take action to protect him from this disease.

272.    Mr. Dean's CDCR number is J90922.

**MARCO DEL AGUILA**

273.    Marco Del Aguila is a 53-year-old Guatemalan native, raised in Glendale, California.

274.    Mr. Del Aguila obtained his GED and is a certified optical technician as well as an optical lab mechanic.

275.    Del Aguila was transferred to Pleasant Valley State Prison on December 20, 2006.

276.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1    277.   Del Aguila was diagnosed with Valley Fever in May 2014 shortly after
2   his release.

3    278.   He was released from CDCR custody on April 17, 2014.

4    279.   Del Aguila currently suffers from skin lesions all over his body, as well
5   as sweating at night, fatigue and joint pain.

6    280.   Mr. Del Aguila filed a VCB claim on or about September 1, 2014,
7   within 6 months of his accrual date.

8    281.   Del Aguila brings a state and federal claim.

9    282.   Because he became infected at PVSP in 2014, Del Aguila brings claims
10  against Defendants Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kernan,
11  Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Yates and Beard.

12   283.   These Defendants knew that inmates like Del Aguila were at increased
13  risk of contracting Valley Fever but failed to take action to protect him from the
14  disease.

15   284.   Mr. Del Aguila's CDCR number is T00044.

16                          **VICKTER ESTRADA**

17   285.   Vickter Estrada is a 30-year-old Hispanic male.

18   286.   Mr. Estrada was transferred to PVSP in 2009.

19   287.   Before he contracted Valley Fever Estrada was in excellent health.

20   288.   Estrada was diagnosed with Valley Fever in January 2014.

21   289.   He suffers from pain in his lungs and joints, along with loss of energy
22  and strength and has developed painful sores on his feet.

23   290.   Estrada was treated with Fluconazole and continues to take this
24  medication twice a day.  He was also treated with medication to control coughing
25  caused by his pneumonia.  The sores on Estrada's feet have gone untreated by his
26  facility's medical staff.

27   291.   Estrada filed a VCB claim on or about June 23, 2014.  The Board
28  rejected his claim on or about August 29, 2014.

1

292.   Estrada brings a state and federal claim.

293.   Because he became infected at PVSP in 2014, Estrada brings claims against Defendants Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Yates and Beard.

294.   These Defendants knew that inmates like Estrada were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

295.   Mr. Estrada's CDCR number is G67609.

## JOHN EVERHART

296.   John Everhart is a 67-year-old Caucasian.

297.   Prior to his incarceration, Mr. Everhart worked as a manual laborer.  He is known as a hard worker.  During his incarceration he volunteers his time.  For the past two years, he has acted as a wheelchair pusher for disabled inmates.

298.   Everhart was transferred to PVSP in 2010.

299.   Mr. Everhart had a known prior susceptibility from Hepatitis C and Type 2 diabetes.

300.   Everhart was diagnosed with Valley Fever in November 2011.

301.   He suffers overall weakness and difficulty breathing,   and developed lesions on his legs.

302.   Everhart was prescribed Fluconazole and remained on this medication for approximately one year.  When his symptoms returned in August 2013, he was again prescribed Fluconazole, which he continues to take.

303.   Everhart brings a federal claim.

304.   Infected at PVSP in 2011, Everhart brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Schwartz, Rothchild, Schwarzenegger, Winslow, and Yates.

305.   These Defendants knew that inmates like Everhart were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

306.   Mr. Everhart's CDCR number is AB6873.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1

## ANTONIO FRANCO

2    307.    Antonio Franco is a 57-year-old Hispanic.  He is a husband and father,

3    originally from Guadalajara, Mexico.

4    308.    Mr. Franco was transferred to PVSP in 2010 from Avenal State Prison.

5    309.    Franco had a compromised immune system from Hepatitis C and

6    suffered from asthma for over 20 years.

7    310.    Franco was diagnosed with pulmonary coccidioidomycosis in April,

8    2012.

9    311.    He experienced severe and painful symptoms including fever, sweating

10    at night, chills, weakness, piercing lung pain, headaches, and coughing fits including

11    coughing up blood.

12    312.    At one point, Franco submitted three health care service request forms

13    over the course of three days prior to being treated.  He was without his asthma

14    medication for over two weeks, which created difficulty for him to breathe.

15    313.    Once seen by a physician, he was prescribed Fluconazole for three

16    months, which did not help.  He was then prescribed Itraconazole.

17    314.    As a result of the coccidioidomycosis, Franco states his life has changed

18    100% for the worse.  He suffers headaches, excruciating pain, and can no longer

19    perform daily activities.

20    315.    Franco experiences mental suffering and describes his life as a living

21    hell.  Due to an already compromised immune system, Franco fears that the Valley

22    Fever will lead to his death.

23    316.    Franco brings a federal claim.

24    317.    Infected at PVSP in 2012, Franco brings claims against Defendants

25    Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Schwartz,

26    Rothchild, Schwarzenegger, Winslow, and Yates.

27    318.    These Defendants knew that inmates like Franco were at increased risk

28    of contracting Valley Fever but failed to take action to protect him from the disease.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

319.    Antonio Franco's CDCR number is E69947

## EMMANUEL FRANCO

320.    Emmanuel Franco is a 26 year old Hispanic.  He has his GED.

321.    Prior to his incarceration, Mr. Franco was in good health.  He enjoyed exercising and being active.

322.    Franco was transferred to Avenal State Prison in August 2010.

323.    He was prescribed Fluconazole.

324.    Franco was diagnosed with Valley Fever in July, 2011.

325.    He now suffers from joint pain and shortness of breath.  He suffers sharp stabbing pain in his lower left lung, fever and sweating spells.  He can no longer enjoy physical activity as he once did due to the impact to his breathing.

326.    Franco lost his job in the prison because he cannot participate in strenuous labor.

327.    Emmanuel Franco brings a federal claim.

328.    Infected at ASP in 2011, Franco brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, and Winslow.

329.    These Defendants knew that inmates like Franco were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

330.    Emmanuel Franco's CDCR number is AB6948.

## MICHAEL FREDERIKSEN

331.    Michael Frederiksen is 52 years old and the father of two children.

332.    Mr. Frederiksen was diagnosed with Valley Fever in 2012.

333.    Frederiksen's symptoms at the onset included body aches, body rashes, and difficulty breathing.

334.    Frederiksen was initially put on an antibiotic regimen.  He was later prescribed Diflucan, to which he suffered an allergic reaction and which provided  no

relief for his symptoms.  He was then prescribed Itraconazole, which reportedly has improved his condition.

335.    Frederiksen continues to suffer body aches and shortness of breath.  The disease has weakened his immune system and he struggles to fight off common illnesses.

336.    Frederiksen brings a federal claim.

337.    Infected at PVSP in 2012, Frederiksen brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

338.    These Defendants knew that inmates like Frederiksen were at increased risk of contracting Valley Fever but failed to take action to protect him.

339.    Mr. Frederiksen's CDCR number is K22061.

## JAMES GARRETT

340.    James Garrett is a 61-year-old African American.

341.    Mr. Garrett grew up on the East Coast.

342.    He was a singer in a band called the Blackbyrds.  The group had a hit in 1975 called "Walking in Rhythm."

343.    Garrett enjoyed good health except for asthma, for which he uses an inhaler.

344.    Garrett was diagnosed with Valley Fever in November 2011.

345.    Since then, he has experienced severe weight loss, loss of appetite, constant body aches, and bodily weakness. He has taken several medications including Azithromycin and Fluconazole which have caused uncomfortable side effects.

346.    Garrett brings a federal claim.

347.    Because he became infected in 2011 while at PVSP, Garrett brings a claim against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothschild, Schwartz, Schwarzenegger, Winslow, and Yates.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

348.    These Defendants knew that inmates like Garrett were at an increased risk of contracting Valley Fever, but failed to take action to protect him from the disease.

349.    Mr. Garrett's CDCR number is G61615.

### KEVIN HARDIN

350.    Kevin Hardin is a 46-year-old African American.

351.    Mr. Hardin was born in Chicago, Illinois.  He moved to California in 1968.  Hardin obtained his GED in prison.  Before his incarceration, he was a laborer and painter.

352.    Hardin was diagnosed in December 2013 at Avenal State Prison.

353.    Mr. Hardin suffers from labored breathing and other symptoms of the disease.

354.    Hardin has been prescribed Fluconazole.

355.    Mr. Hardin filed a VCB claim on or about May 8, 2014.

356.    He brings a state and federal claim.

357.    Infected at ASP in 2013, Hardin brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Beard and Wofford.

358.    These Defendants knew that inmates like Hardin were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

359.    Mr. Hardin's CDCR number is K75820.

### CLIFFORD HAYTER

360.    Mr. Clifford Hayter is a 57-year-old African American.

361.    Mr. Hayter was diagnosed with Valley Fever in May, 2013 at PVSP.

362.    He suffers back pain, headaches and skin problems.

363.    Mr. Hayter filed a VCB claim May, 2014.

364.    Hayter brings a state and federal claim

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

365.    Infected at PVSP in 2013, Hayter brings claims against Defendants Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Yates and Beard.

366.    These Defendants knew that inmates like Hayter were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

367.    Mr. Hayter's CDCR number is J69292.

## SOKHA HINN

368.    Sokha Hinn is 39 years old and Cambodian. He was raised in California.

369.    Mr. Hinn has one daughter.  He has two years of college education.

370.    Hinn was diagnosed with Valley Fever in June 2013 at PVSP.

371.    Hinn suffered weight loss, weakness, bone aches, nausea, fatigue, and sweating at night.

372.    Hinn has been prescribed and takes Fluconazole.

373.    Mr. Hinn filed a VCB claim which was rejected on or about November 21, 2013.

374.    Hinn brings a state claim.

375.    Infected at PVSP in 2013, Hinn brings claims against Defendants Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Yates and Beard.

376.    These Defendants knew that inmates like Hinn were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

377.    Mr. Hinn's CDCR number is P37363.

## JASON HOCKLEY

378.    Jason Hockley is a 28-year-old African American.

379.    Mr. Hockley graduated from high school and has some college education.  He was raised in Los Angeles and has two children.

380.    Hockley was diagnosed with VF in March 2011 at Pleasant Valley State Prison.

381.   Hockley suffered various symptoms.

382.   He brings a federal claim.

383.   Infected at PVSP in 2011, Hockley brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

384.   These Defendants knew that inmates like Hockley were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

385.   Mr. Hockley's CDCR number is F97434.

## DARNELL HUGHES

386.   Darnell Hughes is a 59-year-old African American.

387.   Mr. Hughes had Hepatitis C, asthma and chronic hay fever.

388.   Hughes was diagnosed with Valley Fever in March 2011 at PVSP.

389.   He experiences chest pains, kidney pain, feels tired, has suffered weight loss, night sweats, pneumonia, constant cough, headaches, and has pus-filled bumps on his skin and a rash on his right lower leg.

390.   Mr. Hughes currently takes medication for the Valley Fever, including Fluconazale and Itraconzole.

391.   Hughes brings a federal claim.

392.   Infected at PVSP in 2011, Hughes brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

393.   These Defendants knew that inmates like Hughes were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

394.   Mr. Hughes' CDCR number is G65611.

## JOSE ISLAS

395.   Jose Islas is a 37-year-old Mexican and Native American.

396.   Mr. Islas was diagnosed with Valley Fever in 2011 at PVSP.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

397.    Islas now has a lump on his stomach, suffers from night sweats, shortness of breath, weight loss, and fatigue.  His Valley Fever is disseminated.

398.    Mr. Islas has been on multiple medications for Valley Fever including Fluconazole.

399.    Islas brings a federal claim.

400.    Infected at PVSP in 2011, Islas brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

401.    These Defendants knew that inmates like Islas were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

402.    Mr. Islas's CDCR number is J89852.

## JESSE JOHNSON

403.    Jesse Johnson is an African American born on December 13, 1965.

404.    Mr. Johnson was diagnosed with Valley Fever in July 2011 at Avenal State Prison.

405.    Johnson suffers from loss of appetite, nausea, weight loss, and body pains.

406.    Johnson brings a federal claim.

407.    Infected at ASP in 2011, Johnson brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, and Winslow.

408.    These Defendants knew that inmates like Johnson were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

409.    Jesse Johnson's CDCR number is D74460.

## MANDAZ JOHNSON

410.    Mandaz Johnson is a 59-year-old African American.

411.    Prior to incarceration, Mr. Johnson was a certified caretaker, attendant, construction worker and landscape gardener.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

412.   Johnson was diagnosed in October 2013 while housed at Pleasant Valley State Prison.

413.   Johnson suffers from chest pain, rapid breathing, shortness of breath and fatigue.

414.   He takes Fluconazole.

415.   Johnson brings a state claim.

416.   Infected at PVSP in 2013, Johnson brings claims against Defendants Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Yates and Beard.

417.   These Defendants knew that inmates like Johnson were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

418.   Mr. Johnson's CDCR number E74700.

### DANIEL JONES

419.   Daniel Jones is a 61-year-old African American.

420.   Before being diagnosed with Valley Fever, Mr. Jones was paralyzed on his left side and had osteoporosis.

421.   Jones was diagnosed with Valley Fever on February 15, 2012 at PVSP.

422.   Currently, Mr. Jones experiences severe fatigue and other symptoms.

423.   Mr. Jones has not been prescribed medication for Valley Fever.

424.   Mr. Jones brings a federal claim.

425.   Infected at PVSP in 2012, Jones brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

426.   These Defendants knew that inmates like Jones were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

427.   Daniel Jones's CDCR number is F99657.

### MIKHIEL LEINWEBER

428.   Mikhiel Leinweber is a 33-year-old Caucasian of Russian descent.

429.    Mr. Leinweber was diagnosed with Valley Fever on January 5, 2011 while at PVSP.

430.    Currently, Mr. Leinweber has scars on his lungs and chest pains due to the disease.

431.    He has been on multiple medications.

432.    Leinweber brings a federal claim.

433.    Infected at PVSP in 2011, Leinweber brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

434.    These Defendants knew that inmates like Leinweber were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

435.    Mr. Leinweber's CDCR number is T58130.

## JESSE LEWELLING

436.    Jesse Lewelling is a 37 year old African American from San Luis Obispo, California. He has a 9 year old son.

437.    Mr. Lewelling graduated from high school and went to college for 2 years.

438.    He has worked in private security around the country.

439.    Before his transfer to PVSP, Lewelling was healthy and exercised two hours a day five days a week. He had no immune problems.

440.    Lewelling was diagnosed with Valley Fever in August or September of 2011 at PVSP.

441.    He was prescribed Diflucan for the disease.

442.    Lewelling continues to experience shortness of breath, loss of appetite, fluid in his lungs, loss of weight, and joint aches.

443.    He brings a federal claim.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

444.    Because he became infected at PVSP in 2011, Lewelling brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

445.    These Defendants knew that inmates like Lewelling were at increased risk of contracting Valley Fever but they failed to take action to protect him from the disease.

446.    Mr. Lewelling's CDCR number is F74936.

### CLEOFAS LEWIS

447.    Cleofas Lewis is a 54-year-old African American.

448.    Mr. Lewis was formerly a fork lift driver and has his GED.  While in prison, he completed two trade courses, computers and electronics.

449.    Lewis was transferred to PVSP in 2010.

450.    He contracted Valley Fever in 2012.

451.    Lewis suffers fatigue, coughing and night sweats such that he is unable to sleep, loss of appetite and weight loss, and headaches.

452.    Mr. Lewis has been prescribed Fluconazole.

453.    Lewis brings a federal claim in this action.  He has a pending state claim filed in the consolidated lawsuit filed November 10, 2014.

454.    Because he became infected at PVSP in 2012, Lewis brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

455.    These Defendants knew that inmates like Lewis were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

456.    Mr. Lewis's CDCR number is T23096.

### KEVIN LEWIS

457.    Kevin Lewis is a 28-year-old Caucasian.

458.    Mr. Lewis was formally diagnosed with Valley Fever on January 15, 2014 while at PVSP.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

459.   He suffers fatigue, shortness of breath, has had pneumonia, chronic cough and has been hospitalized and has suffered permanent injury to his right lung due to his Valley Fever.

460.   He has been diagnosed with a 5 cm mass on his lung that will require surgical removal.

461.   Mr. Lewis has been on multiple medications for Valley Fever including Fluconazole.

462.   Mr. Lewis filed VCB claims on July 14, 2014 and August 4, 2014.

463.   He brings a state and federal claim.

464.   Infected at PVSP in 2014, Lewis brings claims against Defendants Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Yates and Beard.

465.   These Defendants knew inmates like Lewis were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

466.   Mr. Lewis' CDCR number is G61810.

## MICHAEL MANNING

467.   Michael Manning is a 57-year-old African American.

468.   Mr. Manning was transferred to PVSP in June 2008.

469.   He was diagnosed with disseminated Valley Fever in 2012.

470.   Manning suffers weakness, tightness in his chest, fever, chills, severe coughing, pain, bleeding, and breathing problems.  He has lesions on his chest, shoulder, and torso, and neurological symptoms.

471.   Manning was hospitalized at Montclair Hospital and prescribed 800 mg of Diflucan daily.

472.   Manning brings a federal claim.  He previously filed a state claim, pending now, in the November 10, 2014 consolidated complaint.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

473.   Because he became infected at PVSP in 2012, Manning brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

474.   These Defendants knew that inmates like Manning were at increased risk of contracting Valley Fever but failed to take action to protect him.

475.   Mr. Manning's CDCR number is H95717.

### JAMES McGINLEY

476.   James McGinley is a 66-year-old Caucasian from West Virginia.

477.   Mr. McGinley worked as a journeyman painter and his passion is rebuilding cars.

478.   McGinley was transferred to ASP in about March 2011.

479.   Inmates including McGinley were required to turn sod over while performing yard work.

480.   McGinley was diagnosed with Valley Fever in April, 2011.

481.   He was put on Fluconazole, 400 mg per day.

482.   He has suffered from a sore throat, night sweats, severe headaches, coughing, weight loss, exhaustion, and overall body soreness. McGinley still suffers from aching bones, headaches, mental confusion, and vertigo.

483.   McGinley brings a federal claim.

484.   Because he became infected at ASP in 2011, McGinley brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, and Winslow.

485.   These Defendants knew that inmates like McGinley were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

486.   Mr. McGinley's CDCR number is K73555.

### WILLIAM MILTON

487.   William Milton is a 48-year-old African-American father of two sons.

488.   In June, 2011 Mr. Milton began experiencing severe night sweats, dizziness, chills, shortness of breath, chest pains, muscle pain, fatigue, and a significant increase in joint and back pain.

489.   Initially he was refused treatment, even when he sent in requests explaining his symptoms, which by then included severe coughing, vomiting, trouble breathing, heavy sweating and an inability to eat.

490.   On July 8, 2011 a doctor finally ordered that Mr. Milton be given emergency treatment. He was diagnosed as having abnormal pulmonary and chest X-ray results.

491.   Milton was diagnosed with Valley Fever on July 20, 2011 at PVSP.

492.   He was prescribed 500 mg Levaquin for his pneumonia and 200 mg Fluconazole to treat the Valley Fever.

493.   In August 2011, Mr. Milton was told he might have to take Valley Fever medication for the rest of his life.  He still had abnormal pulmonary function. The pain he was experiencing in his neck, knees and spine was attributed to cocci.

494.   Mr. Milton continues to suffer from VF symptoms, such as a rash on his back, a growth in one of his eyes, severe joint pain, and fatigue.  He also has emotional difficulties as a result of his physical problems.

495.   Milton brings a federal claim.

496.   Infected at PVSP in 2011, Milton brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

497.   These Defendants knew inmates like Milton were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

498.   Mr. Milton's CDCR number is P38650.

## MACK PAGE

499.   Mack Page is a 66-year-old African-American.

1   500.   Mr. Page was transferred to PVSP in June, 2012.  He was immune-
2   compromised with a history of heart trouble and COPD.

3   501.   Page was diagnosed with Valley Fever in August 2012 at PVSP.

4   502.   Page suffers chills, difficulty breathing, night sweats, chest pain and
5   coughing.

6   503.   He now uses an inhaler to help him breath and can only walk 100
7   yards. In August of 2013, he was transferred out of PVSP.

8   504.   Page was given Itraconozole to treat the disease.  He was recently taken
9   off it.

10   505.   Mr. Page brings a federal claim.

11   506.   Infected at PVSP in 2013, Page brings claims against Defendants
12   Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer,
13   Schwartz, Rothchild, Schwarzenegger, Winslow, Yates and Beard.

14   507.   These Defendants knew inmates like Page were at increased risk of
15   contracting Valley Fever but failed to take action to protect him from the disease.

16   508.   Mr. Page's CDCR number is J66125.

17                              **CEDRIC PARKER**

18   509.   Cedric Parker is a 48-year-old African-American. He has asthma.

19   510.   Parker was diagnosed with Valley Fever on September 6, 2011 at PVSP.

20   511.   Since contracting the disease, Parker has had more frequent asthma
21   attacks.  He suffers from low energy, and muscle and joint pain that prevent him from
22   working out.

23   512.   Parker was prescribed Fluconazole 400mg to manage his Valley Fever
24   and 325mg mapap for pain.

25   513.   Parker brings a federal claim.

26   514.   Infected at PVSP in 2011, Parker brings claims against Defendants Cate,
27   Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild,
28   Schwarzenegger, Winslow, and Yates.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

515.    These Defendants knew inmates like Parker were at increased risk of contracting Valley Fever but failed to take action to protect him.

516.    Mr. Parker's CDCR number is T38256.

### THEODORE PARKER

517.    Theodore Parker is a 33-year-old African American.

518.    Mr. Parker was diagnosed with Valley Fever in January, 2012 at PVSP.

519.    Parker had a pre-existing asthma condition.

520.    Parker was treated with Pnemovac.

521.    Parker initially suffered from pain, fever, and chills and other VF symptoms.  He has become anxious and depressed as a result.

522.    Mr. Parker was released in June, 2014.

523.    He brings a federal claim.

524.    Infected at PVSP in 2012, Parker brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Schwartz, Rothchild, Schwarzenegger, Winslow, and Yates.

525.    These Defendants knew inmates like Parker were at increased risk of contracting Valley Fever but failed to take action to protect him.

526.    Mr. Parker's CDCR number is G12067.

### MANUEL QUIROGA

527.    Mr. Manuel Quiroga is a 66-year-old Cuban from Stockton, California.

528.    Mr. Quiroga is married with 3 children.

529.    Quiroga suffered from asthma, emphysema, and diabetes before his transfer to PVSP.

530.    Quiroga was diagnosed with Valley Fever in late June 2013 at PVSP.

531.    Mr. Quiroga experienced chest pain, shortness of breath, hot and cold sweats, chills, a fever, and pain throughout his body.  He lost 30 lbs in three months.

532.   As a result of the Valley Fever, Mr. Quiroga is now classified as disabled with numerous pulmonary and respiratory problems.  He has a 4cm mass in his right lung.

533.   Quiroga now walks with a cane or walker.

534.   Mr. Quiroga was initially prescribed 400mg of Diflucan per day, but had an allergic reaction to it.  He was then prescribed 400mg a day of Itraconazole.

535.   Quiroga brings a state and federal claim.

536.   Infected at PVSP in 2013, Quiroga brings claims against Defendants Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Schwartz, Rothchild, Schwarzenegger, Winslow, Beard and Yates.

537.   These Defendants knew inmates like Quiroga were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

538.   Mr. Quiroga's CDCR number is P49751.

## CHARLES ROBERTSON

539.   Mr. Charles Robertson is a 29-year-old Hispanic from Hemet, California.

540.   He comes from a large family and has various trade skills.

541.   At the time he became infected with VF, Mr. Robertson was incarcerated for a minor drug possession charge. He was released in October 2013.

542.   Prior to his assignment to Avenal State Prison, Mr. Robertson suffered from Hepatitis C and asthma.

543.   He was transferred to ASP in November 2011.

544.   Robertson was diagnosed with Valley Fever in April 2013 after being sent to the hospital.

545.   As a result of the Valley Fever, Mr. Robertson has developed a mass in his right lung. He has suffered joint pain, fatigue, fever, cough, loss of appetite and night sweats, and difficulty sleeping.  He now suffers from depression.

546.   Robertson has been prescribed 400mg of Diflucan twice a day.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

547.   Mr. Robertson brings a state and federal claim.

548.   Infected at PVSP in 2013, Charles Robertson brings claims against Defendants Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Schwartz, Rothchild, Schwarzenegger, Winslow, Yates and Beard.

549.   These Defendants knew inmates like Robertson were at increased risk of contracting Valley Fever but failed to take action to protect him.

550.   Mr. Robertson's CDCR number is G16844.

### RICHARD ROBERTSON

551.   Richard Robertson is a 54-year-old Caucasian, born in Indiana and raised in Los Angeles.  He worked as a truck driver.  He expects to be released this coming year.

552.   Mr. Robertson suffered from Chronic Obstructive Pulmonary Disease (COPD), asthma, and diabetes mellitus type 2.

553.   Robertson was diagnosed with Valley Fever on December 27, 2010 at PVSP.

554.   He was treated with Diflucan for 6 months.

555.   Robertson suffers various symptoms of Valley Fever, including shortness of breath and sporadic wheezing.

556.   Robertson brings a federal claim.

557.   Infected at PVSP in 2010, Richard Robertson brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

558.   These Defendants knew inmates like Robertson were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

559.   Richard Robertson's CDCR number is P40846.

### JOHNNY SANCHEZ

560.   Johnny Sanchez is a 47-year-old Mexican-American from Los Angeles, California.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

561.   Mr. Sanchez attended high-school through his senior year and earned a GED.

562.   Prior to his incarceration Mr. Sanchez was strong, athletic and in excellent health.

563.   Sanchez was transferred to PVSP in 2011.

564.   Sanchez was admitted to Community Regional Medical Center for pneumonia in 2012, where he was hospitalized for about 9 days and diagnosed with Valley Fever.  Upon his discharge from the hospital he was prescribed Fluconazole, 200mg.

565.   The disease has since caused overall weakness, dizziness, painful coughing, reduced appetite, stomach pain, night sweats, weight loss and a collapsed lung.

566.   Sanchez brings a federal claim.  He previously filed a state claim, on July 7, 2014.

567.   Infected at PVSP in 2012, Sanchez brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

568.   These Defendants knew that inmates like Sanchez were at increased risk of contracting Valley Fever but failed to take action to protect him.

569.   Mr. Sanchez's CDCR number is E72914.

## TYRONE SANDERS

570.   Tyrone Sanders is a 32-year-old Hispanic-American. He has a five-year-old son.

571.   Mr. Sanders was born in Boston, Massachusetts, raised in Texas, and his home is Las Vegas, Nevada.

572.   Sanders completed some college courses.  His job history includes work in construction, docks and warehouses.

573.   Mr. Sanders was transferred to PVSP on August 19, 2011.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

574.   While on the yard at PVSP, he was required to sit in the dirt next to exposed construction areas.

575.   Sanders was diagnosed with Valley Fever in 2012.

576.   He suffered breathing difficulties, uncontrollable coughing, vomiting with blood, migraines and severe knee pain.

577.   He was prescribed Fluconazole 200mg and an inhaler.

578.   Aside from the physical toll the disease has taken on Mr. Sanders, it has had a psychological and emotional impact.

579.   Sanders brings a federal claim.  He filed a state claim, on July 7, 2014, which is pending.

580.   Infected at PVSP in 2012, Sanders brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

581.   These Defendants knew that inmates like Sanders were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

582.   Mr. Sanders' CDCR number is F20814.

### JULIO TARAMONA

583.   Julio Taramona is a 54-year-old Mexican national who grew up in the state of Guerrero in a town not far from Acapulco City.

584.   Taramona has two sisters who also live in the U.S.

585.   He worked for years in construction, including landscaping, plumbing, and electrical.

586.   Taramona was transferred to Pleasant Valley in June, 2008.  Taramona is a level II inmate so PVSP was an inappropriate endorsement for him irrespective of the Valley Fever risk.

587.   In or about July 2011, while at PVSP, Taramona contracted Valley Fever.

588.   He was treated for approximately four months with antibiotics.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

589.    Prior to the infection, Taramona was in good health. He now suffers skin rash, muscle pain, night sweats, fever, coughing, and difficulty breathing.

590.    Sometimes he feels as if he is suffocating because he cannot inhale oxygen into his lungs.

591.    Taramona brings a federal claim.

592.    Infected at PVSP in 2011, Taramona brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

593.    These Defendants knew inmates like Taramona were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

594.    Mr. Taramona's CDCR number is H83259.

## DANNY TERRY

595.    Danny Terry is a 57-year-old African-American, from California.

596.    Terry suffered from Hepatitis C and arthritis and was immune/respiratory compromised.

597.    In 2001, he was transferred to Avenal.

598.    Until 2009, from Terry's vantage point, Avenal maintained the grounds by watering the ground cover.  However, they stopped irrigating and the ground cover all died.

599.    In December 2010, Terry began to experience night sweats, shortness of breath, chronic cough, and headaches, accompanied by a weight loss of 30 pounds.

600.    Terry was first diagnosed with pneumonia, but in January 2011, was informed that he was infected with cocci.

601.    He was prescribed Fluconazole and Tylenol.

602.    On information and belief, the delay in treatment allowed the cocci to travel from his lungs to his blood stream, which worsened his condition.

603.    Terry suffers painful, swollen joints and chronic headaches, skin rash, and back pain.

604.    The symptoms have been so severe that he lost consciousness.

605.    Terry brings a federal claim.

606.    Infected at PVSP in 2011, Terry brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

607.    These Defendants knew inmates like Terry were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

608.    Mr. Terry's CDCR number is D39439.

### PATRICK WALLACE

609.    Patrick Wallace is a 48-year-old African-American from South Carolina.

610.    Mr. Wallace enlisted in the US Navy in 1986.  He was stationed in San Diego when he met his wife.   He is a military man and family man, with two children.

611.    Wallace was diagnosed with Valley Fever in October 2011while at Avenal State Prison.

612.    Before his incarceration, Wallace was in good health.  He exercised and worked daily.

613.    Now he suffers symptoms including high fever, nausea, throwing up, fatigue, pain in his joints, sores and blisters on his legs.

614.    He was put on a breathing machine and hospitalized for nearly a month. He had three different surgeries in a three month period.

615.    His eyesight has also been affected.

616.    Wallace was prescribed Fluconazole in October 2011 to take twice daily through 2013.  His symptoms continued, and he was then prescribed Prozadeal, Posaconazole, and morphine tablets.

617.    He is classified as high risk.

618.    Wallace brings a federal claim.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

619. Because he became infected at ASP in 2011, Wallace brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, and Winslow.

620. These Defendants knew that inmates like Wallace were at increased risk of contracting Valley Fever but failed to take action to protect him.

621. Mr. Wallace's CDCR number is H13381.

## ALONZO WILLIAMS

622. Alonzo Williams is a 52-year-old African American

623. Mr. Williams has a background in athletics, including professional football.

624. He was convicted of comparatively minor theft-related offenses.

625. Williams was transferred to PVSP in 2009.

626. He was diagnosed with Valley Fever in April, 2011.

627. Mr. Williams lives with a compromised immune system, allergies, respiratory strain and fatigue as a result of his VF.

628. He has been treated with Fluconazole.

629. Williams brings a federal claim.

630. Because he became infected at PVSP in 2011, Williams brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

631. These Defendants knew that inmates like Williams were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

632. Mr. Williams' CDCR number is F07231.

## FINLEY WIMBLEY

633. Finley Wimbley is a 44-year-old African-American male.

634.    Before his incarceration at Pleasant Valley State Prison, Mr. Wimbley was in good health.  He had diabetes but otherwise had good energy and strength and exercised regularly.

635.    Wimbley was diagnosed with Valley Fever in 2013.

636.    Prison medical officials were aware of Wimbley's condition but initially told him that he did not need medication.

637.    Wimbley's health has deteriorated, his vision is blurred, he experiences coughing and vomiting, and is unable to sleep due to his symptoms.

638.    Wimbley brings a state claim.

639.    Infected at PVSP in 2013, Plaintiff Wimbley brings claims against Defendants Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Schwartz, Rothchild, Schwarzenegger, Winslow, Yates, and Beard.

640.    These Defendants knew that inmates like Wimbley were at increased risk of contracting Valley Fever but failed to take action to protect him from the disease.

641.    Mr. Wimbley's CDCR number is E74507.

## GERALD YOUNG

642.    Gerald Young is a 56-year-old African American.

643.    He was in good health before his transfer.

644.    Young was hospitalized for Valley Fever on December 22, 2011.

645.    He has been prescribed Fluconazole.

646.    He has suffered various symptoms and has lost 30 pounds.

647.    Young brings a federal claim.

648.    Because he became infected at PVSP in 2011, Young brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

649.    These Defendants knew that inmates like Young were at increased risk of contracting Valley Fever but failed to take action to protect him.

650.    Mr. Young's CDCR number is AE9076.

## VI.

## DEFENDANTS' LIABILITY

### A.    Allegations Against Each Defendant

### JEFFREY BEARD

651.    Defendant Jeffrey Beard is the current Secretary of the CDCR. He succeeded Defendant Matthew Cate in that position on or about December 27, 2012.

652.    As Secretary, Mr. Beard is responsible for all policies and practices of the organization as well as for its operational decisions and has direct supervisory authority over every CDCR employee.[43]

653.    On information and belief, as of December 2012, Beard knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease, particularly at PVSP and ASP; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever, including exclusion, landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions. Indeed, in light of the history of the Valley Fever epidemic, which had been ongoing at the hyper-endemic prisons for 6 years by the time he took office, the approximately $23 million in annual expenses paid by the CDCR for medical care for the victims, and in light of the information known throughout the community of individuals who served as prison

---

[43] CDCR Operations Manual, p. 1.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1    officials and prison medical staff/officials, it is implausible that he would not have had

2    this knowledge.

3    654.   The sources of his knowledge include, but are not limited to, the

4    January, 2007 California Department of Health Services memorandum, widely

5    circulated for "the record," which recommended exclusion of African Americans,

6    Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates

7    and immune-compromised or immune-suppressed persons from hyperendemic prisons

8    and also recommended ground cover throughout those prison properties; a January,

9    2007 memorandum written by former warden James Yates which considered whether

10   to at least relocate the high risk groups mentioned in the CDHS' memorandum and

11   implement the CDHS recommendation for ground cover; the annual Fresno County

12   Grand Jury reports which discussed the Valley Fever problem, and referenced "high

13   risk inmates"; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in

14   Prisons in the Hyperendemic Areas of California," which suggested the diversion and

15   relocation of high risk inmates  and included specific remedial measures to reduce the

16   risk; the November 11, 2007 policy memorandum authored by Susan Hubbard, which

17   discussed the various CDHS recommendations, and the October, 2012 CCHCS report

18   that comprehensively documented the severity of the Valley Fever problem.

19   655.   Secretary Beard also had a great deal of additional documentary

20   information available to him from other sources between 2007 and 2012, as discussed

21   herein.

22   656.   However, despite his knowledge of the problem from multiple sources of

23   information that he received, Beard, as head of CDCR, continued to implement the

24   2007 exclusion policy, which left thousands of inmates exposed to the disease.  He

25   failed to act to otherwise protect inmates from this risk, other than to acquiesce to a

26   federal court's June, 2013 order to evacuate additional inmates from two of the hyper-

27   endemic prisons.

28

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

657.   Defendant Beard further failed to act to implement the specific recommended remedial measures.  He knew at that time of his tenure as Secretary that remedial measures existed that could have been implemented at reasonable cost, and that implementing those measures would reduce the risk to inmates who were housed at PVSP or any of the hyper-endemic prisons, as these recommendations had been formally tendered years before, but he nevertheless ratified and continued the policy of inaction.

658.   Mr. Beard personally participated in the failure to protect inmates from Valley Fever despite having the ability and responsibility as Secretary of CDCR to protect inmates from these unacceptable risks. Beard personally participated in the failure to protect inmates from increased risk of Valley Fever, was deliberately indifferent to inmates' risk of infection, and is personally responsible for the injuries sustained by inmates who contracted Valley Fever at any of the hyper-endemic prisons from December 27, 2012 onward, including Plaintiffs as specified below.

659.   Defendant Beard is liable to all Plaintiffs that contracted the disease in 2013 or later, as he took office in December 2012 and, as Secretary, became responsible for inmate well-being at all prisons as of this date.

## PAUL D. BRAZELTON

660.   Defendant Paul Brazelton was the warden of PVSP from early 2012 to the Fall of 2013.  On information and belief, he occupied positions of authority at PVSP in the five years before his tenure as warden and has worked at the prison since 1994.

661.   As Warden, Mr. Brazelton was responsible for the policies and practices of the prison as well as for its operational decisions, and had direct authority over every CDCR employee at PVSP.

662.   On information and belief, by 2012 at the latest, Brazelton knew of:  (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; (2) the elevated risk of infection faced by

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever, including exclusion, landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions. Indeed, in light of his position and responsibilities during this time, including his own eyewitness observation of the epidemic at PVSP, and in light of the information known throughout the community of individuals who served as prison officials and prison medical staff/officials, it is implausible that he would not have had this knowledge.

663.   The sources of his knowledge, in addition to his personal observations, include but are not limited to, the January, 2007 California Department of Health Services memorandum, widely circulated, which recommended exclusion of high-risk groups, such as African-Americans, American Indians, and Asians as well as immune-compromised/immune-suppressed individuals and also recommended ground cover throughout the prison property; a January, 2007 memorandum written by the warden that immediately preceded him, Mr. James Yates, which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed prison officials at the time to respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; the November 11,

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

2007 policy memorandum authored by Susan Hubbard, which discussed the various CDHS recommendations and was directed to all wardens at the time; the October, 2012 CCHCS report that comprehensively documented the gravity of the Valley Fever problem; and various lawsuits against Warden Brazelton personally from 2012 onward in which inmates described themselves as at high risk of infection.

664.   Defendant Brazelton at a minimum received copies of the Fresno Grand Jury reports of 2012-2013, and almost certainly received or was aware of the previous annual versions of these.

665.   However, despite the multiple sources of information that he received and had access to, Warden Brazelton, as head of PVSP, not only acquiesced to the state's narrow 2007 exclusion policy, which left thousands of inmates exposed to the disease, he refused to exercise his independent authority as warden to transfer inmates out for their safety.  Based on his independent power to transfer inmates out of PVSP, or prevent their transfer to PVSP, based on their safety needs pursuant to Title 15, sections 3379(a)(4), 3379(a)(9), 3379(a)(9)(F)(2) and 3379(a)(9)(G)(1), and to adopt policies and procedures to avoid threats to inmate safety, and his failure to implement such policies, he exhibited deliberate indifference to inmates' risk of contraction of Valley Fever.

666.   On information and belief, Warden Brazelton was aware of the Valley Fever problem before he assumed the position of Warden in 2012 and he was also aware that certain groups were at higher risk of suffering more serious complications from it.

667.   Warden Brazelton had the ability to exclude inmates as they were transferred to his facility and he personally participated in the decision not to do so during his tenure as Warden from 2012-2013.

668.   During this time, Warden Brazelton was named as a defendant in lawsuits by inmates, served on him personally, which further informed him of the Valley Fever problem in general and often that certain groups of inmates were

especially susceptible to serious adverse effects of Valley Fever.  Yet, he continued his decision not to intervene to protect inmates from the known greater risk of infection.

669.   Warden Brazelton also personally participated in the decision not to install ground cover or other remedial measures at the prison.  Throughout his tenure as PVSP warden, he could have installed ground cover and implemented other recommended remedial measures.  He was specifically given this power pursuant to the November 20, 2007 policy memorandum, and in addition had the general responsibility to maintain the prison in a safe condition for inmates.  However, like his predecessor he failed to implement remedial measures which could have reduced the risk to all inmates at PVSP including those who contracted the disease after his tenure as warden.

670.   Warden Brazelton personally participated in the failure to protect inmates from increased risk of Valley Fever, was deliberately indifferent to inmates' risk of contracting Valley Fever, and is personally responsible for the injuries sustained by inmates who contracted Valley Fever at PVSP from early 2012 onward, including Plaintiffs as specified below.[44]

671.   Defendant Brazelton is liable to all Plaintiffs named herein that contracted Valley Fever at PVSP during his tenure from 2012-2013, and thereafter due to his failure to correct the unsafe conditions at the prison during that period.

## MATTHEW CATE

672.   Defendant Matthew Cate was the Secretary of the CDCR from 2008-2012.

673.   As Secretary, Mr. Cate was responsible for the policies and practices of the organization as well as for its operational decisions, and had direct authority over every CDCR employee.[45]

---

[44]  The Plaintiffs specified below are those identified in Plaintiffs' First Claim for Relief as those seeking relief from each particular Defendant.  (Not all Plaintiffs seek relief from each Defendant).

[45]  CDCR Operations Manual, P. 1.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

674.   On information and belief, as of 2007, Mr. Cate knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions.  Indeed, in light of Cate's position and responsibilities at the time, and in light of the information known throughout the community of individuals who served as prison officials and prison medical staff/officials, it is implausible that he would not have had this knowledge.

675.   The sources of his knowledge include, but are not limited to, the January, 2007 California Department of Health Services memorandum, widely circulated for "the record," which recommended exclusion of African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons and also recommended ground cover throughout the prison property; a January, 2007 memorandum written by former warden James Yates which considered whether to at least relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed him to personally respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the

diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; the November 11, 2007 policy memorandum authored by Susan Hubbard, which discussed the various CDHS recommendations; and numerous lawsuits against Mr. Cate personally from 2007 onward in which inmates described themselves as exposed to a significantly elevated risk of contracting Valley Fever.

676.   However, despite the multiple sources of information that he received, Mr. Cate, as head of CDCR, adopted and implemented only the narrow 2007 exclusion policy, which left thousands of inmates exposed to the disease.  He failed to act to otherwise protect inmates from this risk.

677.   Defendant Cate further failed to act to implement recommended remedial measures.  Cate knew at that time of his tenure as Secretary that remedial measures existed that could have been implemented at reasonable cost and that implementing those measures would reduce the risk to inmates who were housed at PVSP, ASP, or any of the hyper-endemic prisons.

678.   Cate, however, disregarded the CDH's recommendation to implement these remedial measures.

679.   On information and belief Cate developed, and submitted for funding, budgets for  construction, renovation, and improvement projects at the hyper-endemic prisons, specifically including extensive work at PVSP, but failed to request funds for the remedial measures recommended to address the Valley Fever epidemic.

680.   Cate was certainly aware of the Valley Fever problem at the time of his receipt of the 2008-2009 Grand Jury report, among other things; he was also aware that certain groups were at higher risk of suffering more serious complications from it.

681.   On information and belief, Mr. Cate personally participated in the decision not to exclude inmates from hyper-endemic prisons throughout his tenure from 2008-2012.  Indeed, during this interval, Mr. Cate had the authority as head of the Secretary of CDCR to have excluded from hyper-endemic prisons all inmates at risk of

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

infection, including the identified higher-risk groups. During this time, Mr. Cate was named as a defendant in numerous lawsuits by inmates in which they protested their contraction of Valley Fever and documented numerous facts about the crisis.

682.   Cate, who had the authority and means to have ordered ground cover to be installed at the hyper-endemic prisons throughout his tenure, on information and belief, also personally participated in the decisions and policy not to install ground cover or take other remedial measures that would have protected all inmates.

683.   Cate personally participated in the failure to protect inmates from increased risk of Valley Fever, was deliberately indifferent to inmates' risk of contracting Valley Fever, and is personally responsible for the injuries sustained by inmates who contracted Valley Fever at any of the hyper-endemic prisons from 2008 onward, including Plaintiffs as specified below.

684.   Former Secretary Cate is liable to all named Plaintiffs that contracted the disease based on the inadequate policies and practices of the State from 2006 forward. All plaintiffs name Defendant Cate as a defendant.

## SCOTT FRAUENHEIM

685.   Defendant Scott Frauenheim was the acting warden of Pleasant Valley State Prison (PVSP) from the Fall of 2013 to approximately October, 2014, when he became warden.  He is currently warden of PVSP.  He held various positions of authority before that, including at Avenal State Prison from 2009-2013, and has worked in the California prison system since 1994.

686.   As warden, Mr. Frauenheim is responsible for the policies and practices of the prison as well as for its operational decisions, and had direct authority over every CDCR employee at PVSP.

687.   On information and belief, by 2013, Frauenheim knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to all inmates from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; (3) the significantly elevated risk to any inmate of contraction of this incurable virus given the incidence rates at PVSP; and (4) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went outside under adverse conditions. Indeed, in light of his position and responsibilities at the time, including his prior tenure at ASP from 2009-2013, and including his own eyewitness observation of the problem occurring in front of him at ASP, and in light of the widespread information known throughout the community of individuals who served as prison officials and prison medical staff/officials about the Valley Fever problem, including detailed federal court orders specifically directed at the issue, it is virtually impossible that he would not have had this knowledge.

688.   The sources of his knowledge include the January, 2007 California Department of Health Services memorandum, widely circulated, which recommended exclusion of high-risk groups, such as African-Americans, American Indians, and Asians as well as immune-compromised/immune-suppressed individuals and also recommended ground cover throughout the prison property; a January, 2007 memorandum written by the warden that immediately preceded him, Mr. James Yates, which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed prison officials at the time to respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and

relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; the November 11, 2007 policy memorandum authored by Susan Hubbard, which discussed the various CDHS recommendations and was directed to all wardens at the time; the October 2012 CCHCS report which assembled various reports and studies to comprehensively publicize the extent of the Valley Fever problems; the June, 2013 detailed federal court order specifically directed at PVSP and ASP; and numerous other lawsuits, media reports and other public outlets from 2009 onward in which inmates of every color and creed filed suit, and protested in the media, their contraction of the disease at Avenal, PVSP and other prisons, but especially PSVP and ASP, the two prisons with the highest incidence of the disease in California.

689.   However, despite the multiple sources of information that he received, Warden Frauenheim, as head of PVSP, not only continued the overly narrow exclusion policy, which by then necessarily respected a federal court order to at a minimum move "high risk" inmates out of PVSP, but still left thousands of inmates to be exposed to the disease.  Warden Frauenheim refused to exercise his independent authority as warden to adequately protect all inmates.

690.   Based on his independent power to transfer inmates out of PVSP, or prevent their transfer to PVSP, based on their safety needs pursuant to Title 15, sections 3379(a)(4), 3379(a)(9), 3379(a)(9)(F)(2) and 3379(a)(9)(G)(1), and to adopt policies and procedures to avoid threats to inmate safety, and his failure to implement such policies, he exhibited deliberate indifference to inmates' risk of contraction of Valley Fever.

691.   On information and belief, Warden Frauenheim was well aware of the Valley Fever problem before he assumed the position of acting warden in 2013 and he was also aware that all inmates at PVSP, including persons that fall outside the traditional definitions of "high risk" (e.g. African-Americans, Filipinos, etc.) were still liable to contract the disease at a significantly higher rate than the surrounding area,

1    and yet he did not take steps to reduce these continuing cases of excessive risk leading
2    to infection.

3        692.   Warden Frauenheim had the ability to exclude inmates as they were
4    transferred to his facility and he personally participated in the decision not to do so
5    during his tenure as Warden from 2013-present.

6        693.   Warden Frauenheim also personally participated in the continuing
7    decision to not install ground cover or implement other remedial measures at the
8    prison.  Throughout his tenure as PVSP warden, he could have installed ground cover
9    and implemented remedial measures.  He was given this power pursuant to a
10   November 20, 2007 policy memorandum as well as his general authority.  However,
11   like his predecessors, he has failed to implement adequate remedial measures.

12       694.   Warden Frauenheim personally participated in the failure to protect
13   inmates from increased risk of Valley Fever, was deliberately indifferent to inmates'
14   risk of contracting Valley Fever, and is personally responsible for the injuries sustained
15   by inmates who contracted Valley Fever at PVSP from when he acceded to the post, in
16   approximately the Fall of 2013 forward, including plaintiffs specified below.

17                                        **JAMES HARTLEY**

18       695.   Defendant James Hartley was the warden of Avenal State Prison (ASP)
19   from 2007 through part of 2014.

20       696.   As Warden, Mr. Hartley was responsible for the policies and practices of
21   the prison as well as for its operational decisions, and had direct authority over every
22   employee at ASP.

23       697.   On information and belief, as of 2007, Hartley knew of: (1) the
24   prevalence of Valley Fever in the locations of the hyper-endemic prisons and the
25   serious risks to inmates from the disease; (2) the elevated risk of infection faced by
26   inmates in various ethnic and racial groups, including African Americans, Filipinos and
27   other Asians, Hispanics, and American Indians, as well as elderly inmates and
28   immune-compromised or immune-suppressed persons such as those taking medication

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions.  Indeed, in light of his position and responsibilities at the time of his knowledge, including his own eyewitness observation of the elevated infection rates at ASP, and in light of the information known throughout the community of individuals who served as prison officials and prison medical staff/officials, it is implausible that he would not have had this knowledge.

698.   The sources of his knowledge include, but are not limited to, the January, 2007 California Department of Health Services memorandum, widely circulated, which recommended exclusion of African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons, and also recommended ground cover throughout the prison property; a January, 2007 memorandum written by the warden of PVSP, Mr. James Yates, which considered whether to at least relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed PVSP prison officials at the time to respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and recommended specific remedial measures to reduce the excessive risk of infection; the November 11, 2007 policy memorandum authored by Susan Hubbard, which discussed the various CDHS recommendations and was directed to all wardens at the time; the October 2012 CCHCS report which discussed the extent of the Valley Fever problem in depth; and

various lawsuits against Warden Hartley personally from 2007 onward in which inmates described how prisoners at ASP were at excessive risk of infection by Valley Fever.

699.    However, despite the multiple sources of information that he received, Warden Hartley, as head of ASP, not only acquiesced to the state's narrow 2007 exclusion policy, which left thousands of inmates exposed to the disease, he refused to exercise his independent authority as warden to transfer inmates for their safety.  Based on his independent power to transfer inmates out of ASP, or prevent their transfer to ASP, based on their safety needs pursuant to Title 15, sections 3379(a)(4), 3379(a)(9), 3379(a)(9)(F)(2) and 3379(a)(9)(G)(1) and to adopt policies and procedures to avoid threats to inmate safety, and given Warden Hartley's failure to implement such policies, he failed to protect inmates, whether "high risk" or not, from the risk of infection with Valley Fever.

700.    Warden Hartley was aware of the Valley Fever problem in general when he assumed the position of Warden in 2007 and he was also aware that certain groups were at higher risk of suffering more serious complications from it.

701.    Hartley personally participated in decisions not to exclude the vast majority of inmates.  He oversaw and implemented the narrow exclusion policy for approximately (7) years, during his tenure from 2007-2014.

702.    Warden Hartley also personally participated in the decisions not to install ground cover and implement other remedial measures that would have protected inmates.

703.    Warden Hartley personally participated in the failure to protect inmates from increased risk of Valley Fever, was deliberately indifferent to inmates' risk of contracting Valley Fever, and is personally responsible for the injuries sustained by inmates who contracted Valley Fever at Avenal State Prison from 2007 onward, including Plaintiffs as specified below.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

704.   Defendant Hartley is liable to all Plaintiffs named herein that contracted Valley Fever at ASP during his tenure from approximately 2004-2014, and thereafter due to his failure to correct the unsafe conditions at the prison.

## SUSAN L. HUBBARD

705.   Defendant Dr. Susan L. Hubbard is the former director of the Division of Adult Institutions, having served in that capacity at least from 2007 through 2009.

706.   As the former director of DAI, Dr. Hubbard was responsible for the policies and practices of the organization as well as for its operational decisions, and had authority over all employees in this Division.

707.   On information and belief, by 2007, Hubbard knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever, including exclusion, landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions.  Indeed, in light of Hubbard's position and responsibilities at the time, and in light of the information known throughout the community of individuals who served as prison officials and prison medical staff/officials, it is implausible that she would not have had this knowledge.

708.   The sources of her knowledge include: the January, 2007 California Department of Health Services memorandum, widely circulated, which recommended exclusion of African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

persons and also recommended ground cover throughout the prison property; a January, 2007 memorandum written by former warden James Yates which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, and which referenced "high risk inmates" and which directed prison authorities to respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the widely-circulated June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; and the November 11, 2007 policy memorandum she personally authored, which discusses the various CDHS recommendations from the January 2007 memorandum.

709.    However, despite her central role in the activity and recommendations that led up to her policy memorandum, Hubbard adopted the narrow 2007 exclusion policy, which left thousands of inmates exposed to the disease. She failed to act to otherwise protect all inmates from this risk.

710.    When, in 2007, Hubbard co-authored the CDCR policy, which on information and belief was approved by Defendant Kernan as head of DAI, to at least exclude what she described as high-risk inmates from the endemic-area prisons, that policy identified only a limited set of immune-compromised persons as high-risk. Hubbard knowingly disregarded all of the reports, medical literature, findings, studies and general knowledge about Valley Fever that included other high risk groups, such as African-American, Filipino, Latinos, Indians, and other races, persons over 55 years old, and ignored the incidence rates, which revealed that all inmates were facing an unacceptable risk of contraction.

711.    Hubbard was aware of the Valley Fever problem from the January, 2007 CDHS report, among other documents noted herein; she was aware that certain groups

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

were at higher risk of suffering more serious complications from it; she personally participated in the decision not to exclude these high risk inmates by virtue of her role in writing the 2007 policy, which ignored the CDHS recommendation to exclude other high-risk inmates; she also personally participated in the decision not to install ground cover, which would have protected all inmates, by not expressly mandating this protocol in the 2007 policy memorandum she authored.

712.   Hubbard's failure to establish in 2007 a policy excluding all inmates, or at least all higher-risk inmates, from the hyper-endemic prisons caused all such inmates subsequently housed at those facilities to face an increased risk of infection.

713.   Hubbard personally participated in the failure to protect inmates from increased risk of Valley Fever, was deliberately indifferent to inmates' risk of contracting Valley Fever, and is personally responsible for the injuries sustained by all inmates who contracted Valley Fever at any of the hyper-endemic prisons from 2007 onward, including plaintiffs as specified below.

714.   Ms. Hubbard is liable to all named Plaintiffs that contracted the disease based on the inadequate policies and practices of the State from 2007 forward.  All plaintiffs name Defendant Hubbard.

## DEBORAH HYSEN

715.   Defendant Deborah Hysen is the current Director of CDCR's Office of Facility Planning, Construction and Management (FPCM).   Hysen was the Chief Deputy Secretary of FPCM from at least 2006 until 2014.

716.   Hysen, first as the Deputy Chief and then as the senior executive of Facilities and Construction for CDCR, had the ability to act no later than 2007 to implement the recommended remedial measures at PVSP, ASP, or any of the hyper-endemic prisons but did not do so until 2013, when minimal soil-stabilization was finally attempted.

717.   On information and belief, by no later than 2007, Hysen knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the

serious risks to inmates from the disease; (2) the elevated risk of infection faced by all inmates, including ones in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever to all inmates, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions.

718.    The sources of her knowledge include: the January, 2007 California Department of Health Services memorandum, widely circulated for "the record," which recommended exclusion of African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons and also recommended ground cover throughout the prison property; a January, 2007 memorandum written by former warden James Yates which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, and which referenced "high risk inmates" and which directed prison authorities to respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the widely-circulated June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further risk and harm to all inmates; the 2012 CCHCS report which comprehensively documented the Valley Fever epidemic; and the November 11, 2007 policy memorandum Dr. Hubbard authored, which discusses the various CDHS recommendations from the January 2007 memorandum.

719.   Defendant Hysen announced publically that her department was designing and implementing a full suite of remedial measures to protect all inmates at the hyper-endemic prisons including PVSP and ASP from infection by Valley Fever. Hysen was quoted in public news media regarding both the Valley Fever epidemic and her department's plans to address it.  Hysen, however, along with Defendant Meyer, failed to implement any of those remedial measures until at least 2013, after multiple court orders, and has yet to complete implementing the recommended measures.

720.   Hysen, knowing that all inmates were at elevated risk of infection, and that certain identified groups were at even more extraordinary risk, declined to implement the recommended remedial measures.

721.   Hysen personally participated in the failure to protect all inmates from increased risk of Valley Fever, was deliberately indifferent to inmates' risk of contracting Valley Fever, and is personally responsible for the injuries sustained by inmates who contracted Valley Fever at any of the hyper-endemic prisons from 2006 onward, including Plaintiffs as specified below.

722.   Ms. Hysen is liable to all named Plaintiffs that contracted the disease based on the inadequate policies and practices of the State from 2006 forward.  All plaintiffs name Defendant Hysen.

### DR. FELIX IGBINOSA

723.   Defendant Dr. Felix Igbinosa is the former medical director of Pleasant Valley State Prison and served in that capacity from approximately 2005 to 2013.

724.   On information and belief, as of no later than 2007, Dr. Igbinosa knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to

address and reduce the risk of Valley Fever for all inmates, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions.  Indeed, in light of Dr. Igbinosa's position and responsibilities at the time, and in light of the information known throughout the community of individuals who served as prison officials and prison medical staff/officials, it is implausible that he would not have had this knowledge.

725.    In and before November 2007, but after the prevalence of Valley Fever was well known to officials of the CDCR, including Defendant Igbinosa, inmates were issued protective masks from medical staff at PVSP upon request.  However, by in or about late 2007, Defendant Igbinosa implemented a policy restricting the issuance of masks to a limited group of inmates, and denying masks, even to inmates who requested one, to inmates who did not meet certain criteria.  Thereafter, inmates who did not fit the stated criteria were not able to obtain protective masks, even for use in windy and dusty outdoor conditions at PVSP.

726.    Defendant Igbinosa implemented this narrow policy for the issuance of protective masks even though the policy was in deliberate disregard of the significant medical needs of the ethnic, racial and immune-compromised groups identified by the California Department of Public Health and Safety as Valley Fever at-risk groups particularly susceptible to contracting coccidioidomycosis or suffering more severe consequences from it.

727.    Upon information and belief, Defendant Igbinosa made weekly visits to PVSP's various facilities, as required by California Code of Regulations, Title 15, section 3384, and noticed the vast areas of open dirt, blowing dust, and inmates walking around without protective masks, including the named PVSP Plaintiffs.  Yet, Defendant Igbinosa deliberately failed to modify the PVSP policy denying protective masks to inmates upon request unless they satisfied the limited policy criteria, and he

generally took no steps or measures to reduce what was a prison wide epidemic at PVSP, as the person entrusted to look after the medical health and welfare of PVSP's entire population.

728.    On information and belief, Defendant Igbinosa also drafted and implemented a policy that systematically discontinued and delayed inmates' pain management medications, and contrary to the reasonable medical needs of the inmates, including those suffering from Valley Fever.

729.    On information and belief, Defendant Igbinosa personally instructed his medical staff at PVSP not to provide certain preventative and palliative treatments to inmates even though the denied medical treatment was medically necessary.

730.    Defendant Igbinosa was charged by Defendant Winslow on or about January 16, 2007, with "ensuring health care staff [at PVSP] are trained in and comply with DCHCS [Division of Correctional Health Care Services] policy for identifying, confirming, and reporting symptomatic or disseminated Coccidioidomycosis and be provided the reporting forms."  [D. Winslow, January 16, 2007, Memo to, *inter alia*, Chief Medical Officers, entitled "Coccidioidomycosis (Valley Fever) Identification and Reporting," at p. 2.]  Winslow further stated that the training was "mandatory," and required that the training "must be conducted by Thursday, February 16, 2007."  [*Ibid.*] On information and belief, Defendant Igbinosa failed to adequately train PVSP staff in a timely fashion as directed.

731.    Defendant Igbinosa was personally involved in denying relief to inmates, including Plaintiffs, seeking additional medical care or other relief (e.g., transfer out of PVSP) for Valley Fever.  As the Medical Director at PVSP, he was the official who generally decided the Second Level Response to appeals from inmates challenging their medical or other treatment for Valley Fever, including requests for transfer out of PVSP.

732.    The sources of Dr. Igbinosa's knowledge about the Valley Fever problem include the substance of the 2004 Kanan memorandum, which identified high-

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

risk groups, such as African-Americans, American Indians, and Asians; the January, 2007 California Department of Health Services memorandum, widely circulated for the record, which recommended exclusion of such high-risk groups and also recommended ground cover throughout the prison property; a January, 2007 memorandum written by former warden James Yates, the warden while he was at PVSP, which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed prison officials at PVSP respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; a September 9, 2007 news article in the Sacramento Bee, which reflected his statement that experts had made it clear that it was not safe to engage in additional construction at PVSP; the November 11, 2007 policy memorandum authored by Susan Hubbard, which discussed the various CDHS recommendations; the 2012 CCHCS report; and over a dozen lawsuits against Dr. Igbinosa personally from 2007 forward in which inmates documented their contraction of the disease and sought formal legal relief.

733.    However, despite the multiple sources of information he received, Dr. Igbinosa, as head medical officer of PVSP, not only acquiesced to the state's narrow 2007 exclusion policy, which left hundreds of inmates of every type to catch the disease, he refused to exercise his independent authority as chief medical officer to transfer one or all for their safety.  Based on his independent power to consider transferring inmates based on their medical needs pursuant to Title 15, sections 3379(a)(9), 3379(a)(9)(F)(2) and 3379(a)(9)(G)(1) and to adopt policies and procedures

BURNS | ELLIOT | B. PAVONE | M.PAVONE | SPIESS | ZUCKER

to avoid threats to inmate safety, and given Dr. Igbinosa's failure to implement such policies, he failed to protect all inmates from the risk of contraction of Valley Fever.

734.  Dr. Igbinosa further failed to act to implement recommended remedial measures.  One of the recommendations that would have protected all inmates was for prison officials to implement ground cover throughout the affected institutions.

735.  Dr. Igbinosa knew at that time that remedial measures existed that could have been implemented at reasonable cost, and that implementing those measures would reduce the risk to inmates who were housed at PVSP or any of the hyper-endemic prisons, as reflected for example by the observation that such cover had reduced the incidence rates from one-half to two-thirds when employed at a military base.

736.  Consequently, Dr. Igbinosa was acutely aware of the Valley Fever problem as witnessed before him at the institution where he practiced, and he was aware that certain groups were at higher risk of suffering serious complications from it.

737.  Dr. Igbinosa personally participated in decisions not to exclude these high risk inmates despite his power and right, as chief medical officer over many years at PVSP, to take a variety of steps to ameliorate the problem.  During this long interval, Dr. Igbinosa was named as a defendant in numerous lawsuits by inmates in which they protested their contraction of Valley Fever.  Yet, he continued to neither intervene, nor review, nor reconsider the narrow exclusion policy, nor implement his own policies to transfer inmates out under his regulatory power.

738.  Dr. Igbinosa acquiesced in the failure to protect inmates from Valley Fever despite having the ability and responsibility as Chief Medical Officer of PVSP for many years to protect all inmates from the unacceptable Valley Fever risks that they faced.  Yet, he did not adopt protective or precautionary policy to interrupt the mass contraction of the disease suffered before his very eyes.  He did not authorize transfers on request, though it was within his power.  And he failed to take sufficient steps, such as providing masks to all who needed them, to reduce the incidence rate.  Accordingly,

given all these facts and factors, he was deliberately indifferent to the health and safety of inmates in relation to the risk of contracting Valley Fever, including Plaintiffs as specified below.

739.    Dr. Igbinosa is named as a defendant with respect to all Plaintiffs that contracted Valley Fever at PVSP during his tenure, which was from approximately 2005-2013.  He is named by all PVSP plaintiffs infected during his tenure.

## J. CLARK KELSO

740.    Defendant J. Clark Kelso serves as the Receiver of the California Correctional Health Care Services (CCHCS).  Kelso became Receiver in late 2005.

741.    As Receiver, Kelso is responsible for directing the CCHCS agency and establishing its operational policies. At all relevant times, Kelso was responsible for CCHCS' continuing failure to adequately address the Valley Fever epidemic in the prison health system.

742.    On information and belief, Mr. Kelso could have established policies to prevent prisoners at increased risk from Valley Fever from being assigned to hyper-endemic prisons or to identify such prisoners already located there and transfer them away once identified.  Defendant Kelso was fully apprised of the risk to Plaintiffs[46] but failed to establish policies to protect them and was grossly negligent in supervising subordinates who shared this responsibility.  As Receiver, Mr. Kelso is named in his official capacity.

743.    On information and belief, and no later than 2007, Mr. Kelso knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and

---

[46] *See, e.g.,* information sources such as, "*Coccidioidomycosis in California's Adult Prisons 2006-2010,*" CCHCS Public Health and Quality Management Units, April 16, 2012.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions.  Indeed, in light of Mr. Kelso's position and responsibilities at the time of the 2005-2006 epidemic, and in light of the information known throughout the community of individuals addressing prison health care issues, it is implausible that he would not have had this knowledge.

744.   The sources of his knowledge include, but are not limited to, the January, 2007 California Department of Health Services memorandum, widely circulated, which recommended exclusion of African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons, and also recommended ground cover throughout the prison property; a January, 2007 memorandum written by former warden James Yates which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, and which referenced "high risk inmates" and which directed prison authorities to respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the widely-circulated June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; the 2012 CCHCS report; and the November 11, 2007 policy memorandum he was personally provided as reflected on the document itself, which discusses the various CDHS recommendations from the January 2007 memorandum.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

745.    However, despite Mr. Kelso's central role as head of CCHCS, the agency tasked with correcting the serious health problems in the California prison system, CCHCS did not timely act, which left hundreds of inmates to catch the disease. Kelso failed to act to otherwise protect inmates from this risk.

746.    Defendant Kelso further failed to act to implement recommended remedial measures.  Kelso knew at that time that remedial measures existed that could have been implemented at reasonable cost, and that implementing those measures would reduce the risk to inmates who were housed at PVSP or any of the hyper-endemic prisons.

747.    However, on information and belief, Receiver Kelso declined to adopt this recommendation and disregarded the CDHS's recommendations for these remedial measures.

748.    When, in 2007, Kelso allowed the policy to exclude only certain medically immune-compromised persons as high-risk, he knowingly disregarded reports, medical literature, findings, studies and general knowledge about Valley Fever that included other high risk groups, such as African-American, Filipino, Latinos, Indians, and other races, and persons over 55 years old, and further failed to implement any of the other recommendations to help minimize the risks of infection.

749.    Mr. Kelso was aware of the Valley Fever problem in general by his receipt of the November, 2007 policy, among other documents noted herein; and he was aware that certain groups were at higher risk of suffering more serious complications from it.

750.    Mr. Kelso personally participated in the decision not to exclude these high risk inmates by virtue of his central oversight role of the 2007 health care system, which ignored the CDHS recommendation to exclude high-risk inmates.  As Receiver, he was in a position based on his title to directly influence and control the policy governing inmate medical safety at the prisons.  It is implausible to believe he was not

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

directly involved in the policy decisions at stake given that he was personally provided it as a lead party on the policy document itself.

751.    Mr. Kelso also participated in the decision not to install ground cover, which would have protected all inmates, by not mandating this protocol in the 2007 policy memorandum authored by DAI.

752.    Mr. Kelso acquiesced in the failure to protect inmates from Valley Fever despite having central responsibility as the person entrusted to directly oversee the California health care system, and he failed in his duty to protect inmates from the unacceptable Valley Fever risks that they faced.  Accordingly, due to his central position in the issue and policies at stake, and based on his oversight decision not to implement policies that protected inmate safety, he was deliberately indifferent to the health and safety of inmates in relation to the risk of contracting Valley Fever, including Plaintiffs as specified below.

753.    Mr. Kelso is named as a defendant with respect to all Plaintiffs that contracted Valley Fever during his tenure as receiver, from October, 2005 to the present.  He is identified as a defendant by all plaintiffs.

754.    His liability is subject to a series of tolling agreements, including a master agreement, of a continuing nature, which essentially remove Mr. Kelso from the litigation unless CCHCS through Kelso's receiver function is deemed to be an entity legally responsible for the injuries described herein.

## SCOTT KERNAN

755.    From 2007 to an unknown date, Defendant Scott Kernan was the Chief Deputy Secretary of Adult Institutions (DAI) for CDCR.  Before becoming Chief Deputy Secretary he was the Deputy Director and Acting Director of DAI.

756.    DAI is responsible for the operation of California's adult prisons.

757.    On information and belief, by no later than 2007 Mr. Kernan knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; (2) the elevated risk of infection faced by

inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions. Indeed, in light of Kernan's position and responsibilities at the time, and in light of the information known throughout the community of individuals who served as prison officials and prison medical staff/officials, it is implausible that he would not have had this knowledge.

758. The sources of Kernan's knowledge include, but are not limited to, the January, 2007 California Department of Health Services memorandum, widely circulated, which recommended exclusion of African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons, and also recommended ground cover throughout affected prison properties; a January, 2007 memorandum written by former warden James Yates which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, and which referenced "high risk inmates" and which directed prison authorities to respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the widely-circulated June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and recommended environmental mitigation measures to minimize further harm to all inmates; and the

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

November 11, 2007 policy memorandum Kernan was personally provided, which discusses CDHS's recommendations from the January 2007 memorandum.

759.   Kernan was aware of the Valley Fever problem in general and was aware that certain groups were at greater risk of suffering more serious complications from the disease.

760.   Kernan was the direct superior of Hubbard, co-author of the 2007 policy, and he knew that that policy was deficient, but he failed to act to protect susceptible inmates and all inmates from the known risk.

761.   Kernan further failed to act to require the hyper-endemic prisons to implement recommended remedial measures.  The 2007 memo, under his authority, merely suggested wardens consider such steps, even though he knew at that time that the remedial measures could have been implemented at reasonable cost, that implementing those measures would reduce the risk to all inmates who were housed at PVSP or any of the hyper-endemic prisons, and that making those remedial measures optional for the prisons was unlikely to result in their implementation.

762.   When, in 2007, Kernan approved implementation of the policy to exclude from the hyper-endemic prisons only certain medically immune-compromised persons, he knowingly disregarded reports, medical literature, findings, studies and general knowledge about Valley Fever that all showed categorically that other groups such as African-American, Filipino, Latinos, Indians, and other races, persons over 55 years old, were also at greatly increased risk, and further failed to implement any of the other recommendations to minimize the risks of infection for all inmates.

763.   Kernan personally participated in the decision not to exclude these high risk inmates by virtue of his central oversight role of the 2007 policy, which ignored the CDHS recommendation to exclude high-risk inmates.  As Chief Deputy Secretary of DAI, he was in a position to directly influence and likely dictate the policy governing inmate safety at the prisons.  Kernan was listed as a lead official in the

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

policy document itself; it is implausible that he was not directly involved in the policy decisions reflected by the document.

764.    Kernan also personally participated in the decision not to install ground cover, which would have protected all inmates, by not mandating this protocol in the 2007 policy memorandum he directly oversaw.

765.    Kernan therefore personally participated in and acquiesced in the failure to protect inmates from Valley Fever despite having central responsibility as the DAI representative directly overseeing the 2007 policy memorandum authored by Director Hubbard, and as chief deputy secretary of the branch of CDCR tasked with safety of the operation of the prisons.  Kernan failed to carry out his duty to protect all inmates from the unacceptable Valley Fever risks that they faced.  Kernan was deliberately indifferent to the health and safety of inmates in relation to the risk of contracting Valley Fever, including plaintiffs identified herein.

766.    Mr. Kernan is named as a defendant with respect to all plaintiffs that contracted Valley Fever as a result of the policies and practices implemented around 2007 and that subsequently governed the issue.  He is identified as a defendant by all plaintiffs.

## CHRIS MEYER

767.    Defendant Chris Meyer was the Senior Chief of Facility Planning, Construction and Management from 2009 to 2014.  In that capacity, Meyer had the authority, the ability and the means to have implemented remedial measures to reduce the risk of infection to all of the Plaintiffs, and could have required construction activities at the prisons to be carried out so as to minimize risks of Valley Fever exposure.  He failed to do either.

768.    Mr. Meyer was deliberately indifferent to the increased risk of serious harm to one or more named plaintiffs.

769.    Meyer knew that fully-implemented environmental mitigation measures could have reduced the risk to all of the plaintiffs.

770.    On information and belief, by 2007, Meyer knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to all inmates from the disease; (2) the elevated risk of serious complications faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever for all inmates, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions.

771.    The sources of his knowledge include, but are not limited to, the January, 2007 California Department of Health Services memorandum, widely circulated for "the record," which minimally recommended exclusion of African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons and also recommended ground cover throughout the prison property; a January, 2007 memorandum written by former warden James Yates which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, and which referenced "high risk inmates" and which directed prison authorities to respond to a recommendation to look for ways to "minimize the threat of Valley Fever" for all prisoners; the widely-circulated June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm to all inmates; the 2012 CCHCS report; and the November 11,

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

2007 policy memorandum Hubbard and Winslow authored, which discusses the various CDHS recommendations from the January 2007 memorandum.

772.   Defendant Meyer supervised Hysen in announcing publically that the department was designing and implementing a full suite of remedial measures to protect all inmates at the hyper-endemic prisons including PVSP and ASP from infection by Valley Fever.  Meyer, however, along with Defendant Hysen, decided not to implement any of the announced remedial measures.

773.   Meyer personally participated in the failure to reduce the risk to all inmates.

774.   He had the means and the authority to implement those measures yet failed to do so and failed to adequately supervise Hysen who was also responsible for implementing those measures.

775.   Defendant Meyer knew of the increased risks to all inmates housed at the hyper-endemic prisons, and in particular to inmates of the identified higher-risk racial, ethnic and age groups.

776.   Meyer, as the senior executive of Facilities and Construction for CDCR, had the ability to act no later than 2007 to implement the recommended remedial measures at PVSP, ASP, or any of the hyper-endemic prisons but did not do so until 2013, when minimal soil-stabilization was finally attempted.

777.   Meyer was deliberately indifferent to the increased risk of harm Plaintiffs faced, which caused their constitutional injuries.

778.   Mr. Meyer is liable to all named plaintiffs that contracted the disease based on the inadequate policies and practices he was responsible for, from 2007 forward.  All plaintiffs name Mr. Meyer.

## TANYA ROTHCHILD

779.   Defendant Tanya Rothchild is the former Chief of CDCR's Classification Services Unit (CSU) from approximately 2008 through 2012.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

780.    Rothchild was aware of the epidemic of Valley Fever because, at a minimum, on information and belief, she received the August 3, 2006 and November 20, 2007 memoranda directed at all classification and parole representatives which discussed the problem and set the exclusion policies.

781.    On information and belief, as of the beginning of her tenure at CSU, she knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to all inmates from the disease; (2) the elevated risk of serious consequences faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever for all inmates, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions.  Indeed, in light of Ms. Rothchild's position and responsibilities as the head transfer agent, and the policy memoranda that governed her job at the time, and in light of the information known throughout the community of individuals who served as prison officials and prison medical staff/officials, it is implausible that she would not have had this knowledge.

782.    The sources of her knowledge also include the contents of the January, 2007 California Department of Health Services memorandum, widely circulated for the record, which recommended exclusion of such high-risk groups and also recommended ground cover throughout the prison property for the benefit of all inmates, and which was closely tied to the two policy memoranda circulated to all CSU agents; a January, 2007 memorandum written by James Yates, which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover to protect all inmates; the 2008-2009 Fresno County

Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed prison officials at the time to respond to a recommendation to look for ways to "minimize the threat of Valley Fever" as to all inmates; and the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm to all.

783.    However, despite the multiple sources of information she received, Ms. Rothchild, as head of the CSU, not only acquiesced to the state's narrow 2007 exclusion policy, which left thousands of inmates exposed to the disease, she refused to exercise her independent authority as head of the classification services unit to significantly reduce the risk of Valley Fever.  Based on her independent power to classify inmates to not be endorsed to dangerous prisons, based on their safety needs pursuant to Title 15, sections 3375(b) and to adopt policies and procedures to avoid such threats to inmate safety, and given Ms. Rothchild's failure to implement such policies, she failed to protect all inmates from the risk of contraction of Valley Fever.

784.    Ms. Rothchild was aware of the Valley Fever problem in general before she became the head of the CSU and she was also aware that certain groups were at even higher risk of suffering serious complications from it.

785.    Ms. Rothchild personally participated in decisions not to endorse inmates away from the dangerous prisons, or the vulnerability to Valley Fever of certain inmates, during the classification process during her tenure.   During this interval, Ms. Rothchild at all times stood in a position of authority over the transfer process, and had the legal right and power to reverse, adjust or expand the classification criteria so as to protect these inmates.

786.    She created and continued policies that authorized the transfer of high-risk and other inmates to the hyper-endemic prisons, without regard to those inmates'

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

susceptibility to infection and without regard to the dangerousness of the prison she was sending them to.

787.   She further failed to adequately supervise subordinates who were responsible for individual classification and transfer decisions that exposed inmates to the risk of infection by virtue of transfer to hyperendemic prisons.

788.   Consequently, Rothchild had the authority and the means to protect inmates by implementation of transfer policies that would have minimized their exposure to dangerous prisons, but she failed to act to reduce the risks faced by plaintiffs specified below and was therefore deliberately indifferent to the increased risk of harm these plaintiffs faced, which caused their injuries.

789.   Ms. Rothchild is liable to all named plaintiffs that contracted the disease based on the inadequate transfer policies and practices of the State from 2008 forward. All plaintiffs name Rothchild.

## TERESA SCHWARTZ

790.   Defendant Teresa Schwartz is the former Associate Director of Adult Institutions at CDCR and held this position as of January, 2007 when the recommendations and policy decisions about the Valley Fever epidemic were being made.  Before then, she was a warden at Vacaville in 2004 and an Associate Director of Reception at CDCR from 2005-2006.

791.   On information and belief, by January 2007, Schwartz knew about: (1) the elevated risk of infection faced by all inmates, including ones in various ethnic and racial groups such as African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (2) the need for remedial measures to address and reduce the risk of Valley Fever for all inmates, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

protection for inmates who worked outdoors or went out under adverse conditions. Indeed, in light of Schwartz's position and responsibilities at the time, and in light of the information known throughout the community of individuals who served as prison officials and prison medical staff/officials, it is implausible that she would not have this knowledge.

792.  The sources of her knowledge include but are not limited to the January, 2007 California Department of Health Services memorandum, widely circulated, which minimally recommended exclusion of African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons, and also recommended ground cover throughout the prison property for the protection of all inmates; the January, 2007 memorandum written by former warden James Yates which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover written directly to her; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, and which referenced "high risk inmates" and which directed prison authorities to respond to a recommendation to look for ways to "minimize the threat of Valley Fever" for all inmates; Dr. Winslow's widely-circulated June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm to all inmates; and the November 11, 2007 policy memorandum she was provided as an associate director, which discusses the various CDHS recommendations from its January 2007 memorandum.

793.  Ms. Schwartz was aware that the policy only excluded certain inmates based on certain medical criteria, which left thousands of inmates exposed to the disease.  She thus failed to act to protect all inmates, including identified high-risk inmates, from the disease.

794.   Defendant Schwartz further failed to act to implement remedial measures recommended by CDH.  One of the recommendations that would have protected all inmates was for Schwartz to implement ground cover throughout the hyperendemic prison properties, CDH's recommendation number 3 in its January 2007 memorandum, as discussed in Warden Yates' January, 2007 memorandum to her personally.

795.   She knew at that time that remedial measures existed that could have been implemented at reasonable cost, and that implementing those measures could reduce the risk to inmates who were housed at PVSP or any of the hyper-endemic prisons, as reflected for example by the possible alternatives in this memorandum.

796.   However, Ms. Schwartz declined to adopt this recommendation and disregarded the CDH's recommendation on ground cover and remedial measures.

797.   Schwartz was aware of the Valley Fever problem at the hyperendemic prisons and was aware that certain groups were at higher risk.

798.   Ms. Schwartz personally participated in the decision not to exclude all high risk inmates from the hyperendemic prisons.

799.   Ms. Schwartz similarly personally participated in the decision not to install ground cover or other remedial measures which would have reduced the risk for all inmates and staff at the hyperendemic prisons.

800.   Schwartz was deliberately indifferent to the health and safety of inmates at PVSP, ASP, and all the hyperendemic prisons, including plaintiffs as specified below.

801.   Ms. Schwartz is named as a defendant with respect to all plaintiffs that contracted Valley Fever as a result of the policies and practices implemented by Schwartz around 2007 and onward and that subsequently influenced inmate placement at hyperendemic prisons and the continued unsafe conditions there.  She is identified as a defendant by all plaintiffs.

BURNS | ELLIOT | B. PAVONE | M.PAVONE | SPIESS | ZUCKER

# ARNOLD SCHWARZENEGGER

802.   Defendant Arnold Schwarzenegger is the former Governor of California, having acted in that position from 2003 through 2011.

803.   As Governor, Mr. Schwarzenegger was ultimately responsible for the policies and practices of the State of California, and had direct authority over every state employee.

804.   On information and belief, as of 2007, former Governor Schwarzenegger knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever, such as landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions.  Indeed, in light of Governor Schwarzenegger's position and responsibilities at the time, as the state's leader, supervisor of CDCR's top officials, and having budgetary authority over all the agency's expenditures during the Valley Fever epidemic, it is implausible that he would not have had this knowledge.

805.   The sources of his knowledge include, on information and belief, but are not limited to, the substantive contents of the following documents: informational briefing from a 2005 prisoners' rights group, Prison Movement, sent directly to Governor Schwarzenegger that he would have received, describing the threat posed by Valley Fever to all inmates, and especially its threat to susceptible groups including African-Americans, Filipinos, elderly inmates and the immune-compromised; the January, 2007 California Department of Health Services memorandum, widely

circulated, which recommended exclusion of such high-risk groups and also recommended ground cover throughout the prison property for the protection of all inmates; a January, 2007 memorandum written by former warden James Yates which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; a 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates," and which directed prison officials to respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm for the protection of all inmates; and the November 11, 2007 policy memorandum authored by Susan Hubbard, which discussed the various CDHS recommendations about exclusion and remediation.

806.  In addition, Governor Schwarzenegger announced in a 2007 press conference that the State's policy and practice of transferring inmates to serve their sentences in Pleasant Valley State Prison would continue unabated, and that he intended to house even more inmates there in the future by increasing construction pursuant to AB900.  He brushed off a specific question about inmate safety due to Valley Fever, when specifically asked about it by a reporter, a question phrased as: "there are a lot of experts who are saying that if you go ahead with the construction program at some of these prisons, the infill construction program, it's going to lead to more inmates and staff members getting sick and possibly dying.  Do you need to adjust the infill component of AB 900?"  Schwarzenegger responded: "We will go ahead and build."

807.  Schwarzenegger therefore knew that construction presented particular danger to prisoners but dismissed the risks posed.  The risks and danger that Schwarzenegger knew about, and reflected his deliberate indifference to, were not just

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

the general risk of Valley Fever at the prisons but the risk that more construction would increase exposure to Valley Fever – the opposite of the remedial measures recommended by experts to avoid broadcasting the spores found in the soils in the hyperendemic region.

808.    However, despite the multiple sources of information he received, Gov. Schwarzenegger, as the chief executive of the State of California, among other actions, adopted or acquiesced to a narrow 2007 exclusion policy, which left thousands of inmates exposed to the disease.  He failed to act to otherwise protect inmates from this risk, including by acquiescing to the failure to install ground cover or any other remedial measures.

809.    Then-governor Schwarzenegger prepared and approved state budgets for 2006 through 2011.  These budgets included bold new construction initiatives entailing massive expenditures at California prisons.  Knowing that a Valley Fever epidemic was continuing in those prisons, and aware of the risks that construction posed as the very opposite of the recommended remedial measures, Schwarzenegger failed to request, budget or appropriate a single dollar for Valley Fever prevention and remedial measures at the prisons and instead pressed forward with construction projects that created an unacceptable risk to Plaintiffs.  These additional and continuing acts of deliberate indifference further increased the excessive risk faced by these Plaintiffs.

810.    Schwarzenegger personally ratified or personally acquiesced in the failure to protect inmates from Valley Fever despite having the ability and responsibility as Governor to protect state residents, including inmates, from the unacceptable health risks that they faced.  Accordingly, he was deliberately indifferent to the health and safety of inmates in relation to the risk of contracting Valley Fever, including Plaintiffs as specified below.

811.    Former Governer Schwarzenegger is named as a defendant with respect to all Plaintiffs that contracted Valley Fever as a result of the policies and practices

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

implemented around 2007 and that subsequently governed the issue until at least 2013. He is identified by all plaintiffs as a defendant.

## DR. DWIGHT WINSLOW

812.    Defendant Dwight Winslow, M.D. was the former Chief Medical Director for CDCR from approximately 2005 through 2014.

813.    On information and belief, and no later than 2007, Dr. Winslow knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease; (2) the elevated risk of infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; and (3) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went out under adverse conditions.  Indeed, in light of Dr. Winslow's position and responsibilities at the time of the 2005-2006 epidemic, and in light of the information known throughout the community of individuals addressing prison health care issues, it is implausible that he would not have had this knowledge.

814.    The sources of his knowledge include, but are not limited to, the January, 2007 California Department of Health Services memorandum, widely circulated, which recommended exclusion of African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons, and also recommended ground cover throughout the prison property; a January, 2007 memorandum written by former warden James Yates which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

ground cover; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, and which referenced "high risk inmates" and which directed prison authorities to respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the widely-circulated June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; the 2012 CCHCS report; and the November 11, 2007 policy memorandum he authored, which discusses the various CDHS recommendations from the January 2007 memorandum.

815.   On information and belief, Dr. Winslow received the 2004 Kanan Memo and was familiar with its conclusions that inmates of identified ethnic, racial, age, and medical status were at increased risk from Valley Fever.

816.   Dr. Winslow was also informed of this through the California Department of Public Health information memorandum dated January 11, 2007, "Recommendations for Coccidioidomycosis Mitigation in Prisons in Hyperendemic Areas of California."

817.   The DPH in 2007 concluded that exclusion of all of these high-risk inmates was "the most effective method to decrease risk [of Valley Fever infections]." Dr. Winslow knew of these recommendations because he specifically referenced them when he wrote in the 2007 CDCR policy: "The California Department of Health Services (DHS) worked with California Department of Corrections and Rehabilitation (CDCR) staff in analyzing the problem and in assisting in designing an approach to mitigate the effects of the organism that causes cocci or 'Valley Fever.' "

818.   Yet, Dr. Winslow's 2007 CDCR policy decision was to divert only a certain narrowly-defined subset of medically-compromised inmates from the hyper-endemic prisons, despite DHS's recommendation to divert all high-risk inmates based on the identified criteria, and his own express recognition that racial factors – Asian,

Blacks and Hispanics, notably – increased the susceptibility of these inmates to the disseminated form of the disease.

819.   Dr. Winslow's 2007 policy continued to allow members of high-risk ethnic and racial groups to be housed at prisons where the risk of infection was known to be greatly increased, along with persons from the general inmate population, who also faced a dramatically increased risk of contraction.  Winslow had the authority and the power to issue a definitive policy excluding all inmates from these locations, and insisting on implementation of the recommended environmental remedial measures to further reduce the risk for all inmates.  Yet his policy decision required neither of these critical precautionary steps.

820.   Winslow knew that this policy would expose virtually all inmates including the plaintiffs in this action to an increased risk of harm, and he had the ability and the means to have reduced or prevented that risk, but chose not to do so. Winslow was deliberately indifferent to inmate medical health and welfare, despite being the person specifically charged with it through his powers are prison medical director.

821.   Although Winslow knew and acknowledged that dust control measures would reduce Plaintiffs' risk of contracting Valley Fever, his 2007 policy suggested only that prisons "consider increasing ground cover throughout their property." Winslow, as co-author of the policy, could have made these measures mandatory and thereby reduced the risk of infection for all inmates, but he chose not to do so.

822.   Dr. Winslow personally participated in the decision not to mandate the installation of ground cover or other dust control measures at the prisons, measures which would have protected all inmates resident at those facilities from 2007 onward. Winslow was deliberately indifferent to the risks of infection faced by prisoners including plaintiffs as specified below.

823.   Former medical director Winslow is named as a defendant with respect to all plaintiffs that contracted Valley Fever as a result of the policies and practices

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

implemented around 2007 and that subsequently governed the issue.  He is identified by all plaintiffs as a named defendant.

## CARL WOFFORD

824.    Defendant Carl Wofford was the acting warden of Avenal State Prison (ASP) from 2013 to approximately December 20, 2013, when he was appointed warden of Avenal.

825.    As warden, Mr. Wofford is responsible for the policies and practices of the prison as well as for its operational decisions, and has direct authority over every CDCR employee at ASP.

826.    On information and belief, by 2013, Mr. Wofford knew of: (1) the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the serious risks to inmates from the disease, particularly at ASP, where he was being assigned; (2) the elevated risk of serious infection faced by inmates in various ethnic and racial groups, including African Americans, Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates and immune-compromised or immune-suppressed persons such as those taking medication for chronic arthritis and other diseases; (3) the significantly elevated risk to any inmate of contraction of this incurable virus given the incidence rates at ASP; and (4) the need for remedial measures to address and reduce the risk of Valley Fever, including landscaping, paving, soil stabilization, proper ventilation, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went outside under adverse conditions.  Indeed, in light of his position and responsibilities at the time, and in light of the widespread information known throughout the community of individuals who served as prison officials and prison medical staff/officials about the Valley Fever problem by 2013, it is virtually impossible that he would not have had this knowledge.

827.   The sources of his knowledge include the January, 2007 California Department of Health Services memorandum, widely circulated, which recommended exclusion of high-risk groups, such as African-Americans, American Indians, and Asians as well as immune-compromised/immune-suppressed individuals and also recommended ground cover throughout the prison property; a January, 2007 memorandum written by the warden that immediately preceded him, Mr. James Yates, which considered whether to relocate the high risk groups mentioned in the CDHS' memorandum and implement the CDHS recommendation for ground cover; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed prison officials at the time to respond to a recommendation to look for ways to "minimize the threat of Valley Fever"; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm for the protection of all inmates; the November 11, 2007 policy memorandum authored by Susan Hubbard, which discussed the various CDHS recommendations and was directed to all wardens at the time; the October 2012 CCHCS report which assembled various reports and studies to comprehensively publicize the extent of the Valley Fever problems; the June, 2013 detailed federal court order specifically directed at PVSP and ASP; and numerous other lawsuits, media reports and other public outlets from 2009 forward in which inmates of different racial and ethnic backgrounds and risk characteristics filed suit, and protested in the media, their contraction of the disease at Avenal and PVSP, the two prisons with the highest incidence of the disease in California.

828.   However, despite the multiple sources of information that he received, Warden Wofford, as head of ASP, not only acquiesced to the state's narrow 2007 exclusion policy, which left thousands of inmates exposed to the disease, he refused to exercise his independent authority as warden to transfer inmates for their safety.  Based

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

on his independent power to transfer inmates out of ASP, or prevent their transfer to ASP, based on their safety needs pursuant to Title 15, sections 3379(a)(4), 3379(a)(9), 3379(a)(9)(F)(2) and 3379(a)(9)(G)(1) and to adopt policies and procedures to avoid threats to inmate safety, and given Warden Wofford's failure to implement such policies, he failed to protect inmates from the continuing risk of contraction of Valley Fever.

829.   Warden Wofford was aware of the Valley Fever problem when he assumed the position of acting warden in 2013.

830.   Warden Wofford personally participated in continuing decisions not to protect high-risk and other inmates from the elevated risk and dangerous conditions at the prison.

831.   Warden Wofford also personally participated in the continuing decisions not to install ground cover or implement other remedial measures that would have protected all inmates.

832.   Warden Wofford personally participated in the failure to protect inmates from increased risk of Valley Fever, was deliberately indifferent to inmates' risk of contracting Valley Fever, and is personally responsible for the injuries sustained by inmates who contracted Valley Fever at Avenal State Prison from his ascension to the post of acting warden, from 2013 forward, including plaintiffs as specified below.

833.   Alternately, Warden Wofford is responsible for acquiescing to the existing custom, practice or policy at ASP of not intervening to protect inmates from the disease, despite having the authority to enact policies that would have protected them.

834.   Defendant Wofford is named by those Plaintiffs who contracted the disease at ASP from 2013 onward.

### JAMES A. YATES

835.   Defendant James A. Yates is the former warden of Pleasant Valley State Prison and is believed to have occupied that position from at least 2005 until 2011.

836.   Yates was aware of the epidemic of Valley Fever occurring at his prison throughout this time, or at least since August 2006 – and perhaps as early as 2003 when rates at PVSP started to spike -- because he was copied on and received at the time an August 3, 2006 memorandum directed at all wardens which discussed the problem.

837.   Mr. Yates was directly apprised of the need to exclude high risk inmates by virtue of his receipt of a January 12, 2007 California Department of Health memorandum, which recommended that high risk groups, such as African-Americans and Filipinos, be excluded from the area, and he responded to that memorandum.

838.   However, in responding to that memo, Mr. Yates ignored the request to exclude certain racial groups and instead only commented that "PVSP has identified inmates that are high risk due to pulmonary conditions and heavily immunosuppressed patients."  He deliberately ignored the exclusion by other criteria such as by age or racial or ethnic background.

839.   Despite knowing the susceptibility of high-risk inmates, Yates failed to adopt policies or practices to avoid the transfer of inmates to the prison or to protect such inmates located there, during his tenure and afterward, though he had the power to do so pursuant to Title 15, § 3375(b), which allowed him to consider risk to an inmate's health, among other considerations, in accepting an inmate for transfer.

840.   Defendant Yates further failed to act to implement recommended remedial measures at PVSP.  One of the recommendations that would have protected all such inmates was ground cover throughout the prison property,

841.   Yates failed to implement this or other recommendations.

842.   Yates was aware of the Valley Fever problem since the start of his tenure at Warden; he was aware that certain groups were at higher risk of suffering more serious complications from it no later than January 2007; he personally participated in the decision not to exclude these high risk inmates; he also personally participated in the decision not to install ground cover or other remedial measures which would have

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1  protected all inmates.  Yates was deliberately indifferent to the health and safety of all

2  inmates at PVSP, including the plaintiffs below.

3      843.   On information and belief, by no later than 2007, Mr. Yates knew of: (1)

4  the prevalence of Valley Fever in the locations of the hyper-endemic prisons and the

5  serious risks to all inmates from the disease; (2) the elevated risk of serious infection

6  faced by inmates in various ethnic and racial groups, including African Americans,

7  Filipinos and other Asians, Hispanics, and American Indians, as well as elderly inmates

8  and immune-compromised or immune-suppressed persons such as those taking

9  medication for chronic arthritis and other diseases; (3) the significantly elevated risk to

10  any inmate of contraction of this incurable virus given the incidence rates at PVSP; and

11  (4) the need for remedial measures to address and reduce the risk of Valley Fever,

12  including landscaping, paving, soil stabilization, proper ventilation, limiting and

13  strictly controlling excavation and soil-disturbing activities at the prisons, limiting

14  inmate exposure outdoors during windy conditions, and providing respiratory

15  protection for inmates who worked outdoors or went outside under adverse conditions.

16  Indeed, in light of his position and responsibilities at the time, and in light of the

17  widespread information known throughout the community of individuals who served

18  as prison officials and prison medical staff/officials about the Valley Fever problem, it

19  is impossible that he would not have had this knowledge.

20      844.   The sources of his knowledge include reports of the greatly increased

21  number of infections at PVSP beginning in 2003; the 2005-2006 intervention of

22  various third parties during the CSH construction; the January, 2007 California

23  Department of Health Services memorandum, widely circulated, which recommended

24  exclusion of high-risk groups, such as African-Americans, American Indians, and

25  Asians as well as immune-compromised/immune-suppressed individuals and also

26  recommended ground cover throughout the prison property; a January, 2007

27  memorandum written by himself, which considered whether to relocate the high risk

28  groups mentioned in the CDHS' memorandum and implement the CDHS

recommendation for ground cover; the 2008-2009 Fresno County Grand Jury report which discussed the Valley Fever problem, referenced "high risk inmates" and which directed prison officials at the time to respond to a recommendation to look for ways to "minimize the threat of Valley Fever" but did not mandate anything; the June 2007 "Recommendations for Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas of California," which suggested the diversion and relocation of high risk inmates and contained a myriad of environmental suggestions to minimize further harm; the November 11, 2007 policy memorandum authored by Susan Hubbard, which discussed the various CDHS recommendations and was directed to all wardens at the time; the October 2012 CCHCS report which assembled various reports and studies to comprehensively publicize the extent of the Valley Fever problems, a problem he knew about since at least 2005; the June, 2013 detailed federal court order specifically directed at PVSP and ASP; and numerous other lawsuits, media reports and other public outlets from 2005 forward in which inmates of every color and creed filed suit, and protested in the media, their contraction of the disease at PVSP, the prison with the singularly highest incidence of the disease in California.

845.   Despite the multiple sources of information that he received, Warden Yates, as head of PVSP, not only acquiesced to the state's narrow 2007 exclusion policy, which left thousands of inmates exposed to the disease, he refused to exercise his independent authority as warden to transfer inmates for their safety.  Based on his independent power to transfer inmates out of ASP, or prevent their transfer to ASP, based on their safety needs pursuant to Title 15, sections 3379(a)(4), 3379(a)(9), 3379(a)(9)(F)(2) and 3379(a)(9)(G)(1) and to adopt policies and procedures to avoid threats to inmate safety, and given Warden Yates' failure to implement such policies, he failed to protect inmates from the continuing risk of contraction of Valley Fever.

846.   Warden Yates personally participated in continuing decisions not to exclude high risk and other inmates from the greatly elevated risk at the prison.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

847.   Warden Yates also personally participated in the continuing decisions not to install ground cover or implement other remedial measures that would have protected all inmates.

848.   Warden Yates personally participated in the failure to protect inmates from increased risk of Valley Fever, was deliberately indifferent to inmates' risk of contracting Valley Fever, and is personally responsible for the injuries sustained by inmates who contracted Valley Fever at PVSP, including plaintiffs, during his tenure.

849.   Yates is named as a defendant with respect to all Plaintiffs that contracted Valley Fever at PVSP from 2007 to the present, as his policies and practices continue to affect inmates transferred to PVSP even after his departure in or about 2012.

**B.    Defendants Failed to Disclose Known Risks**

850.   Each Defendant responsible for CDCR-wide or facility-level inmate operations had the ability to disclose to Plaintiffs essential facts regarding the risks from Valley Fever, the increased risk that each Plaintiff faced, and the fact that those increased risks, and Plaintiffs' resulting injuries, were caused by Defendants' actions, but instead purposely failed to disclose those facts.

851.   Specifically, Defendants failed to disclose to Plaintiffs the risk factors for the disease, the likelihood of exposure, the common symptoms and progress of the disease, the seriousness of the injuries it causes, the dangerous local conditions that increased Plaintiffs' likelihood of contracting the disease, and the fact that Defendants themselves were responsible for the increased risk that Plaintiffs faced.

852.   Defendants Brazelton, Yates, Igbinosa and Frauenheim had a duty and could have disclosed those facts but instead failed to disclose them to each Plaintiff who contracted the disease at PVSP during those Defendants' respective tenures or thereafter.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

853.   Defendant Hartley and Wofford similarly had a duty and could have disclosed those facts but instead failed to disclose them to Plaintiffs who contracted the disease at ASP during their tenure.

854.   Defendants Beard, Cate, Hubbard, Kelso, Schwartz, Schwarzenegger, and Winslow had a duty and could have disclosed those facts but instead failed to disclose them or to set policy or take action to require that disclosure, to all plaintiffs within CDCR at all times during these Defendants' tenure and thereafter.

855.   Defendants failed to disclose these facts, even in purported "educational" materials that they belatedly provided to some inmates at some of the prison locations, which intentionally minimized the disclosures to each inmate.

856.   Because these Defendants affirmatively failed to disclose these facts from Plaintiffs, Plaintiffs were not fully aware of the increased risks they faced at their locations of confinement, or, as applicable, that they were particularly susceptible to those risks, or that Defendants' wrongful conduct had caused them to be exposed to those increased risks.

857.   Plaintiffs relied on Defendants to provide such information and to adequately educate Plaintiffs about those risks and the nature of Plaintiffs' injuries, and Defendants intended that Plaintiffs should so rely.

858.   Plaintiffs, for whom any appreciable interval elapsed between the onset of symptoms potentially attributable to Valley Fever and the date that these Plaintiffs initiated administrative or legal action with respect to Valley Fever, did not bring such actions sooner because of those Defendants' deliberate failure to disclose all the essential facts necessary for Plaintiffs to understand their injuries and attribute their injuries to Defendants' conduct.  Such failure to disclose the risks was unconscionable.

# VII.
## EACH PLAINTIFF SEEKS RELIEF ONLY AGAINST CERTAIN DEFENDANTS IDENTIFIED BELOW AND ONLY AS TO CERTAIN CLAIMS

859.   On information and belief, and throughout their tenure in their offices described above in paragraphs 19-38, Defendants Cate, Hysen, Hubbard, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, and Winslow all knew of the increased risk of Valley Fever in the hyperendemic prisons, particularly at PVSP and ASP, knew that recommended measures could reduce that risk, and had the ability, means and authority to implement measures, including policy measures, throughout their tenure to ameliorate the problem.  None did so. As such, these Defendants are sued by all Plaintiffs for creating or contributing to the policies and practices that created the Valley Fever problem, or failing to implement a solution after the initial epidemic, with respect to California prisoners.

860.   On information and belief, and throughout their tenure in their offices described above in paragraphs 19-38, Defendants Igbinosa, Yates, Brazelton and Frauenheim also knew of the increased risk of Valley Fever at Pleasant Valley State Prison, knew that recommended measures could reduce that risk, and had the ability, means and authority to implement such measures throughout their tenure.  None did so. As such, these Defendants are sued by all Plaintiffs who contracted VF at PVSP for knowingly disregarding serious health risks to them.  If a given plaintiff contracted VF before 2012, he names only Messrs. Igbinosa and Yates; if he contracted in 2012-2013, he adds Mr. Brazelton; if in 2013 or 2014, he also includes Mr. Frauenheim.

861.   On information and belief, and throughout their tenure in office described above in paragraphs 22 and 34, Defendants former warden James Hartley and current warden Carl Wofford also knew of the increased risk of Valley Fever at Avenal State Prison, knew that recommended measures could reduce that risk, and had the ability, means and authority to implement such measures throughout his tenure.  They did not do so.  As such, Mr. Hartley is sued by all plaintiffs who contracted VF at

Avenal from 2005-present and Mr. Wofford by all those from 2013-2014, for knowingly disregarding a serious health risk to them.

862.    On information and belief, and throughout his tenure in his office described above in paragraph 20 beginning in 2013, Defendant and CDCR Secretary Jeffrey Beard knew of the increased risk of Valley Fever in the hyperendemic prisons, particularly at PVSP and ASP, knew that recommended measures could reduce that risk, and had the ability, means and authority to implement these measures throughout his tenure.  He did not do so, except to a certain extent by acquiescence to a federal court order.  As such, Secretary Beard is named as a defendant by Plaintiffs who contracted Valley Fever in 2013 and thereafer, for failing to protect all inmates from serious health risks.

863.    Accordingly, the following Plaintiffs are asserting claims against only the following Defendants and assert only the corresponding state law negligence claim ("state claim") or federal civil rights claim ("federal claim") or both, as set forth below in the remaining paragraphs of this particular section.

864.    Eric Bates brings a federal claim.

865.    Infected at ASP in 2011, Plaintiff Bates brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, and Winslow.

866.    Paul Blevins brings a state claim.

867.    Infected at ASP in 2014, Mr. Blevins brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Wofford, and Beard.

868.    Michael Blue brings a federal claim.

869.    Infected at PVSP in 2012, Plaintiff Blue brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

870.    Darrell Bradford brings a federal claim.

871.   Infected at PVSP in 2011, Mr. Bradford brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

872.   Johnny Briones brings a state and federal claim.

873.   Because he was infected at PVSP in 2014, Mr. Briones bring claims against Defendants Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Yates and Beard.

874.   James Carr brings a federal claim.

875.   Infected at PVSP in 2012, Plaintiff Carr brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

876.   Ricky Carter brings a state and federal claim.

877.   Infected at PVSP in 2013, Plaintiff Carter brings claims against Defendants Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Yates and Beard.

878.   Keith Dean brings a federal claim.

879.   Infected at ASP in 2011, Plaintiff Dean brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kelso, Kernan, Meyer, Schwartz, Rothchild, Schwarzenegger, and Winslow.

880.   Marco Del Aguila brings a state and federal claim.

881.   Because he became infected at PVSP in 2014, Del Aguila brings claims against Defendants Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Schwartz, Rothchild, Schwarzenegger, Winslow, Yates and Beard.

882.   Vickter Estrada brings a state and federal claim.

883.   Because he became infected at PVSP in 2014, Estrada brings claims against Defendants Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Yates and Beard.

884.   John Everhart brings a federal claim.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

885.   Infected at PVSP in 2011, Mr. Everhart brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

886.   Antonio Franco brings a federal claim.

887.   Infected at PVSP in 2012, Mr. Antonio Franco brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

888.   Emmanuel Franco brings a federal claim.

889.   Infected at ASP in 2011, Mr. Emmanuel Franco brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, and Winslow.

890.   Michael Frederikson brings a federal claim.

891.   Infected at PVSP in 2012, Mr. Frederiksen brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

892.   James Garrett brings a federal claim.

893.   Because he became infected in 2011 while at PVSP, Garrett brings a claim against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothschild, Schwartz, Schwarzenegger, Winslow, and Yates.

894.   Kevin Hardin brings a state and federal claim.

895.   Infected at ASP in 2013, Mr. Hardin brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Wofford and Beard.

896.   Clifford Hayter brings a state and federal claim

897.   Infected at PVSP in 2013, Mr. Hayter brings claims against Defendants Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Yates and Beard.

898.   Mr. Sokha Hinn brings a state claim.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

899.   Infected at PVSP in 2013, Mr. Hinn brings claims against Defendants Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Yates and Beard.

900.   Hockley brings a federal claim.

901.   Infected at PVSP in 2011, Mr. Hockley brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

902.   Darnell Hughes brings a federal claim.

903.   Infected at PVSP in 2011, Mr. Hughes brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

904.   Jose Islas brings a federal claim.

905.   Infected at PVSP in 2011, Mr. Islas brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

906.   Jesse Johnson brings a federal claim.

907.   Infected at ASP in 2011, Mr. Johnson brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, and Winslow.

908.   Mandaz Johnson brings a state claim.

909.   Infected at PVSP in 2013, Mr. Johnson brings claims against Defendants Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Yates and Beard.

910.   Daniel Jones brings a federal claim.

911.   Infected at PVSP in 2012, Mr. Jones brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

912.   Mikhiel Leinweber brings a federal claim.

913.   Infected at PVSP in 2011, Mr. Leinweber brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

914.   Jesse Lewelling brings a federal claim.

915.   Because he became infected at PVSP in 2011, Lewelling brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

916.   Cleofas Lewis brings a federal claim in this action.

917.   Because he became infected at PVSP in 2012, Cleofas Lewis brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

918.   Kevin Lewis brings a state and federal claim.

919.   Infected at PVSP in 2014, Kevin Lewis brings claims against Defendants Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Yates and Beard.

920.   Michael Manning brings a federal claim in this action.

921.   Because he became infected at PVSP in 2012, Manning brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

922.   James McGinley brings a federal claim.

923.   Because he became infected at ASP in 2011, McGinley brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, and Winslow.

924.   Because he became infected at PVSP in 2012, Manning brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

925.   William Milton brings a federal claim.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1    926.    Infected at PVSP in 2011, Mr. Milton brings claims against Defendants

2    Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild,

3    Schwarzenegger, Winslow, and Yates.

4    927.    Mack Page brings a federal claim.

5    928.    Infected at PVSP in 2013, Mr. Page brings claims against Defendants

6    Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer,

7    Schwartz, Rothchild, Schwarzenegger, Winslow, Yates and Beard.

8    929.    Cedric Parker brings a federal claim.

9    930.    Infected at PVSP in 2011, Cedric Parker brings claims against

10   Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso,

11   Rothchild, Schwarzenegger, Winslow, and Yates.

12   931.    Theodore Parker brings a federal claim.

13   932.    Infected at PVSP in 2012, Theodore Parker brings claims against

14   Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer,

15   Schwartz, Rothchild, Schwarzenegger, Winslow, and Yates.

16   933.    Manuel Quiroga brings a state and federal claim.

17   934.    Infected at PVSP in 2013, Mr. Quiroga brings claims against Defendants

18   Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz,

19   Kelso, Rothchild, Schwarzenegger, Winslow, Yates, and Beard.

20   935.    Charles Robertson brings a state and federal claim.

21   936.    Infected at PVSP in 2013, Mr. Charles Robertson brings claims against

22   Defendants Brazelton, Cate, Frauenheim, Hysen, Hubbard, Igbinosa, Kernan, Meyer,

23   Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, Yates and Beard.

24   937.    Richard Robertson brings a federal claim.

25   938.    Infected at PVSP in 2010, Mr. Richard Robertson brings claims against

26   Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso,

27   Rothchild, Schwarzenegger, Winslow, and Yates.

28   939.    Johnny Sanchez brings a federal claim.

940.   Infected at PVSP in 2012, Sanchez brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

941.   Tyrone Sanders brings a federal claim.

942.   Infected at PVSP in 2012, Sanders brings claims against Defendants Brazelton, Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

943.   Julio Taramona brings a federal claim.

944.   Infected at PVSP in 2011, Mr. Taramona brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

945.   Danny Terry brings a federal claim.

946.   Infected at PVSP in 2011, Mr. Terry brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kernan, Meyer, Schwartz, Kelso, Rothchild, Schwarzenegger, Winslow, and Yates.

947.   Patrick Wallace brings a federal claim.

948.   Because he became infected at ASP in 2011, Wallace brings claims against Defendants Cate, Hartley, Hysen, Hubbard, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, and Winslow.

949.   Finley Wimbley brings a state claim.

950.   Because he became infected at PVSP in 2013, Wimbley brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, Beard and Yates.

951.   Alonzo Williams brings a federal claim.

952.   Because he became infected at PVSP in 2011, Williams brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

953.   Gerald Young brings a federal claim.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

954.   Because he became infected at PVSP in 2011, Young brings claims against Defendants Cate, Hysen, Hubbard, Igbinosa, Kelso, Kernan, Meyer, Rothchild, Schwartz, Schwarzenegger, Winslow, and Yates.

## VIII.

## FIRST CLAIM FOR RELIEF – VIOLATION OF THE EIGHTH AMENDMENT (42 U.S.C. § 1983)

### A.    Defendants Knew of Serious Health Risks to Plaintiffs and Decided Not to Act and Protect Plaintiffs

955.   Plaintiffs incorporate the allegations of paragraphs 1-954, as if these allegations were fully set forth herein.

956.   This claim is brought by all Plaintiffs that identified, within the section entitled "Each Plaintiff Seeks Relief Only Against Certain Defendants Identified Below And Only As To Certain Claims," that they are asserting a federal claim.

957.   Each respective Plaintiff asserting a federal claim seeks relief only against those Defendants that each respective Plaintiff identified in the section entitled "Each Plaintiff Seeks Relief Only Against Certain Defendants Identified Below And Only As To Certain Claims."

958.   Each plaintiff is a human being.

959.   Each plaintiff had a federally-protected Eighth Amendment right to be free from cruel and unusual punishment, a right secured by the United States Constitution under 42 U.S.C. § 1983.

960.   Defendants acted under color of state law in that Defendants are state employees, operate the state prisons, and carry out the policies and practices described herein under the authority of California statute, regulation, and policy, to control Plaintiffs' lives, prison housing location and prison housing conditions.

961.   The Eighth Amendment prohibits inhumane methods of punishment and inhumane conditions of confinement.

962.    When the State takes a person into its custody and holds him against his will, the Constitution imposes upon it a corresponding duty to assume a responsibility for his safety and general well-being.  When the State fails to provide for the needs of a confined individual, including appropriate medical attention and reasonable safety, it transgresses the substantive limits on state action set by the Eighth Amendment.

963.    An Eighth Amendment violation is stated when officials can be shown to have known of and disregarded a substantial risk of serious harm to prisoners.

964.    It is cruel and unusual punishment under the Eighth Amendment to expose inmates to adverse environmental toxins that cause serious harm.

965.    Each Defendant was aware that inmates housed at the hyper-endemic prisons faced an increased risk of serious harm from infection by the coccidioides spores known to be present at elevated levels there, and knew that the risk at specific prisons and for specific groups was even greater.  Each of the Defendants had the authority, the ability and the means to reduce the risk of infection but each was deliberately indifferent to those risks and failed to take action to prevent or reduce the risk, causing Plaintiffs' constitutional injuries.

966.    Further, each Defendant's actions and failure to act as alleged herein – which occurred throughout their tenure set forth in the section entitled "The Defendant Parties" – proximately and substantially caused significantly increased risk to each Plaintiff who later became infected.  Each Defendant's failure to implement protective remedial measures throughout their tenure set forth in the section entitled "The Defendant Parties," as well as at any time after their tenure and prior to the dates each Plaintiff herein became infected, allowed the dangerous conditions at the prison to continue unabated and proximately and substantially caused those Plaintiffs to be exposed to a significantly greater risk of exposure at all times subsequent.  Had each Defendant acted during their tenure set forth in the section entitled "The Defendant Parties" but prior to the date of injury, then Plaintiffs' risks of contracting Valley Fever would have been significantly reduced.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

967.   Similarly, the failure by each Defendant with policy-making responsibility to establish and implement a policy during their tenure (set forth in the section entitled "The Defendant Parties") that would have excluded at-risk inmates or higher-risk inmates from the hyper-endemic prisons at any time before a Plaintiff became infected, thereby proximately and substantially caused that Plaintiff to be present at a hyper-endemic prison and to be exposed to an increased risk of infection leading to their injury.

968.   Defendants knew there was a serious, epidemic level of risk of harm to Plaintiffs and all prisoners that faced incarceration in hyper-endemic prisons.

969.   Defendants had actual knowledge of the serious risk of harm to the Plaintiffs but nevertheless ignored the risks and exposed and continued to expose Plaintiffs to an unacceptably high risk of contracting Coccidioidomycosis by failing to adopt an exclusion policy that protected these high risk inmates.

970.   Defendants' failure to adopt an appropriate exclusion policy, and each Defendants' actions and omissions in connection with the incarceration of inmates, including Plaintiffs, at hyper-endemic prisons, and each Defendants' failure to take the required remedial actions to make those prisons safer for all inmates, including in particular PVSP and ASP, caused Plaintiffs' injuries.

971.   Defendants' knowing, reckless, unlawful policies created and maintained an unacceptably high risk to prisoners.  Defendants are liable for these unconstitutional policies and practices and negligent decisions because they personally participated in the promulgation, adoption, passage, continuation, or supervision of them.

972.   Through the policies and practices they adopted, promulgated, followed, and executed, Defendants knew or recklessly ignored the fact that they would cause the unconstitutional deprivation of Plaintiffs' rights.

973.   Specifically, under these policies and practices, subordinate officials did not transfer inmates away from the most dangerous prisons, did not identify inmates at high risk in the classification process, and consequently, continued sending inmates

including Plaintiffs to endemic and hyper-endemic prisons without regard to susceptibility or risk, either of the person or the prison.

974. Furthermore, Defendants failed to authorize and implement measures to reduce the risk at these prisons by providing ground cover, implementing soil stabilization, installing protective ventilation systems and other measures, or even warning inmates about the danger they faced.

975. Defendants as supervisors knew with substantial certainty that these failures would cause inmates including Plaintiffs to contract Valley Fever, and that their failure to properly train and supervise subordinate prison authorities would cause the deprivation of Plaintiffs' right to safety under the Eighth Amendment.

976. Defendants, as supervisors, did nothing to prevent subordinate prison authorities from causing Plaintiffs' greatly increased risk of contracting Valley Fever.

977. Defendants have engaged in a pattern and practice of conduct since at least 2006 which they knew would place and keep California prison inmates including Plaintiffs incarcerated at locations of unreasonable risk of personal injury.

978. Despite numerous, repeated and explicit warnings about the serious danger of Valley Fever to inmates at the hyper-endemic prisons, and most especially to those identified as high-risk persons with enhanced susceptibility for disseminated cocci disease, Defendants failed to take the reasonable, obvious steps needed to protect those involuntarily in their charge.

979. Defendants continued their practice and policy to transfer and house inmates in the hyper-endemic prisons, including those individuals known by them to be at heightened risk for contracting disseminated cocci disease, and as a result, caused Plaintiffs to contract a disease that is incurable, inflicts long-term suffering, and will likely play a part in the inmates' early death.

980. Defendants knowingly and recklessly promulgated or continued a policy or practice of transferring inmates to unreasonably dangerous prisons without regard to their health.

981.   Defendants knowingly and recklessly promulgated or continued a practice and policy that failed to take any steps to protect those inmates transferred to hyper-endemic prisons.

982.   Defendants knowingly and recklessly promulgated or continued a practice and policy of failing to employ mitigation measures at the dangerous prisons, such as paving, landscaping or planting grass to minimize the spread of the spores, or implementing appropriate measures with respect to ventilation systems to prevent spores from entering the interior of the facilities.

983.   Defendants knowingly and recklessly promulgated or continued the practice and policy of failing to warn inmates about the dangers of prisons to which they were involuntarily and forcibly transferred.

984.   These actions, including knowing transfer to dangerous prisons, failure to warn inmates about the dangers within those prisons, and the failure to take any action to protect inmates from the dangers within those prisons, particularly Pleasant Valley State Prison, were taken by the Defendants pursuant to the State's practice and policy, which they personally participated in adopting, promulgating, executing or continuing.

985.   Those practices and policies, as well as the subsequent ministerial actions and inactions described herein, actually and proximately and substantially caused Plaintiffs' harm.

986.   Defendants had the power and the obligation to make policies, and implement practices, that would have reduced the risk of infection by Valley Fever.

987.   Defendants acted with a conscious disregard for human life in deciding to transfer prisoners to hyper-endemic areas and defied the many recommendations, input, advice, reports, expert suggestions, in-house studies, outside reports, generally-available academic material, as well as other credible and authoritative information sources that warned them of the dire risks and consequences they imposed on Plaintiffs by their inaction with respect to the spread of cocci.

988.    Each Plaintiff asserting a federal civil rights claim under section 1983 knew or should have known, only within 4 years of filing his original complaint, that the harm he suffered was caused by wrongful conduct.

### B.    Defendants' Conduct Justifies an Award of Punitive Damages

989.    Defendants have engaged in a pattern and practice since at least 2006 that has placed and kept Plaintiffs in situations of unreasonable risk of substantial personal harm.

990.    Despite numerous, repeated and explicit warnings about the danger of Valley Fever at the hyper-endemic prisons, and especially the danger to those individuals identified as higher-risk for the disseminated disease, Defendants failed to take any of the reasonable and obvious steps needed to protect those in their charge.

991.    Defendants took no action to mitigate Plaintiffs' exposure to Valley Fever at their prisons until 2011 when, after multiple court orders, they finally took the minimal and incomplete action of applying a two-year sealant to the soil at PVSP.[47]

992.    Not until March 2013 did Defendants test and later install minimal dust control devices – only air filters and door sweeps – in some of the prison facilities.[48]

993.    After similar delays, Defendants only posted incomplete warning signs about the symptoms of Valley Fever and provided limited educational materials and training to prison medical staff.[49]

994.    Notably absent from the posted signs and the Defendants' educational materials were the critical facts that Valley Fever is incurable and can be fatal, that certain individuals such as African-Americans, Hispanics, Filipinos and other Asians or those with immune-compromising conditions are at a much higher risk of becoming

---

[47] *See* Deborah Hysen Declaration, May 6, 2013, ¶ 3**.**

[48] *See* Hysen Declaration ¶¶ 4-5.

[49] *See*, e.g., Declaration of Michael Stainer, May 6, 2013 [Exhibits C, D and E].

seriously ill and dying from Valley Fever, and that inmates should avoid exposure to soil, dust, and windy conditions.[50]

995.   Defendants knew that Valley Fever has no cure and requires a lifetime of medical management.  They knew that inmates had died from Valley Fever that they contracted while in custody, and that certain identifiable groups of people suffer the severe form of the disease at much higher rates.[51]  Yet Defendants took no action other than posting misleadingly incomplete signs and distributing similar leaflets, which downplayed or omitted the crucial information about risk groups -- and more importantly, did nothing to address the causes or the results of exposure to the disease.

996.   As Dr. Galgiani stated, "In my opinion, the incidence of Valley Fever in [PVSP and ASP] is unacceptably high from a public health standpoint, and avoidable inmate deaths are occurring as a result."[52]

997.   Defendants admitted in pleadings in *Plata* that they took no steps to mitigate the threat of harm posed to prisoners in the hyper-endemic prisons, apart from inadequate educational materials and a policy that protected immune-compromised inmates but ignored the risk to the high-risk racial and ethnic groups, between the years 2006 and 2011, and beyond.[53]  Defendants took no action to protect Plaintiffs even though were aware "that Valley Fever presents a serious risk to inmate health."[54]

---

[50] See, e.g., Stainer Declaration, Exhibits C, D and E.

[51] Kanan Memo, p. 3 ["The risk and incidence of disseminated disease are highest in American Indians, Asians, Blacks, and immunocompromised individuals, including those taking chronic steroids."]; *see also*, CDCR October 27, 2006 Memo; Smith, Pappagianis, et al, *Human Coccidioidomycosis*, Bacteriology Reviews (September, 1961), 25(3), at p. 314, and fns. 5, 27.

[52] Galgiani Declaration, April 25, 2013 [Docket 2598], ¶ 2.

[53] *See* Defendants' Opposition brief in *Plata*, May 6, 2013, Docket 2618, pp. 3-4.

[54] *Id*., at pp. 13.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

998.   Defendants declined to implement any kind of ground cover or other soil stabilization, as recommended by the California Department of Health, on the purported basis it was "too costly" even though ground cover "was demonstrated to be effective at reducing airborne spores by military operations during World War II."[55] Instead they waited until compelled by court order in 2011, and even then, deployed a minimal soil sealant with an estimated two-year life span.[56]

999.   In April 2012, the Receiver completed a study with several grim findings.  Because of Defendants' years-long pattern and practice of ignoring the known heightened risk of disease to certain groups of inmates, at least 355 prisoners required hospitalization due to Valley Fever infection from 2008-2010, and 27 prisoners lost their lives to the disease between 2006 and 2010.[57]

1000. Dr. Gil Chavez, California's State Epidemiologist and the Deputy Director of Infectious Diseases within California's Department of Public Health, stated, "[a] factor that probably contributed to the high rates in [PVSP and ASP] is housing populations of inmates at risk for severe cocci disease, such as African-Americans and persons with diabetes and other chronic diseases."[58]

---

[55] *Plata* order, June 24, 2013, Docket 2661, p. 5:18-23; *see also* Starr, "*Recommendations for Coccidioidomycosis Mitigation in Prisons in Hyperendemic Areas of California,*" CDCR Memorandum June, 2007 [internal page 1, recommendation 1].

[56] *See* Deborah Hysen Declaration, ¶ 3.

[57] *See* "*Coccidioidomycosis in California Department of Corrections and Rehabilitation Institutions,*" CCHCS Report, October 10, 2012, p. 2.

[58] April 4, 2013 letter from Dr. Chavez to Acting CDCR Secretary for Operations Martin Hoshino, p. 1, ¶ 2.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1001. The rate of deaths due to cocci among African-American inmates was eight times the death rate among African-Americans in California generally, and twice the death rate due to cocci among non-African-American inmates in California.[59]

1002. The court-appointed Receiver managing the California State prison system's health care program issued his "*Recommendations for Immediate Response to Coccidioidomycosis in CDCR Prisons*" in November 2012.[60]   Included among the Receiver's recommendations, formed in consultation with court-appointed medical experts, was the direction to cease transferring African-Americans, persons with diabetes and those with no HIV test results to PVSP and ASP.[61]

1003. On April 11, 2013, the Receiver's public health staff presented him with an analysis and report concerning the Valley Fever epidemic in the PVSP and ASP facilities.[62]  This report found that African-Americans were at 90% higher risk for disseminated cocci disease than their fellow white inmates, and "other race" categories (e.g., perhaps Asian, Native-American) were at 100% increased risk; inmates over 55 years old bore an increased risk of at least 60%.  *Ibid*.

1004. With such analyses in hand, the Receiver still had to issue yet another directive to the defiant CDCR on April 29, 2013, amended on May 1, 2013, as the Defendants continued to refuse to exclude from the hyper-endemic prisons those

---

[59] Id., pp. 5-6 ["For the year 2006-2007, African-American inmates were eight times more likely … to die of coccidioidomycosis than African-American men in the California population"].

[60] *Plata* order, June 24, 2013, p. 9 [Docket 2661].

[61] *Id*.

[62] Kelso, "Notice Of Filing Of Report And Response Of Receiver Regarding Plaintiffs' Motion Re Valley Fever," *Plata v. Brown*, Eastern District California No. 01-1351 [May 1, 2013, Docket 2601].

1    inmates with clearly-identified high-risk attributes, including African-Americans and

2    those potentially at risk due to medical conditions or lack of medical data.[63]

3        1005. In their May 23, 2013 report, the medical experts appointed by the

4    District Court in the *Plata* case found that 36 inmate deaths were caused by Valley

5    Fever between 2006 and 2011. Of those deaths, 70% were African-American and 76%

6    had a concurrent immune-compromised condition such as HIV or diabetes.[64]

7        1006. Those same medical experts underscored the importance of excluding

8    from PVSP and ASP "all populations that meet the American Thoracic Society criteria

9    for increased risk of severe cocci disease (e.g., African-Americans, Filipinos) … [as

10   well as] individuals whose HIV status is unknown[.]"[65] They also concluded that, "if

11   measures taken do not reduce cocci rates to near local community rates, [CDCR]

12   should close PVSP and ASP."

13       1007. Despite the Receiver's specific instructions and the court-appointed

14   medical experts' opinions, and evidencing the continuing deliberate indifference by

15   Defendants, there was a continued "refus[al] to exclude the other inmates covered by

16   the Receiver's policy – most notably, diabetics and African-American and Filipino

17   inmates[.]"[66]

18       1008. Defendants continued to defy the Receiver's explicit instructions,

19   complaining that the policy was "vague" and "premature."[67]

20   [63] *See* Kelso Report, pp. 9-11.

21

22   [64] *See* Plata v. Brown, ED 01-1351 [Judge Henderson Order, citing Court Medical

23   Expert Report, "Cocci. in California State Prisons," p. 5 [Docket 2661, "Henderson
     Order"].

24   [65] Henderson Order, p. 12 [Docket 2661].

25

26   [66] Henderson Order, citing Court Medical Expert Report, "Cocci. in California State
     Prisons," p. 11.

27

28   [67] Declaration of Diana Toche, May 6, 2013, ¶¶ 11-14 [Docket 2615]; Declaration of
     Warren George, pp. 5-6 [email thread with relevant commentary by Deputy Attorney

1009. According to Dr. Galgiani, "[t]he incidence of Valley Fever at these two prisons is at a level indicating a public health emergency.… and prison officials should be, but apparently are not, acting in a manner consistent with a situation where the lives of individuals are at substantial risk."[68]

1010. Galgiani concluded that, as a result of the California prison system's inadequate handling of the Valley Fever epidemic among inmates, "needless suffering and death were inflicted on these men."[69]

1011. In spite of repeated warnings, expert opinions including those of their own staff, and Federal court orders, Defendants continued to send high-risk prisoners to the hyper-endemic facilities and declined to implement at those facilities any of the recommended remedial measures to protect inmates.[70]

1012. In fact, Defendants not only failed to implement remedial measures to reduce Plaintiffs' risk of infection, they persisted in practices that increased that risk.

1013. Although Defendants knew that construction activities that disturbed the soil would mobilize cocci spores and increase the risk to those exposed, they continued to carry out such construction at the hyper-endemic prisons without taking commonly-known precautions to minimize infection.

---

General Benjamin Rice dated May 3, 2013]; May 8, 2013 letter from Dr. Diana Toche to J. Clark Kelso.

[68] Galgiani Declaration, ¶ 15.

[69] Galgiani Declaration, ¶ 19.

[70] See, e.g., Dovey "*Inmate Patients at High Risk*," [CDCR Memo August 3, 2006]; Hubbard & Winslow, "*Exclusion of Inmate-Patients* [CDCR Memo November 20, 2007]; *Plata* order, p. 5, June 24, 2013, Docket ["Notably, although CDPH observed the increased risk for African-Americans and Filipinos, PVSP did not transfer these inmates out."]

1014. Inmates and outside experts observed continuing construction, at PVSP and ASP at a minimum, taking place without any precautions to prevent inmates' exposure to cocci.  Inmates including Bruce Koklich and observers from the Centers for Disease Control noted excavation and construction taking place in the D yard at PVSP, and other construction projects at PVSP and ASP including excavation, disking of bare soil, dust-producing grounds maintenance and other construction activities without any dust control or precautions to reduce soil disturbance or cocci mobilization, let alone all the remedial measures recommended years before.

1015. These ongoing construction activities at hyper-endemic prisons all exacerbated the risk of inmates' exposure to cocci spores and the increased risk of contracting Valley Fever.

1016. The *Plata* Court found that: "The experts [all] agree that the factors for increased risk of severe cocci are well-known and undisputed, and that screening out high-risk inmates is an appropriate response.  …  Defendants are unwilling to exclude [certain] inmates whom they know are at an increased risk of severe disease, which may lead to death.  Defendants have therefore clearly demonstrated their unwillingness to respond adequately to the health care needs of California's inmate population[.]   In the absence of a court-ordered exclusionary policy, inmates will continue to suffer unnecessary and unreasonable harm, thus presenting the most recent example of how Defendants lack 'the will, capacity, and leadership to maintain a system of providing constitutionally adequate medical health care services . . . ."[71]

1017. The *Plata* Court noted that "the recommendation to exclude inmates at higher risk of severe cocci was first specifically made to Defendants over six *years* ago."[72]   Remedial measures at the prisons and efforts to control soil disturbance and

---

[71] *Plata* order, p. 24 [Northern District Judge Thelton Henderson, filed June 24, 2013, Docket 2661].

[72] *Plata* order, p. 20 [emphasis added].

cocci mobilization were similarly recommended many years previously, but still not observed by these Defendants.

1018. Defendants' deliberate failure to take any action to protect Plaintiffs, who were known to be at elevated risk of contracting the severe, disseminated form of Valley Fever, in the face of a duty to act, constituted a reckless indifference to Plaintiffs' 8th Amendment rights.

1019. For all the reasons stated herein, Defendants' indifference to Plaintiffs' suffering has been willful and with conscious disregard of the rights or safety of others.

**C.    Defendants Do Not Have Qualified Immunity**

1020. Defendants were subjectively aware of a serious risk of harm from coccidioidomycosis, but deliberately elected to expose Plaintiffs to that risk even though the risk could have been avoided.

1021. Defendants deliberately violated the Eighth Amendment's prohibition against cruel and unusual punishment, and are accordingly denied the protection of qualified immunity.

1022. For qualified immunity purposes, exposure to adverse environmental toxins is a well-established risk under the state's obligation to keep inmates safe.

1023. Defendants may not claim they were just following orders, as they were in positions of responsibility such that they could give orders affecting large numbers of inmates, including Plaintiffs, or set policies across specific prisons or the entire prison population.

1024. Defendants knew that they were exposing Plaintiffs to a life-threatening, permanent ailment and that ready alternatives and protective measures were available. Defendants ignored these risks and took no action.  Therefore, Defendants are not entitled to qualified or any other immunity.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

## IX.
## <u>SECOND CLAIM FOR RELIEF –</u>
## <u>STATE LAW NEGLIGENCE CLAIM</u>

1025. Plaintiffs incorporate the allegations of paragraphs 1-954 and 989-1019, as if these allegations were fully set forth herein.

1026. This claim is brought by all Plaintiffs that identified, within the section entitled "Each Plaintiff Seeks Relief Only Against Certain Defendants Identified Below And Only As To Certain Claims," that that they are asserting a state claim.

1027. Each respective Plaintiff asserting a state claim seeks relief only against those Defendants that each respective Plaintiff identified in the section entitled "Each Plaintiff Seeks Relief Only Against Certain Defendants Identified Below And Only As To Certain Claims."

1028. All times pertinent to this action, Defendants had both a regulatory and a common law duty to exercise reasonable care to keep the inmates and the prison environments reasonably safe, and to address known dangerous conditions at those prisons that created unreasonable risk of harm.

1029. Defendants also had a special relationship with Plaintiffs, as their jailors, that required Defendants to protect Plaintiff from known and foreseeable harms.

1030. Defendants were aware or should have been aware that, without adequate protective measures addressing the known highly-elevated presence of *Coccidioides immitis* spores at the hyper-endemic prisons, Plaintiffs would be subject to greatly increased exposure to the fungal spores and would therefore be at greatly increased risk of contracting Valley Fever.

1031. Defendants negligently failed to take even the rudimentary steps described herein, that were identified and recommended by their own experts, to make the prison safer for Plaintiffs.

1032.  In failing to implement those protective measures, those Defendants who had non-discretionary responsibilities for inmate and facility safety were negligent in their ministerial decisions, acts and omissions, causing Plaintiffs' injuries.

1033.  In addition, these Defendants who had supervisory responsibilities with respect to inmate and facility safety were negligent in failing to adequately supervise their subordinates committing such negligent ministerial decisions, acts and omissions.

1034. Defendants' negligence in failing to make the hyperendemic prisons safe, in the face of known dangerous conditions, was a substantial factor and proximate cause of each Plaintiff's contraction of Valley Fever that has resulted in substantial damage to Plaintiffs.

1035. Defendants are liable for the damages their negligence actually and proximately caused.

1036. Each Plaintiff asserting a state negligence claim knew or should have known, only within 2 years before the filing of his original complaint, that the harm he suffered was caused by wrongful conduct.

1037. Ordinarily, pursuant to Government Code section 900, et seq., a party pursuing a state cause of action must file a claim with the Victims Compensation Board and receive an adverse decision before filing suit, under certain timeframes.

1038. Plaintiffs asserting a state claim are relieved of the obligation to have filed such a claim based on information alleged herein.

1039.  The mechanics of Government Code sections 900, 905.2, 950.2 and 825 reveal that a VCB claim by a prisoner against a public employee defendant is not required, because the state is not mandatorily liable to pay such a claim; therefore as a public defendant can only enforce the presentment requirement for cases of mandatory indemnity, the presentment requirement cannot be enforced in this situation.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

# X.

## PRAYER FOR RELIEF

*Wherefore*, Plaintiffs request on the first Claim for Relief the following:

(i)     economic damages in an amount to be proven at trial to compensate plaintiffs for the ongoing cost of antifungal medical care (estimated at $10,000/year) and medical monitoring of the disease (estimated at $1,000/year), for the expected cost of periodic hospitalizations due to its flare-ups (estimated to cost about $100,000 per hospitalization)[73] to cover the cost of severe illness brought upon by dissemination of the disease (which ranges from the tens of thousands to hundreds of thousands dollars in medical care, depending on the severity of the disseminated injuries), and the resulting loss in the inmate's ability to work and earn money upon his release, which varies depending on the degree of debilitation of a given inmate;

(ii)    non-economic damages in an amount to be proven at trial for the pain, suffering and misery associated with the experience of the disease and its associated management, the loss of health and enjoyment of life attributable to management of a serious disease, the fear, depression and demoralization associated with the consequences of having a life-long disease, and the risk, and reality, of its disseminated form resulting in severe health consequences up to and including an early and painful death;

(iii)   punitive damages;

(iv)    reasonable attorney's fees pursuant to 42 U.S.C. §§ 1988 and 1997(e) at the maximum allowable rate by statute .

(v)     costs of suit including the expense of experts;

(vi)    interest; and

(vii)   such other relief as the Court deems just and proper.

---

[73] "Valley Fever Costs Mount for Patients and Taxpayers," USC Annenberg, November 2, 2014.

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

Plaintiff requests on the Second Claim for Relief, the following:

(i)     economic damages in an amount to be proven at trial to compensate plaintiff for the ongoing cost of antifungal medical care (estimated at $10,000/year) and medical monitoring of the disease (estimated at $1,000/year), for the expected cost of periodic hospitalizations due to its flare-ups (estimated by the State to cost about $100,000 per hospitalization) to cover the cost of severe illness brought upon by dissemination of the disease (which ranges from the tens of thousands to hundreds of thousands dollars in medical care, depending on the severity of the disseminated injuries), and the resulting loss in the inmate's ability to work and earn money upon his release, which varies depending on the degree of debilitation of a given inmate;

(ii)     non-economic damages in an amount to be proven at trial for the pain, suffering and misery associated with the experience of the disease and its associated management, the loss of health and enjoyment of life attributable to management of a serious disease, the fear, depression and demoralization associated with the consequences of having a life-long disease, and the risk, and reality, of its disseminated form resulting in severe health consequences up to and including an early and painful death;

(iii)    costs of suit including the expense of experts;

(iv)    interest;

(v)    punitive damages; and

1        (vi)   such other relief as the Court deems just and proper.

2

3    Date: December 29, 2014          PAVONE & FONNER

4                              /s/ Benjamin Pavone

5                             Benjamin Pavone, Esq.
                         Attorneys for Plaintiffs

6

7    Date: December 29, 2014          AFFELD GRIVAKES ZUCKER LLP

8                              /s/ Gregg Zucker

9                             Gregg Zucker, Esq.
                         Attorneys for Plaintiffs

10

11

12    Date: December 29, 2014          LAW OFFICES OF DAVID ELLIOT

13

14                              /s/ David Elliot

15                             David Elliot, Esq.
                         Attorneys for Plaintiffs

16    Date: December 29, 2014          BURNS & SCHALDENBRAND

17

18                              /s/ Edward Burns

19                             Edward Burns, Esq.
                         Attorneys for Plaintiffs

20

21    Date: December 29, 2014          LAW OFFICES OF MATTHEW B. PAVONE

22                              /s/ Matthew Pavone

23                             Matthew Pavone, Esq.
                         Attorneys for Plaintiffs

24

25

26

27

28

BURNS | ELLIOT | B. PAVONE | M. PAVONE | SPIESS | ZUCKER

# XI.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand trial by jury.

Date: December 29, 2014                    PAVONE & FONNER

                                            /s/ Benjamin Pavone
                                           Benjamin Pavone, Esq.
                                           Attorneys for Plaintiffs

Date: December 29, 2014                    AFFELD GRIVAKES ZUCKER LLP

                                           /s/ Gregg Zucker
                                           Gregg Zucker, Esq.
                                           Attorneys for Plaintiffs

Date: December 29, 2014                    LAW OFFICES OF DAVID ELLIOT

                                           /s/ David Elliot
                                           David Elliot, Esq.
                                           Attorneys for Plaintiffs

Date: December 29, 2014                    BURNS & SCHALDENBRAND

                                           /s/ Edward Burns
                                           Edward Burns, Esq.
                                           Attorneys for Plaintiffs

Date: December 29, 2014                    LAW OFFICES OF MATTHEW B. PAVONE

                                           /s/ Matthew Pavone
                                           Matthew Pavone, Esq.
                                           Attorneys for Plaintiffs